Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.1:12-cv-02941-JLK-KLM

CRAIG TELKE, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

NEW FRONTIER MEDIA, INC.,
ALAN ISAACMAN,
MELISSA HUBBARD,
HIRAM J. WOO,
WALTER TIMOSHENKO,
LFP BROADCASTING, LLC and
FLYNT BROADCAST, INC.,

    Defendants.

---

## AFFIDAVIT OF KARSTEN LAMPKA

---

Karsten Lampka, being first duly sworn, deposes and states as follows:

1.     My name is Karsten Lampka. I am over the age of twenty-one and am otherwise competent to testify. The following statements are based on my personal knowledge.

2.     I am a Managing Director of Avondale Partners, LLC ("Avondale"). On or about April 3, 2012, Avondale was retained by the Special Committee ("Special Committee") of the board of directors of New Frontier Media, Inc. ("New Frontier") to render certain financial advisory and investment banking services including, if requested and as appropriate, an opinion as investment bankers as to whether the consideration to be received by holders of the common stock of New Frontier pursuant to a proposed transaction is fair from a financial point of view.

3.     On October 14, 2012, Avondale issued its written opinion ("Fairness Opinion"), a copy of which is attached hereto, that as of the date thereof, and based upon and subject to the various qualifications, limitations, factors and assumptions set forth therein, that the consideration to be received by the holders of the common stock of New Frontier pursuant to the transaction with LFP Broadcasting LLC is fair from a financial point of view to such shareholders.

4. As described on pages 1 and 2 of the Fairness Opinion, to reach its opinion as to fairness, Avondale performed the following services, among others, in connection with its engagement:

    a. Reviewed certain publicly available financial statements of New Frontier that Avondale deemed relevant, including the consolidated financial statements for recent years and certain other relevant financial and operating data of the company made available to Avondale from published sources and by senior management of the company;

    b. Reviewed the draft merger agreement and related disclosure letter;

    c. Compared New Frontier from a financial point of view with certain other companies in the media and entertainment industry that Avondale deemed relevant.

    d. Reviewed certain publicly available equity research reports that Avondale deemed relevant regarding companies in the media and entertainment industry;

    e. Considered the financial terms, to the extent publicly available, of selected recent business combinations in the media and entertainment industry that Avondale deemed to be comparable, in whole or in part, to the transaction with LFP Broadcasting;

    f. Reviewed the financial terms, to the extent publicly available, of certain other transactions Avondale believed to be reasonably comparable to the transaction with LFP Broadcasting;

    g. Interviewed senior management of New Frontier regarding the company's operating history and its prospects;

    h. Reviewed the trading history of New Frontier's common stock;

    i. Took into account Avondale's assessment of general economic, market and financial and other conditions and its experience in other transactions, as well as its expertise in securities valuation and its knowledge of the industry in which New Frontier operates,;

    j. Reviewed certain non-public information, including internal operating data and financial analyses and forecasts prepared by senior management of New Frontier and supplied to Avondale; and

    k. Performed other such analyses and examinations as Avondale deemed appropriate.

5. Avondale's work was subject to certain qualifications and assumptions that are described in the Fairness Opinion.

6. It is my understanding that a shareholder of the New Frontier has brought this law suit and claims in support of his motion for preliminary injunction that in certain respects the

Securities and Exchange Form 14D-9 filed by the New Frontier and furnished to its shareholders fails to disclose certain information concerning the work Avondale performed in reaching its opinion as to the fairness of the transaction. *See* Motion for Preliminary Injunction and Request for Expedited Proceedings ("Plaintiff's Motion") at 12. The Form 14D-9 is referred to in Plaintiff's Motion as the "Recommendation Statement," but is referred to herein as the "Form D-9".

7. New Frontier's attorneys have requested that I respond to the accusations of Plaintiff's Motion with respect to Avondale's work and specifically the adequacy of the description of our work in the Form D-9. It is my understanding that Plaintiff's Motion claims that the Form D-9 is materially misleading because "it fails to disclose the definitions and uses of several key components of the DCF ["Discounted Cash Flow"], including disclosing to investors its definition of cash flows; its application of stock-holder based compensation expenses ("SBC") and net operating loss carry forwards ("NOLS"); and the rationale behind employing an unusually high discount rate range of 20-30%." Plaintiff's Motion at 12-13.

8. While the Form D-9 does not specifically define the method used by Avondale to determine cash flows, the method used is not misleading. As suggested by Plaintiff's Motion, Avondale used the standard measure of discounted cash flows known as "unlevered after-tax free cash flow." As this was the method used and is commonly used in calculating discounted cash flows it is not misleading to have not included the definition in the Form D-9.

9. Plaintiff's Motion also suggests that it was misleading to leave shareholders guessing as to whether unlevered or levered cash flow was used. Plaintiff's Motion at 13. These terms refer to whether interest income on invested cash and interest expense on debt are included within the term discounted cash flow. The term "levered" refers to including interest income and expense in cash flows; the term "unlevered" refers to not including the effects of interest. The preferred measure and the one used by Avondale is unlevered. This avoids reduction of cash flows by high interest on indebtedness. In New Frontier's case, however, the distinction between levered and unlevered is immaterial because New Frontier has little debt and earned only nominal amounts of interest on its cash and cash equivalents so even if interest income and expense were included it would not have materially affected net cash flows.

10. Finally, Plaintiff's Motion argues that it was misleading to leave shareholders to speculate if some atypical definition of cash flows had been used, such as "some measure of earnings" or "even dividends as a metric of cash flow." Plaintiff's Motion at 13. Earnings without adjustment do not equate to cash flow and it would not be within industry norms to refer to earnings as cash flows without some explanation. Further New Frontier does not pay dividends so it would not be reasonable to assume that the cash flows calculated by Avondale were based upon such an inapplicable basis.

11. The second consideration raised by Plaintiff's Motion is the treatment of share based compensation ("SBC"). Plaintiff's Motion at 13. Share based compensation is a non-cash expense that must be included in calculating earnings, but does not affect cash flow. As is customary, Avondale added back SBC in calculating cash flows so as not to artificially reduce cash flows by non-cash expenses. While the specific treatment of SBC is not stated in the Form D-9, the calculation was proper and there is nothing misleading in failing to specifically describe

{JK00437465.2 }   3

that customary practice was employed. Further, SBC is a relatively small expense compared to total expenses and regardless how it was treated would not have been material. New Frontier's SBC as disclosed on its projected income statement is between $174,000 and $230,000 for years 2013 through 2017. Total expenses for the same years are between $23.3 million and $25.1 million. See Form D-9 at 49.

12. The third allegation of non-disclosure made by Plaintiff's Motion is with respect to the treatment of net operating losses ("NOL"). Plaintiff's Motion at 14. The Management Forecasts used by Avondale take into account the tax savings from NOL stemming from New Frontier's continuing net operating losses. The precise tax effect from NOL is a complicated calculation under Internal Revenue Service regulations and an attempt to quantify the effects of NOL separately would not materially impact the shareholders' mix of information. Therefore Avondale did not attempt to separately identify the effect of NOL in its calculations of discounted cash flows. Furthermore, NOL is only valuable to New Frontier to the extent that it has significant tax liabilities to offset with NOL. New Frontier has not generated in the past, and is not expected to generate in the future, sufficient taxable net earnings to fully utilize its NOL.

13. Finally, Plaintiff's Motion claims that Avondale used an "unusually high assumed discount rate range of $20% to 30%." Plaintiff's Motion at 14. New Frontier disclosed the discount rates used and therefore shareholders were not misled as to the actual discount rates. While Plaintiff's Motion claims that the rates are "unusually high," Avondale performed its own analysis of the weighted average cost of capital for New Frontier and comparable companies and determined that the discount was appropriate. Further, New Frontier had commissioned a valuation study which included a calculation of its weighted average cost of capital from an independent consultant unrelated to the proposed transaction with LFP Broadcasting that determined New Frontier's capital costs were 30.3%. Avondale therefore concluded that a discount rate range of 20% to 30% was reasonable and disclosed this range to shareholders.

14. Plaintiff's Motion takes four aspects of Avondale's discounted cash flow analysis in an attempt to challenge Avondale's opinion as to the fairness of the transaction. Avondale's discounted cash flow analysis is only one of the varieties of techniques that Avondale utilized to assess the fairness of the transaction. In addition to the discounted cash flow analysis, Avondale performed the following analyses:

a. An historical stock trading analysis, described at page 44 of Form D-9;

b. A volume of shares traded analysis, also described at page 44 of Form D-9;

c. A comparison of the proposed transaction to selected precedent merger and acquisition transactions that Avondale deemed appropriate, described at pages 44-45 of Form D-9;

d. A review of information relating to public companies deemed appropriate in the media and entertainment industry to arrive at an implied valuation based upon a range of multiples, described at page 46 of Form D-9; and

e. An analysis of premiums paid for transactions with enterprise values less than $250 million for deals announced from January 1, 2010 to October 12, 2012,

excluding transactions where the target stock price was below $1.00 per share as well as transactions involving financial institutions and real estate investment trusts (REITs). Avondale then arrived at implied premiums to stock prices as of March 9, 2012 and October 12, 2012. This analysis is described at pages 46-47 of Form D-9.

15. The implied prices per share determined by the utilization of each of the means described in paragraph 14, above, resulted in a range of prices from low to high. The average of the range was below the offer price of $2.02 per share in the proposed transaction with LFP Broadcasting in every case except one. Only in the case of the premium paid analysis based upon New Frontier stock price 4 weeks prior to October 15, 2012 was the average of the price range slightly above the offer price—and then only by a few cents. The offer price results in a premium above the market price of the shares on March 9, 2012, before any public offer to acquire the shares was made, of 69% to 82% depending upon the date on which the premium is measured.

16. As described at pages 20 and 21 of the Form D-9, Avondale and the Special Committee and its attorneys developed a list of potential bidders that Avondale contacted to determine their level of interest in bidding for New Frontier. Avondale supplied confidentiality agreements to companies identified in Form D-9 and to bidders described as Bidders C and D. Avondale actively participated in conversations and communications with prospective bidders. At no time did any prospective bidder make a binding offer better than the ultimate agreed upon offer price of $2.02 per share received from LFP Broadcasting and the contingent price of $2.08 per share.

FURTHER AFFIANT SAYETH NAUGHT

_____
Karsten Lampka

STATE OF TENNESSEE    )
                      ) SS.
COUNTY OF Davidson    )

The foregoing was sworn to before me by Karsten Lampka on this 23rd day of November, 2012.

WITNESS my hand and Seal.

_____
Notary Public

My Commission expires: 3/4/2013

{JK00437465.2}                                5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.1:12-cv-02941-JLK-KLM

CRAIG TELKE, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

NEW FRONTIER MEDIA, INC.,
ALAN ISAACMAN,
MELISSA HUBBARD,
HIRAM J. WOO,
WALTER TIMOSHENKO,
LFP BROADCASTING, LLC and
FLYNT BROADCAST, INC.,

    Defendants.

---

AFFIDAVIT OF KARSTEN LAMPKA

---

    Karsten Lampka, being first duly sworn, deposes and states as follows:

    1.    My name is Karsten Lampka.  I am over the age of twenty-one and am otherwise competent to testify.  The following statements are based on my personal knowledge.

    2.    I am a Managing Director of Avondale Partners, LLC ("Avondale").  On or about April 3, 2012, Avondale was retained by the Special Committee ("Special Committee") of the board of directors of New Frontier Media, Inc. ("New Frontier") to render certain financial advisory and investment banking services including, if requested and as appropriate, an opinion as investment bankers as to whether the consideration to be received by holders of the common stock of New Frontier pursuant to a proposed transaction is fair from a financial point of view.

    3.    On October 14, 2012, Avondale issued its written opinion ("Fairness Opinion"), a copy of which is attached hereto, that as of the date thereof, and based upon and subject to the various qualifications, limitations, factors and assumptions set forth therein, that the consideration to be received by the holders of the common stock of New Frontier pursuant to the transaction with LFP Broadcasting LLC is fair from a financial point of view to such shareholders.

4. As described on pages 1 and 2 of the Fairness Opinion, to reach its opinion as to fairness, Avondale performed the following services, among others, in connection with its engagement:

   a. Reviewed certain publicly available financial statements of New Frontier that Avondale deemed relevant, including the consolidated financial statements for recent years and certain other relevant financial and operating data of the company made available to Avondale from published sources and by senior management of the company;

   b. Reviewed the draft merger agreement and related disclosure letter;

   c. Compared New Frontier from a financial point of view with certain other companies in the media and entertainment industry that Avondale deemed relevant.

   d. Reviewed certain publicly available equity research reports that Avondale deemed relevant regarding companies in the media and entertainment industry;

   e. Considered the financial terms, to the extent publicly available, of selected recent business combinations in the media and entertainment industry that Avondale deemed to be comparable, in whole or in part, to the transaction with LFP Broadcasting;

   f. Reviewed the financial terms, to the extent publicly available, of certain other transactions Avondale believed to be reasonably comparable to the transaction with LFP Broadcasting;

   g. Interviewed senior management of New Frontier regarding the company's operating history and its prospects;

   h. Reviewed the trading history of New Frontier's common stock;

   i. Took into account Avondale's assessment of general economic, market and financial and other conditions and its experience in other transactions, as well as its expertise in securities valuation and its knowledge of the industry in which New Frontier operates,;

   j. Reviewed certain non-public information, including internal operating data and financial analyses and forecasts prepared by senior management of New Frontier and supplied to Avondale; and

   k. Performed other such analyses and examinations as Avondale deemed appropriate.

5. Avondale's work was subject to certain qualifications and assumptions that are described in the Fairness Opinion.

6. It is my understanding that a shareholder of the New Frontier has brought this law suit and claims in support of his motion for preliminary in junction that in certain respects the

Securities and Exchange Form 14D-9 filed by the New Frontier and furnished to its shareholders fails to disclose certain information concerning the work Avondale performed in reaching its opinion as to the fairness of the transaction. *See* Motion for Preliminary Injunction and Request for Expedited Proceedings ("Plaintiff's Motion") at 12. The Form 14D-9 is referred to in Plaintiff's Motion as the "Recommendation Statement," but is referred to herein as the "Form D-9".

7. New Frontier's attorneys have requested that I respond to the accusations of Plaintiff's Motion with respect to Avondale's work and specifically the adequacy of the description of our work in the Form D-9. It is my understanding that Plaintiff's Motion claims that the Form D-9 is materially misleading because "it fails to disclose the definitions and uses of several key components of the DCF ["Discounted Cash Flow"], including disclosing to investors its definition of cash flows; its application of stock-holder based compensation expenses ("SBC") and net operating loss carry forwards ("NOLS"); and the rationale behind employing an unusually high discount rate range of 20-30%." Plaintiff's Motion at 12-13.

8. While the Form D-9 does not specifically define the method used by Avondale to determine cash flows, the method used is not misleading. As suggested by Plaintiff's Motion, Avondale used the standard measure of discounted cash flows known as "unlevered after-tax free cash flow." As this was the method used and is commonly used in calculating discounted cash flows it is not misleading to have not included the definition in the Form D-9.

9. Plaintiff's Motion also suggests that it was misleading to leave shareholders guessing as to whether unlevered or levered cash flow was used. Plaintiff's Motion at 13. These terms refer to whether interest income on invested cash and interest expense on debt are included within the term discounted cash flow. The term "levered" refers to including interest income and expense in cash flows; the term "unlevered" refers to not including the effects of interest. The preferred measure and the one used by Avondale is unlevered. This avoids reduction of cash flows by high interest on indebtedness. In New Frontier's case, however, the distinction between levered and unlevered is immaterial because New Frontier has little debt and earned only nominal amounts of interest on its cash and cash equivalents so even if interest income and expense were included it would not have materially affected net cash flows.

10. Finally, Plaintiff's Motion argues that it was misleading to leave shareholders to speculate if some atypical definition of cash flows had been used, such as "some measure of earnings" or "even dividends as a metric of cash flow." Plaintiff's Motion at 13. Earnings without adjustment do not equate to cash flow and it would not be within industry norms to refer to earnings as cash flows without some explanation. Further New Frontier does not pay dividends so it would not be reasonable to assume that the cash flows calculated by Avondale were based upon such an inapplicable basis.

11. The second consideration raised by Plaintiff's Motion is the treatment of share based compensation ("SBC"). Plaintiff's Motion at 13. Share based compensation is a non-cash expense that must be included in calculating earnings, but does not affect cash flow. As is customary, Avondale added back SBC in calculating cash flows so as not to artificially reduce cash flows by non-cash expenses. While the specific treatment of SBC is not stated in the Form D-9, the calculation was proper and there is nothing misleading in failing to specifically describe

that customary practice was employed. Further, SBC is a relatively small expense compared to total expenses and regardless how it was treated would not have been material. New Frontier's SBC as disclosed on its projected income statement is between $174,000 and $230,000 for years 2013 through 2017. Total expenses for the same years are between $23.3 million and $25.1 million. See Form D-9 at 49.

12.     The third allegation of non-disclosure made by Plaintiff's Motion is with respect to the treatment of net operating losses ("NOL"). Plaintiff's Motion at 14. The Management Forecasts used by Avondale take into account the tax savings from NOL stemming from New Frontier's continuing net operating losses. The precise tax effect from NOL is a complicated calculation under Internal Revenue Service regulations and an attempt to quantify the effects of NOL separately would not materially impact the shareholders' mix of information. Therefore Avondale did not attempt to separately identify the effect of NOL in its calculations of discounted cash flows. Furthermore, NOL is only valuable to New Frontier to the extent that it has significant tax liabilities to offset with NOL. New Frontier has not generated in the past, and is not expected to generate in the future, sufficient taxable net earnings to fully utilize its NOL.

13.     Finally, Plaintiff's Motion claims that Avondale used an "unusually high assumed discount rate range of $20% to 30%." Plaintiff's Motion at 14. New Frontier disclosed the discount rates used and therefore shareholders were not misled as to the actual discount rates. While Plaintiff's Motion claims that the rates are "unusually high," Avondale performed its own analysis of the weighted average cost of capital for New Frontier and comparable companies and determined that the discount was appropriate. Further, New Frontier had commissioned a valuation study which included a calculation of its weighted average cost of capital from an independent consultant unrelated to the proposed transaction with LFP Broadcasting that determined New Frontier's capital costs were 30.3%. Avondale therefore concluded that a discount rate range of 20% to 30% was reasonable and disclosed this range to shareholders.

14.     Plaintiff's Motion takes four aspects of Avondale's discounted cash flow analysis in an attempt to challenge Avondale's opinion as to the fairness of the transaction. Avondale's discounted cash flow analysis is only one of the varieties of techniques that Avondale utilized to assess the fairness of the transaction. In addition to the discounted cash flow analysis, Avondale performed the following analyses:

    a.     An historical stock trading analysis, described at page 44 of Form D-9;

    b.     A volume of shares traded analysis, also described at page 44 of Form D-9;

    c.     A comparison of the proposed transaction to selected precedent merger and acquisition transactions that Avondale deemed appropriate, described at pages 44-45 of Form D-9;

    d.     A review of information relating to public companies deemed appropriate in the media and entertainment industry to arrive at an implied valuation based upon a range of multiples, described at page 46 of Form D-9; and

    e.     An analysis of premiums paid for transactions with enterprise values less than $250 million for deals announced from January 1, 2010 to October 12, 2012,

excluding transactions where the target stock price was below $1.00 per share as well as transactions involving financial institutions and real estate investment trusts (REITs).  Avondale then arrived at implied premiums to stock prices as of March 9, 2012 and October 12, 2012. This analysis is described at pages 46-47 of Form D-9.

15. The implied prices per share determined by the utilization of each of the means described in paragraph 14, above, resulted in a range of prices from low to high.  The average of the range was below the offer price of $2.02 per share in the proposed transaction with LFP Broadcasting in every case except one.  Only in the case of the premium paid analysis based upon New Frontier stock price 4 weeks prior to October 15, 2012 was the average of the price range slightly above the offer price—and then only by a few cents.  The offer price results in a premium above the market price of the shares on March 9, 2012, before any public offer to acquire the shares was made, of 69% to 82% depending upon the date on which the premium is measured.

16. As described at pages 20 and 21 of the Form D-9, Avondale and the Special Committee and its attorneys developed a list of potential bidders that Avondale contacted to determine their level of interest in bidding for New Frontier.  Avondale supplied confidentiality agreements to companies identified in Form D-9 and to bidders described as Bidders C and D.  Avondale actively participated in conversations and communications with prospective bidders.  At no time did any prospective bidder make a binding offer better than the ultimate agreed upon offer price of $2.02 per share received from LFP Broadcasting and the contingent price of $2.08 per share.

FURTHER AFFIANT SAYETH NAUGHT

_____
Karsten Lampka

STATE OF TENNESSEE       )
                         ) SS.
COUNTY OF _____         )

The foregoing was sworn to before me by Karsten Lampka on this ___ day of November, 2012.

WITNESS my hand and Seal.

_____
Notary Public

My Commission expires: _____