| | |
|---|---|
| ☐ Small Claims  ☐ County Court  ☒ District Court<br>☐ Probate Court  ☐ Juvenile Court  ☐ Water Court<br>City and County of Boulder, Colorado<br>Court Address: 1777 Sixth Street<br>Boulder, Colorado 80302 | EFILED Document<br>CO Boulder County District Court 20th JD<br>Filing Date: Oct 26 2012 08:34AM MDT<br>Filing ID: 47386899<br>Review Clerk: Natascha Wise |
| **Plaintiff:** ELWOOD M. WHITE, On Behalf of Himself and All Others Similarly Situated,<br><br>v.<br><br>**Defendants:** NEW FRONTIER MEDIA, INC., MELISSA HUBBARD, ALAN ISAACMAN, WALTER TIMOSHENKO, HIRAM J. WOO, FLYNT BROADCAST, INC., and LFP BROADCASTING, LLC. | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff and Class:<br>Charles W. Lilley, #9443<br>Karen Cody-Hopkins, Of Counsel, #35367<br>Charles Lilley & Associates P.C.<br>730 17th Street, Suite 670<br>Denver, Colorado 80202<br>Phone: 303-293-9800<br>Fax: 303-298-8975<br>clilley@lilleylaw.com<br>karen@codyhopkinslaw.com | Case Number:<br><br><br>Ctrm: |
| **CLASS ACTION COMPLAINT** | |

Plaintiff, by his undersigned attorneys, for his class action complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a class action on behalf of the public shareholders of New Frontier Media, Inc. ("New Frontier" or the "Company") against New Frontier and its Board of



EXHIBIT B

Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on October 15, 2012 (the "Proposed Transaction"), pursuant to which New Frontier will be acquired by LFP Broadcasting, LLC ("LFP Broadcasting") and its wholly-owned subsidiary, Flynt Broadcast, Inc. ("Merger Sub," and together with LFP Broadcasting, "LFP").

2.  On October 15, 2012, the Board caused New Frontier to enter into a definitive agreement and plan of merger (the "Merger Agreement"). Pursuant to the Merger Agreement, within ten business days of the announcement of the Proposed Transaction, LFP will commence a tender offer (the "Tender Offer") to purchase all of the outstanding shares of New Frontier common stock for $2.02 per share in cash, without interest. New Frontier shareholders may also be entitled to receive additional contingent cash payments, not to exceed $0.06 per common share, under certain conditions. The Tender Offer will remain open for a minimum of twenty business days following the commencement.

3.  The Proposed Transaction is the product of a flawed process that resulted from the Board's failure to maximize shareholder value and deprives New Frontier's public shareholders of the ability to participate in the Company's long-term prospects. Furthermore, in approving the Merger Agreement, the Individual Defendants breached their fiduciary duties to plaintiff and the Class (defined herein). Moreover, as alleged herein, New Frontier and LFP aided and abetted the Individual Defendants' breaches of fiduciary duties.

## THE PARTIES

4. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of New Frontier common stock. Plaintiff is a resident of Pennsylvania.

5. Defendant New Frontier is a Colorado corporation and maintains its principal executive offices at 6000 Spine Road, Suite 100, Boulder, Colorado 80301. The Company is a provider of transaction television services and a distributor of general motion picture entertainment. The Company's common stock trades on the NASDAQ GS under the ticker "NOOF."

6. Defendant Melissa Hubbard ("Hubbard") has served as a New Frontier director since 2002. According to New Frontier's Annual Proxy Statement filed with the United States Securities and Exchange Commission ("SEC") on Form DEF 14A on September 21, 2012 (the "2012 Proxy"), Hubbard is a member of the Company's Audit Committee and Executive Committee. She is also a member of a special committee of the Board that was formed to review potential strategic alternatives for the Company (the "Special Committee").

7. Defendant Alan Isaacman ("Isaacman") has served as a New Frontier director since 1999 and as Chairman of the Board since September 2012. According to the 2012 Proxy, Isaacman is a member of the Company's Special Committee and Executive Committee.

8. Defendant Walter Timoshenko ("Timoshenko") has served as a New Frontier director since 2007. According to the 2012 Proxy, Timoshenko is Chairman of the Company's Compensation Committee and is a member of the Company's

Nominations Committee, Special Committee, and Executive Committee.

9. Defendant Hiram J. Woo ("Woo") has served as a New Frontier director since 2001. According to the 2012 Proxy, Woo is Chairman of the Company's Audit Committee and Nominations Committee and is a member of the Compensation Committee, Special Committee, and Executive Committee.

10. The defendants identified in paragraphs 6 through 9 are collectively referred to herein as the "Individual Defendants." By virtue of their positions as directors and/or officers of New Frontier, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public shareholders of New Frontier.

11. Each of the Individual Defendants at all relevant times had the power to control and direct New Frontier to engage in the misconduct alleged herein. The Individual Defendants' fiduciary obligations require them to act in the best interest of plaintiff and all New Frontier shareholders.

12. Each of the Individual Defendants owes fiduciary duties to plaintiff and the other members of the Class, as defined herein. They are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

13. The Company's public shareholders must receive the maximum value for their shares through the Proposed Transaction. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated and are continuing to violate the fiduciary duties they owe to plaintiff and the Company's other public shareholders, due to the fact that they have engaged in all or part

4

of the unlawful acts, plans, schemes, or transactions complained of herein.

14. Defendant LFP Broadcasting is a Delaware corporation with its corporate headquarters located at 8484 Wilshire Boulevard, Suite 900, Beverly Hills, California 90211.

15. Defendant Merger Sub is a Colorado corporation and is a wholly-owned subsidiary of LFP Broadcasting that was created for the sole purpose of effecting the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action on his own behalf and as a class action, pursuant to Rule 23 of the Colorado Rules of Civil Procedure, on behalf of himself and the public shareholders of New Frontier (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

17. This action is properly maintainable as a class action.

18. The Class is so numerous that joinder of all members is impracticable. As of August 6, 2012, there were approximately 16,190,408 shares of New Frontier common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

19. Questions of law and fact are common to the Class, including, among others:

   a. Whether defendants have breached their fiduciary duties owed to plaintiff and the Class; and

    b.  Whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

  20. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

  21. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

  22. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background*

  23. According to its website, New Frontier is a leader in transactional television as well as general motion picture entertainment. The Company delivers transactional adult-themed pay-per-view networks to cable and satellite operators across the United States. Additionally, the Company is a leading provider of content to video-

on-demand platforms on cable and satellite. The Company's programming originates at New Frontier's state of the art digital broadcast infrastructure in Boulder, Colorado.

24.   On November 14, 2011, New Frontier issued a press release wherein it announced its fiscal 2012 second quarter results. According to Michael Weiner ("Weiner"), the Company's former Chief Executive Officer ("CEO"):

> "New Frontier Media continued to execute its strategic initiatives during the second quarter of fiscal year 2012[.]" . . . "Within the Transactional TV segment, we expanded our distribution of lower priced, short-form content to several top-ten U.S. cable operators. We expect to further expand our distribution of lower priced content as well as other new and unique content packages in U.S. markets throughout fiscal year 2012. We believe the distribution of these new content packages will improve the Transactional TV segment's future domestic performance. Internationally, the Transactional TV segment grew revenue to $1.5 million as compared to $1.4 million in the same prior year quarter. Although we experienced increased competition on certain video-on-demand platforms in Latin America during the quarter resulting in some pressure on our short-term international performance, we expect continued revenue growth from international markets in the future."
>
> "We were pleased with the profitable results of the Film Production segment during the quarter despite $0.2 million of non-cash film cost impairment charges. In addition, we have secured a new episodic series production with a premium cable channel customer, and we expect to complete this production during the first half of fiscal year 2013. We are still focused on lowering overhead within the Film Production segment while obtaining and selling higher quality mainstream content to many of our existing Transactional TV segment cable and satellite customers. We are encouraged by the results of these efforts thus far and believe we can achieve further improvement in the segment's results." . . .
>
> "We generated positive cash flow from operating activities of $1.4 million during the first half of fiscal year 2012, which included cash collections of $1.7 million from building improvement allowances and cash disbursements of $0.7 million from our initial production activities for the Film Production segment's episodic series arrangement. We also effectively completed our stock repurchase program during the quarter by repurchasing approximately $0.9 million of common stock, and we recently authorized the additional repurchase of up to the lesser of $1.0

million or 0.8 million shares of common stock. To date, we have repurchased over 6.1 million shares of common stock. *Overall, we believe we are making good progress towards our strategic goals and expect the impact of these efforts will result in improved shareholder value over the long-term.*"

(Emphasis added).

25. On February 13, 2012, New Frontier issued a press release wherein it announced its fiscal 2012 third quarter results. According to Weiner:

> "New Frontier Media maintained solid operations during the third quarter of fiscal year 2012[.]" . . . "The Transactional TV segment continues to pursue its expansion into international markets, and we continue to believe there are further opportunities for growth from those efforts. We are also executing strategies domestically that we believe will help stabilize and return the domestic business to a growth trajectory. These domestic efforts include the distribution of lower priced assets, an expansion of subscription services, and the distribution of new and unique content packages. We also plan to further focus on the cost structure of the segment to identify new opportunities to reduce expenses without harming the segment's growth efforts."
>
> "For the Film Production segment, our cost reduction efforts continue to provide benefits to the segment. The segment was once again profitable during the quarter. Going forward, we plan to further focus our efforts on growing revenue through the distribution of higher quality mainstream content. We believe our relationships with cable and satellite operators provide us with strong VOD distribution partners to complement our international distribution. We also continue to pursue other domestic strategic partnerships to improve the domestic distribution outlets available to the segment." . . .
>
> "We ended the quarter with approximately $11.7 million in cash. Additionally, we received approximately $0.8 million in cash in January 2012 from a tax refund and expect to receive an additional $2.3 million in cash during the first half of fiscal year 2013 from the delivery of the Film Production segment's episodic series. We have generated positive cash flow from operating activities of $0.7 million, which included cash collections of $1.7 million from building improvement allowances and cash disbursements of $1.7 million from our production activities for the Film Production segment's episodic series arrangement. During the first nine months of fiscal year 2012, we have also repurchased approximately

8

$3.5 million of common stock, or 3.0 million shares, at an average total purchase price of $1.17 per share, and we believe the repurchase of these shares was a good use of our cash. *We believe New Frontier Media remains solid and look forward to furthering the development of the Company in the future.*"

(Emphasis added).

***The Proposed Transaction***

26. On October 15, 2012, New Frontier announced the Proposed Transaction with LFP, pursuant to which the Company will be acquired for $2.02 per common share in cash up front, or approximately $33 million. New Frontier shareholders may also be entitled to receive additional contingent cash payments, not to exceed $0.06 per common share, tied to the extent to which New Frontier's available cash balance at the closing of the Tender Offer, less unpaid transaction expenses, exceeds $11,514,000.

27. Pursuant to the terms of the Merger Agreement, an affiliate of LFP Broadcasting will commence the Tender Offer for all issued and outstanding shares of New Frontier common stock at $2.02 per share, without interest. The Merger Agreement requires that the Tender Offer commence within ten business days of October 15, 2012, and the Tender Offer will expire at midnight Eastern Time on the twentieth business day following and including the commencement date, unless extended.

28. The Board has unanimously recommended that New Frontier's shareholders tender their shares in the Tender Offer. The Proposed Transaction is expected to close during the fourth quarter of 2012.

29. On October 16, 2012, New Frontier filed a Form 8-K with the SEC, attaching as Exhibit 2.1 the Merger Agreement.

9

30. To the detriment of the Company's shareholders, the terms of the Merger Agreement substantially favor LFP and are calculated to unreasonably dissuade potential suitors from making competing offers.

31. For example, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 6.04(a) of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 6.04(a) of the Merger Agreement states:

> (a) The Company shall not, and shall cause its Subsidiaries not to, and shall not authorize or permit their respective Representatives to, directly or indirectly, (i) whether publicly or otherwise, initiate, solicit, knowingly encourage or knowingly facilitate any inquiry with respect to, or the making, submission or announcement of, any proposal, inquiry, offer or indication of interest that constitutes or would reasonably be expected to lead to a Takeover Proposal, (ii) participate in or knowingly encourage any negotiations or discussions regarding, or furnish to any Person access to the business, properties, assets, books or records or provide any material non-public information or data with respect to, the Company or any of its Subsidiaries in connection with any proposal, inquiry, offer or indication of interest that constitutes or would reasonably be expected to lead to a Takeover Proposal, (iii) approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Takeover Proposal, (iv) amend or grant any waiver or release under, or fail to enforce, any standstill or similar contract with respect to any class of equity securities of the Company or any of its Subsidiaries, or (v) execute or enter into any agreement in principle, letter of intent, term sheet, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or other Contract relating to a Takeover Proposal (other than an Acceptable Confidentiality Agreement in connection with the actions contemplated by, and pursuant to, Section 6.04(b)) (any such Contract, a "Company Acquisition Agreement") or resolve, agree, approve, recommend or publicly propose to take such action. Except as otherwise expressly permitted by this Section 6.04, neither the Company Board nor any committee thereof shall (A) fail to make the Company Board

Recommendation, (B) approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Takeover Proposal or enter into any Company Acquisition Agreement or resolve, agree, approve, recommend or publicly propose to take any such action, or (C) withdraw, amend, modify or qualify, in a manner adverse to Parent or Merger Sub, or propose publicly to withdraw, amend, modify or qualify in a manner adverse to Parent or Merger Sub, the Company Board Recommendation (any of the foregoing clauses (A), (B) and (C) above, a "Company Adverse Recommendation Change"); it being understood and agreed that any "stop-look-listen" communication by the Company Board to the shareholders of the Company pursuant to Rule 14d-9(f) under the Exchange Act (or any related communication to shareholders of the Company) will not be deemed a Company Adverse Recommendation Change. The Company shall, and shall cause its Subsidiaries to, and shall direct and use reasonable best efforts to cause its and their respective Representatives to, immediately cease and cause to be terminated, and shall not authorize or knowingly permit any of its or their Representatives to continue, any and all existing discussions or negotiations, if any, with any third party conducted prior to the date hereof with respect to any Takeover Proposal.

32. Further, pursuant to Section 6.04(c) of the Merger Agreement, the Company must advise LFP, within forty-eight hours, of any proposals or inquiries received from other parties. Thereafter, the Company must keep LFP "reasonably informed of any related material developments, discussions and negotiations related to any such Takeover Proposal or inquiry and shall make available to Parent all material non-public information made available to any Person making any such Takeover Proposal. . . ." Section 6.04(c) of the Merger Agreement states:

> (c) The Company shall, within forty-eight (48) hours after receipt thereof, (i) notify Parent in writing of the receipt by the Company or any of its Representatives of any Takeover Proposal or request for information or inquiry, in each case, from any third party, that expressly contemplates or that the Company believes would reasonably be expected to lead to a Takeover Proposal, and (ii) the third party making, and details of the material terms and conditions of, any such Takeover Proposal, request or inquiry (including any change to the financial terms, conditions or other material terms thereof and the terms of any and all agreements in

11

connection therewith (including any financial arrangements)). The Company shall keep Parent reasonably informed of any related material developments, discussions and negotiations related to any such Takeover Proposal or inquiry and shall make available to Parent all material non-public information made available to any Person making any such Takeover Proposal at substantially the same time as it provides such information to such other Person.

33. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants LFP a "matching right" with respect to any "Superior Proposal" made to the Company. Section 6.04(b) of the Merger Agreement provides:

> (b) Notwithstanding Section 6.04(a), prior to the Offer Closing, the Company Board, directly or indirectly through any Representative, may, subject to compliance with Sections 6.04(c) and 6.04(d), (i) (A) in response to a bona fide written Takeover Proposal made after the date hereof that the Company Board determines in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, constitutes, or would reasonably be expected to result in, a Superior Proposal, and which Takeover Proposal did not result from a breach of Section 6.04(a), (1) contact the Person making such Takeover Proposal for the purpose of clarifying the proposal and any material contingencies and the likelihood of consummation to make the determinations described in the definition of "Superior Proposal," (2) furnish non-public information relating to the Company or any of its Subsidiaries to the Person making such Takeover Proposal and its Representatives pursuant to an executed confidentiality agreement that constitutes an Acceptable Confidentiality Agreement, and (3) engage or participate in negotiations or discussions with such Person and its Representatives regarding such Takeover Proposal, and (B) if requested by a Third Party that has entered into a confidentiality, standstill or similar agreement with the Company prior to the date hereof (including where such request is prohibited under the terms of the applicable confidentiality and standstill agreement), waive any prohibition with respect to the submission of a Takeover Proposal or amendment thereto in any such agreement, in any such case, if the Company Board determines, in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, that failure to do so would be inconsistent

with its fiduciary duties under applicable Law, (ii) terminate this Agreement pursuant to Section 8.04(a) and/or make a Company Adverse Recommendation Change in response to a material event, development or change in circumstance (not in connection with a Takeover Proposal) that is unknown by the Company Board as of the date of this Agreement, if the Company Board determines in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, that the failure to do so would be inconsistent with its fiduciary duties under applicable Law; provided that the Company shall provide Parent with no fewer than three (3) days' notice of any Company Adverse Recommendation Change prior to such change (and during such three (3) day period, the Company agrees that the Company and its Representatives shall negotiate in good faith with Parent and its Representatives regarding such revisions to the terms of the Offer, the Merger and the other transactions contemplated by this Agreement proposed by Parent as shall be necessary or appropriate to address such event, development or change in circumstances), provided, that in the event of a termination of this Agreement pursuant to this clause (ii), the Company complies with its obligations to pay the Termination Fee in Section 8.06(b)), (iii) if the Company Board determines in response to a Takeover Proposal that such proposal is a Superior Proposal, and the Company Board determines in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, that the failure to do so would be inconsistent with its fiduciary duties under applicable Law, terminate this Agreement pursuant to Section 8.04(a) and/or make a Company Adverse Recommendation Change and, in the case of a termination, the Company shall, substantially concurrently with the termination of this Agreement, enter into the Company Acquisition Agreement implementing such Superior Proposal provided, that in the event of a termination of this Agreement pursuant to this clause (iii), the Company complies with its obligations to pay the Termination Fee in Section 8.06(b) and/or (iv) take any action that any court of competent jurisdiction orders the Company to take (which Order remains unstayed). . . .

34. Further locking up control of the Company in favor of LFP is Section 8.06 of the Merger Agreement, which contains a provision for a "Termination Fee" of $1,000,000 payable by the Company to LFP if the Individual Defendants cause the Company to terminate the Merger Agreement pursuant to the lawful exercise of their fiduciary duties.

13

35. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

36. Moreover, Section 1.04 of the Merger Agreement grants LFP an irrevocable top-up option (the "Top-Up Option"). Section 1.04 of the Merger Agreement states:

> (a) The Company hereby grants to Merger Sub an irrevocable option (the "Top-Up Option"), exercisable only on the terms and conditions set forth in this Section 1.04, to purchase at a price per share equal to (i) the Offer Price paid in the Offer plus (ii) a CPR, that number of shares of Company Common Stock (the "Top-Up Shares") equal to the lowest number of shares of Company Common Stock that, when added to the number of shares of Company Common Stock owned by Parent and Merger Sub at the time of exercise of the Top-Up Option, shall constitute one share more than 90% of the Fully Diluted Shares immediately after the issuance of the Top-Up Shares (the "Short Form Threshold"); provided, that the Top-Up Option will not be exercisable unless, immediately after such exercise and the issuance of Top-Up Shares pursuant thereto, the Short Form Threshold would be reached (after giving effect to the issuance of the Top-Up Shares); provided, further, that (i) the Top-Up Option shall not be exercisable for a number of shares of Company Common Stock in excess of the shares of Company Common Stock authorized and unissued at the time of exercise of the Top-Up Option (giving effect to the shares of Company Common Stock issuable pursuant to all then-outstanding stock options, restricted stock units and any other rights to acquire Company Common Stock as if such shares were outstanding) and (ii) the exercise of the Top-Up Option and the issuance and delivery of the Top-Up Shares shall not be prohibited by any Law or Order.

37. In other words, if LFP does not obtain the minimum number of shares in the Tender Offer required to effectuate the Proposed Transaction, LFP may purchase from the Company the number of shares necessary for it to exceed the ninety percent threshold. The Top-Up Option is coercive and will dilute the economic interests of any remaining public shareholders, including plaintiff and members of the putative Class.

38. Moreover, the Company has entered into an amendment (the "Rights Agreement Amendment") to the Amended and Restated Rights Agreement dated August 1, 2008, as amended on October 31, 2011, by and between the Company and Corporate Stock Transfer, Inc. (the "Rights Agreement"). Pursuant to the Rights Agreement Amendment, the Rights Agreement is inapplicable to the Proposed Transaction. According to the Company:

> The Amendment was entered into to permit the Offer, Merger and the other transactions contemplated by the Merger Agreement to occur without triggering any distribution or other adverse event to Parent under the Rights Agreement. In particular, neither Parent, Merger Sub nor any of their Affiliates or Associates (as such terms are defined in the Rights Agreement) shall become an Acquiring Person (as such term is defined in the Rights Agreement), and a Stock Acquisition Date, a Distribution Date, a Section 11(a)(ii) Event and a Section 13 Event (as such terms are defined in the Rights Agreement) shall not occur, as a result of the approval, execution, delivery, performance or public announcement of the Merger Agreement or the consummation or public announcement of the Offer, the Merger, Top-Up Option or any of the other transactions contemplated by the Merger Agreement. In addition, the Amendment provides that the Rights Agreement shall expire immediately prior to the effective time of the Merger.

Thus, while the Rights Agreement has been rendered inapplicable to the Proposed Transaction with LFP, it remains as a barrier to any potential competing offers.

39. Moreover, the Company's former CEO, Weiner, has expressed his opinion that the Individual Defendants have acted contrary to the interests of the Company's shareholders in connection with the Proposed Transaction.

40. On October 10, 2012, Weiner sent a resignation letter to the Board, tendering his resignation as a director effective immediately (the "Resignation Letter"). The Resignation Letter is attached as Exhibit 17.1 to a Form 8-K filed by the Company

15

on October 16, 2012.

41. Weiner stated in the Resignation Letter that: "As a result of the extremely troubling actions taken by a majority of the members of the Board of Directors – consisting of Alan Isaacman, Melissa Hubbard, Walter Timoshenko and Hiram J. Woo – in connection with my termination as CEO, the strategic review process and related matters, I hereby resign as a director effective immediately."

42. In the Resignation Letter, Weiner questioned whether actions by the Board "ma[d]e the Company a less attractive acquisition candidate[,]" as well as whether "the Special Committee treat[ed] all bidders equally and conduct[ed] a fair and exhaustive review process[,]" and whether "any member of the Special Committee ha[s] a personal or business relationship with any representatives of the bidders[.]" Weiner stated that he believes the Board took actions that "were not in the best interests of shareholders[.]"

43. Additionally, Weiner further stated that David Nicholas resigned as a director of the Company on September 29, 2012, as a result of disagreements with the current directors and concerns regarding, among other things, the Special Committee and the strategic review process.

44. Furthermore, the consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of New Frontier is materially in excess of the amount offered in the Proposed Transaction. For example, according to Yahoo! Finance, at least one analyst has set a price target for New Frontier's stock at $4.00 per share.

45. The Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

46. Moreover, the Proposed Transaction consideration fails to adequately compensate New Frontier's shareholders for the significant synergies created by the merger. According to LFP Broadcasting President Michael H. Klein, "The acquisition of New Frontier Media fits perfectly with our strategic plan for the growth of our company[.] . . . The addition of these assets to our portfolio strengthens us significantly moving forward."

47. As a result, defendants have breached the fiduciary duties they owe to the Company's public shareholders because the shareholders will not receive adequate or fair value for their New Frontier common stock in the Proposed Transaction.

## COUNT I

### (Breach of Fiduciary Duties Against the Individual Defendants)

48. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

49. As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of New Frontier's net worth as a merger/acquisition candidate; (b) take all appropriate steps to enhance New Frontier's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public shareholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants'

own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of New Frontier's public shareholders; (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of New Frontier; and (f) disclose all material information to the Company's shareholders.

50.     The Individual Defendants have breached their fiduciary duties to plaintiff and the Class.

51.     As alleged herein, defendants have initiated a process to sell New Frontier that undervalues the Company. In addition, by agreeing to the Proposed Transaction, defendants have capped the price of New Frontier at a price that does not adequately reflect the Company's true value. Defendants also failed to sufficiently inform themselves of New Frontier's value, or disregarded the true value of the Company. Furthermore, any alternate acquiror will be faced with engaging in discussions with a management team and Board that are committed to the Proposed Transaction.

52.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value.

53.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT II

### (Aiding and Abetting the Board's Breaches of Fiduciary Duties Against New Frontier and LFP)

54.     Plaintiff repeats and realleges the preceding allegations as if fully set forth

herein.

55. Defendants New Frontier and LFP knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred. In connection with discussions regarding the Proposed Transaction, New Frontier provided, and LFP obtained, sensitive non-public information concerning New Frontier and thus had unfair advantages that are enabling it to acquire the Company at an unfair and inadequate price.

56. As a result of this conduct, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their New Frontier shares.

57. Plaintiff and the members of the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to plaintiff and the Class;

D. Directing defendants to account to plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.  Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.  Granting such other and further relief as this Court may deem just and proper.

Plaintiff requests a jury trial.

Dated: October 26, 2012

*Pursuant to C.R.C.P. 121, 1-26(7), a duly signed copy of this pleading is on file the offices of [Local Counsel]*

By:
s/Charles W. Lilley
s/Karen Cody-Hopkins
Charles W. Lilley, #9443
Karen Cody-Hopkins, of Counsel, #35367
730 17th Street, Suite 670
Denver, CO 80202
Tel.: (303) 293-9800
Fax: (303) 298-8975
clilley@lilleylaw.com
karen@ciodyhopkinslaw.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.:  (302) 295-5310
Fax:  (302) 654-7530

*Attorneys for Plaintiff*

Plaintiff's Address:
108 North Second Street
Wrightsville, PA 17368