| | |
|---|---|
| ☐ Small Claims ☐ County Court ☒ District Court<br>☐ Probate Court ☐ Juvenile Court ☐ Water Court<br>City and County of Boulder, Colorado<br>Court Address: 1777 Sixth Street<br>　　　　　　　Boulder, Colorado 80302 | DATE FILED: November 13, 2012 |
| **Plaintiff:** DENNIS PALKON, Individually and On Behalf of All Others Similarly Situated,<br><br>v.<br><br>**Defendants:** NEW FRONTIER MEDIA, INC., LFP BROADCASTING, LLC, FLYNT BROADCAST, INC., MELISSA HUBBARD, ALAN ISAACMAN, HIRAM J. WOO, and WALTER TIMOSHENKO | ↑  **COURT USE ONLY**  ↑ |
| <u>Attorneys for Plaintiff and Class:</u><br>Charles W. Lilley, #9443<br>Karen Cody-Hopkins, Of Counsel, #35367<br>Charles Lilley & Associates P.C.<br>730 17th Street, Suite 670<br>Denver, Colorado 80202<br>Phone: 303-293-9800<br>Fax: 303-298-8975<br><u>clilley@lilleylaw.com</u><br><u>karen@codyhopkinslaw.com</u> | Case Number:<br><br>Ctrm: |
| **VERFIFED SHAREHOLDER COMPLAINT** | |

　　　　Plaintiff, Dennis Palkon, by his attorneys, as and for his class action complaint, alleges upon personal knowledge with respect to himself, and upon information and belief as to all other allegations based upon, *inter alia*, the investigation of counsel, as follows:

## NATURE OF THE ACTION

　　　　1.　　　This is a shareholder class action brought by plaintiff on behalf of himself and the public shareholders of New Frontier Media, Inc., ("New Frontier" or the "Company") against New Frontier, the directors of New Frontier, LFP Broadcasting, LLC ("Parent"), and its indirect wholly owned subsidiary Flynt Broadcast, Inc. ("Merger Sub") (collectively "Flynt") arising out



**EXHIBIT**

C

of their agreement to sell New Frontier to Flynt (the "Proposed Transaction"). In pursuing the Proposed Transaction, each of the defendants has violated applicable law by directly breaching and/or aiding breaches of fiduciary duties of loyalty and due care owed to plaintiff and the proposed class.

2.    On October 15, 2012, New Frontier entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Flynt will acquire all of New Frontier's outstanding shares of common stock, pursuant to a tender offer ("Tender Offer") for approximately $33 million, after which New Frontier will merge into a Flynt-controlled entity. The Proposed Transaction has been approved by New Frontier's Board of Directors (the "Board"). Under the terms of the Proposed Transaction, New Frontier stockholders will receive $2.02 in cash for each share of New Frontier common stock, as well as a contingent cash payment right, not to exceed $0.06 for each common share (the "Offer Price").

3.    The Proposed Transaction is the product of a flawed process that is designed to ensure the sale of New Frontier to Flynt on terms preferential to Flynt, but detrimental to plaintiff and the other public stockholders of Flynt. Plaintiff seeks to enjoin the Proposed Transaction.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over each defendant named herein. New Frontier is a corporation that conducts business and maintains operations in Colorado. It is headquartered in Boulder, Colorado. The remaining individual defendants have sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

2

5.      Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this County. Additionally, a substantial portion of the transactions and wrongs complained of herein occurred in this County, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to New Frontier's shareholders.   Defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## THE PARTIES

6.      Plaintiff is and has been the owner of New Frontier common shares continuously since prior to the wrongs complained of herein.

7.      Defendant New Frontier, a Colorado corporation headquartered in Boulder, Colorado, is a leader in transactional television as well as general motion picture entertainment. The Company delivers transactional adult-themed pay-per-view networks to cable and satellite operators across the United States.

8.      Defendant Alan Isaacman is the Chairman of the Board of Directors of New Frontier.

9.      Defendant Melissa Hubbard is a director of New Frontier.

10.      Defendant Hiram J. Woo is a director of New Frontier.

11.      Defendant Walter Timoshenko is a director of New Frontier.

12.      Defendant Lori J. Schafer is a director of New Frontier

13.      Defendants in ¶¶ 8-12 are collectively referred as the Individual Defendants.

14.     The Individual Defendants, as officers and/or directors of New Frontier, have a fiduciary responsibility to Plaintiff and the other public shareholders of New Frontier, and owe them the highest obligations of good faith, loyalty, fair dealing, due care, and candor.

15.     Defendant LFP Broadcasting, LLC is a Delaware Limited Liability Company.  Its principal place of business is 8484 Wilshire Boulevard, Suite 900, Beverly Hills, CA 90211.

16.     Flynt Broadcast, Inc. is a Colorado corporation and a wholly owned subsidiary of LFP Broadcasting, LLC whose principal place of business is 8484 Wilshire Boulevard, Suite 900, Beverly Hills, CA 90211.

17.     The Individual Defendants, together with Defendants New Frontier, LFP Broadcasting, LLC, and Flynt Acquisition Corp., are referred to herein collectively as "Defendants."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

18.     By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with Plaintiff and the Company's other public shareholders, and owe them the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure

19.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in a change in corporate control or a break-up of the corporation's assets, they have a fiduciary obligation to act in the best interests of the company's shareholders. To diligently comply with these duties, the directors may not take any action that:

       (a)     adversely affects the value provided to the corporation's shareholders;

       (b)     will discourage or inhibit alternative offers to acquire control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties; and/or

(d)     will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public shareholders, or place their own pecuniary interests above those of the interests of the company and its shareholders.

20.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of New Frontier, are obligated to:

(a)     determine whether a proposed sale of the Company is in the shareholders' best interests;

(b)     consider all *bona fide* offers or strategic alternatives; and

(c)     refrain from implementing unreasonable measures designed to protect a transaction to the exclusion of a more beneficial deal, and from participating in any transaction in which their loyalties are divided.

21.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, have violated and are continuing to violate the fiduciary duties they owe to Plaintiff and the Company's other public shareholders, including the duties of loyalty, good faith, candor, and due care.

## SUBSTANTIVE ALLEGATIONS

22.     New Frontier is a leader in transactional television as well as general motion picture entertainment. The Company delivers transactional adult-themed pay-per-view networks to cable and satellite operators across the United States. Additionally, the Company is a leading provider of content to video-on-demand platforms on cable and satellite. The Company's programming originates at New Frontier Media's state of the art digital broadcast infrastructure

5

in Boulder, Colorado. The Company owns thousands of hours of digital content and partners with movie studios to bring together the most exciting variety of transactional adult entertainment available today. New Frontier is based in Boulder, Colorado.

23.     On October 15, 2012, the Company issued a press release titled "*New Frontier Media To Be Acquired By LFP Broadcasting For $2.02 Per Share In Cash Plus A Contingent Cash Payment Right*," which stated:

> **BOULDER, COLORADO and LOS ANGELES, CA – October 15, 2012 –** New Frontier Media, Inc. (NasdaqGS: NOOF), a leading provider of transactional television services and distributor of general motion picture entertainment, today announced that the Company has signed a definitive agreement to be acquired by LFP Broadcasting, LLC, an affiliate of L.F.P., Inc., the company founded and headed up by Larry Flynt, for $2.02 per common share in cash up front, or approximately $33 million, plus a contingent cash payment right for each common share. The acquisition price represents approximately a 79% premium to New Frontier Media's closing stock price on March 8, 2012, the day before New Frontier Media received a publicly-announced unsolicited acquisition proposal. The acquisition is expected to close during the fourth quarter of 2012.
>
> The announcement follows a comprehensive review of strategic alternatives to maximize shareholder value undertaken by the special committee of independent members of New Frontier Media's Board of Directors. Earlier this year, after receiving unsolicited expressions of interest, New Frontier Media formed a special committee and retained financial and legal advisors to evaluate strategic and financial alternatives. After a thorough assessment, the special committee unanimously recommended and the Board of Directors unanimously approved the agreement. The Board of Directors unanimously recommends that New Frontier Media's shareholders tender their shares in the tender offer.
>
> The New Frontier Media Board of Directors issued the following statement commenting on the announcement: "This announcement represents a very positive outcome for our shareholders, who will receive complete liquidity for their shares at a very significant premium. We also believe that this transaction with LFP Broadcasting creates a great opportunity for our organization, cable television partners and customers as two of the premier adult media broadcasting companies join forces."
>
> "The acquisition of New Frontier Media fits perfectly with our strategic plan for the growth of our company," said LFP President Michael H. Klein. "The addition of these assets to our portfolio strengthens us significantly moving forward."

Under the terms of the agreement, an affiliate of LFP Broadcasting will commence a cash tender offer for all issued and outstanding shares of New Frontier Media common stock at $2.02 per share, without interest. New Frontier Media shareholders may also be entitled to receive additional contingent cash payments, not to exceed $0.06 per common share, tied to the extent to which New Frontier Media's available cash balance at the closing of the tender offer, less unpaid transaction expenses, exceeds $11,514,000.

The merger agreement requires that the tender offer commence within 10 business days of October 15, 2012. The tender offer will expire at midnight Eastern Time on the 20th business day following and including the commencement date, unless extended in accordance with the terms of the merger agreement and the applicable rules and regulations of the U.S. Securities and Exchange Commission (SEC). The consummation of the tender offer is subject to the satisfaction or waiver of certain conditions, including: (i) a majority of outstanding New Frontier Media shares on a fully diluted basis having been tendered into the offer and not validly withdrawn, (ii) there not having been a material adverse change with respect to New Frontier Media, (iii) New Frontier Media having not less than $11,514,000 in cash, and (iv) other customary conditions. The tender offer is not subject to a financing condition

The tender offer, if successful, will be followed by a second-step merger in which any shares of New Frontier Media not tendered into the offer will be converted into the right to receive the same per share consideration paid to New Frontier Media shareholders in the tender offer, subject to shareholders' dissenters' rights under Colorado law. As a result of the transaction, New Frontier Media's common stock would no longer be publicly-owned or traded on the NASDAQ market. Further details will be provided in filings with the SEC.

Avondale Partners LLC is acting as exclusive financial advisor to the Special Committee of the Board of Directors of New Frontier Media in connection with its review of strategic alternatives and the transaction and has rendered a fairness opinion to the Special Committee in connection with the transaction. Alston + Bird LLP is acting as legal advisor to the Special Committee. Holland & Hart LLP is acting as legal advisor to the Company.

Lipsitz Green Scime Cambria LLP and Dinsmore & Shohl LLP are acting as legal advisors to LFP Broadcasting in connection with the transaction.

### THE PROPOSED ACQUISITION

24.     On October 15, 2012, New Frontier announced that the Company has signed a

definitive agreement to be acquired by an affiliate of Flynt, which offers adult entertainment

through HUSTLER TV, for $2.02 per common share in cash for each share of New Frontier common stock, as well as a contingent cash payment right, not to exceed $0.06 for each common share. The Agreement and Plan of Merger was approved by New Frontier's Board of Directors, upon the unanimous recommendation of a Special Committee of the Board, which was comprised solely of non-employee independent directors.

25. On October 16, 2011, the Company filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") wherein it disclosed the Merger Agreement. The announcement and filing reveal that the Proposed Acquisition is the product of a flawed sale process and, unless the offer price is increased, would be consummated at an unfair price.

26. Indeed, the deal is so bad for New Frontier shareholders that both former CEO and director Michael Weiner and director David Nicholas resigned from their positions.

27. In his resignation letter, sent on September 28, 2012, David Nicholas stated, in pertinent part:

> I hereby submit my resignation as a director of New Frontier Media, Inc., effective immediately, as a result of my fundamental disagreement with recent actions taken by each of you, in your capacities as members of the Special Committee and otherwise, that I believe are not in the best interests of the shareholders, employees and other constituents of the Company.
>
> Since Longkloof Limited made its offer to acquire the Company back in March 2012, I believe the members of the Special Committee have put their own interests ahead of those of the shareholders and may have breached their fiduciary duties. Consistent with my fiduciary duties, I delivered to each of you a letter dated August 15, 2012 detailing my serious concerns that the Special Committee was imperiling the Company and pursuing its own personal self-interests at the expense of shareholders. In the letter, I suggested that we immediately hold a special meeting of the Board to cordially and productively discuss these concerns. Instead of coordinating to convene a meeting, I received a written response one month later from the members of the Special Committee containing self-serving and misleading statements that failed to adequately address my concerns.
>
> The following is a brief summary of some of my concerns that have compelled me to resign:

**Formation of Special Committee** - The purpose of the Special Committee established by the Board in response to the Longkloof offer was purportedly to evaluate the Company's current long-term business plan against a range of alternatives that have the potential to maximize shareholder value. I was appointed to serve on the Special Committee when it was first established by the Board.

However, the amount of additional fees other members of the Special Committee proposed to pay themselves became a sore point of contention among us. After I expressed my view that these fees were excessive and that I would be willing to continue to serve on the Special Committee without additional compensation, I was told by other members of the Special Committee that it would "look bad" if I was the only member who did not accept additional fees. Shortly thereafter, the size of the Special Committee was reduced from 5 to 3 and Mr. Woo and I were voted off the Special Committee. It was at this point that I began to have serious concerns with the policies, practices and motives of the Special Committee. At a subsequent Board meeting, Mr. Woo was added back to the Special Committee despite my emphatic objection as this would result in a majority of the Board serving on the Special Committee, thereby ceding control of the Company to the Special Committee.

\*        \*        \*

**Exclusion From Strategic Review Process** - The Special Committee has continuously excluded me and other Company executives from the strategic review process. I am fully aware of the reasons why an independent committee is necessary to run the process. However, the full Board still needs to be assured that the significant time and money being spent by the Special Committee is actually benefiting shareholders. Despite numerous requests in my capacity as a director, I was not given any meaningful updates on the process by the Special Committee. This lack of communication on the part of the Special Committee curtailed my ability to carry out my fiduciary duties as a director.

**Termination of Michael Weiner** - Based upon my conversations with senior management, in my view the Special Committee has effectively shut senior management out of the strategic review process, thereby making it extremely difficult for management to effectively run the business, and has attempted to usurp the duties of key members of management. This has culminated with the recent termination of Michael Weiner as CEO of the Company, a decision that was made by the Board members constituting the Special Committee without my approval and without seeking my input. Alan Isaacman, the Chairman of the Special Committee, has also replaced Mr. Weiner as Chairman of the Board. Prior to his termination, Mr. Weiner also raised what in my view are serious concerns with the lack of communication with management regarding the strategic review process, the Longkloof lawsuit and the activities of the members of the Special Committee in general.

It is my strong belief that the directors of any public company should be receptive to and welcome other points of view on the Board. This ensures a system of checks and balances that prevents any individual or group of directors from taking action that is contrary to the best interests of the shareholders, the true owners of the company. Unfortunately, the termination of Mr. Weiner as CEO, the replacement of Mr. Weiner as Chairman of the Board and the other activities of the Special Committee that have made it impossible for me to continue to serve as a director was in my view a coup d'etat carefully orchestrated by the members of the Special Committee to silence opposition. For example, I am told that despite the fact that I remain a director of the Company, certain members of management have been informed that speaking to me could create issues for them.

28.    In a follow up letter to the Board of Directors on October 8, 2012, Nichols said, in

pertinent part:

As I stated in my resignation letter, I believe I was removed from the Special Committee because I questioned the amount of additional fees its members agreed to pay themselves. Despite threats from other directors that my refusal to accept these committee fees would make them "look bad," I stand by my decision not to accept additional committee fees that I believe are excessive and unwarranted.

You have done a disservice to shareholders by failing to adequately address many of the concerns raised in my resignation letter. Your assertion that the Special Committee provided "periodic updates" to the other Board members in order to "help ensure an independent and unbiased process" is disingenuous on multiple levels. The limited updates I received regarding the strategic review process lacked substance and were designed to keep me in the dark about the interests of any potential bidders in the Company. Neither I nor the shareholders can be assured that the activities of the Special Committee, which have been going on for approximately eight months, are actually benefiting shareholders. In addition, my concerns regarding your potential business relationships, personal interests and/or agendas with respect to the strategic review process have been ignored. The issues I have raised regarding your independence also remain unaddressed.

The Special Committee has wasted corporate assets and in my view damaged the Company's business. Ultimately, each of you will be held accountable for any destruction of shareholder value that has resulted from your actions.

29.    After his resignation on October 10, 2012, Weiner stated in pertinent part:

I believe shareholders should be aware of the circumstances surrounding my termination including actions taken by the current directors that I believe were not in the best interests of shareholders. Specifically, I believe the current directors' decision to terminate me as CEO and not to re-nominate me or David Nicholas for

election as a director at the upcoming annual meeting of shareholders was, in my opinion, intended to stifle opposition and criticism from other directors and to entrench the members of the Special Committee on the Board.

During the past few months, I have raised significant concerns with the independence and conduct of the Special Committee, which is now comprised only of the current directors. The Special Committee was formed to review strategic alternatives after receipt of an acquisition proposal from Longkloof, the Company's largest stockholder, holding approximately 16% of the Company's outstanding shares. Instead of negotiating with Longkloof to receive a higher offer price than Longkloof's revised bid of $1.75 per share, the Special Committee filed an expensive lawsuit against Longkloof without a full vote of the Board and without first consulting with me. I have consistently expressed to the current directors my belief that the lawsuit was ill-advised from both a strategic and economic standpoint and the allegations in the lawsuit about me were baseless.

\*     \*     \*

Despite numerous requests, the Special Committee refused to provide me with meaningful information regarding its timetable and goals for the process and other aspects of the process, making it extremely difficult for me to run the business. I was also kept in the dark on the Longkloof litigation, making it impossible for me to properly address pressing inquiries from employees, shareholders, distributors and customers regarding this matter.

- Did the Special Committee consider whether my insights into the Company and its industry would have benefited the strategic review process and potentially lead to the receipt of higher bids?

- Did the Special Committee consider whether my insights would have assisted Avondale Partners with its valuation analysis of the Company?

- How can shareholders be assured that the activities of the Special Committee are actually benefiting shareholders?

- What is the status of the strategic review process? Shareholders have the right to know!

On September 29, 2012, David Nicholas resigned as a director of the Company as a result of disagreements with the current directors and concerns similar to mine regarding the Special Committee, the strategic review process and my termination as CEO. With my termination, the Special Committee has in my view effectively eliminated any and all opposition to its policies and practices by other directors and any semblance of a truly independent body to oversee the strategic review process. In my view, the lack of independence of the Special Committee and the

11

current directors' failure to nominate any new, unaffiliated director nominees for election at the upcoming annual meeting should raise glaring red flags with respect to the strategic review process and any acquisition proposal that may be recommended by the Board in the coming weeks.

- Did the Special Committee treat all bidders equally and conduct a fair and exhaustive review process?

- Does any member of the Special Committee have a personal or business relationship with any representatives of the bidders?

- Why has the Special Committee not concluded the strategic review process?

- Does the current composition of the Special Committee and the circumstances surrounding the resignation of me and David Nicholas create any legal exposure for the Company in connection with any proposed acquisition?

30.     The sale of New Frontier for the unreasonably low price of $2.02 per share during a period of economic downturn is to the detriment of the Company's public shareholders and would deprive the Company's shareholders of the opportunity to benefit from New Frontier's plans to increase the Company's value.

31.     In addition, the $2.02 offer is significantly less than many analyst estimates.  As reported by Yahoo! Finance, using data provided by Thompson Reuters First Call financial news service, the mean analyst target price for New Frontier stock was $4.00 per share.

32.     Moreover, the terms of the Merger Agreement will dissuade or otherwise preclude the emergence of a superior transaction.  Specifically, the Merger Agreement states:

Section 6.04                    No Solicitation.

(a)     The Company shall not, and shall cause its Subsidiaries not to, and shall not authorize or permit their respective Representatives to, directly or indirectly, (i) whether publicly or otherwise, initiate, solicit, knowingly encourage or knowingly facilitate any inquiry with respect to, or the making, submission or announcement of, any proposal, inquiry, offer or indication of interest that constitutes or would reasonably be expected to lead to a Takeover Proposal, (ii) participate in or knowingly encourage any negotiations or discussions regarding,

or furnish to any Person access to the business, properties, assets, books or records or provide any material non-public information or data with respect to, the Company or any of its Subsidiaries in connection with any proposal, inquiry, offer or indication of interest that constitutes or would reasonably be expected to lead to a Takeover Proposal, (iii) approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Takeover Proposal, (iv) amend or grant any waiver or release under, or fail to enforce, any standstill or similar contract with respect to any class of equity securities of the Company or any of its Subsidiaries, or (v) execute or enter into any agreement in principle, letter of intent, term sheet, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or other Contract relating to a Takeover Proposal (other than an Acceptable Confidentiality Agreement in connection with the actions contemplated by, and pursuant to, Section 6.04(b)) (any such Contract, a "Company Acquisition Agreement") or resolve, agree, approve, recommend or publicly propose to take such action. Except as otherwise expressly permitted by this Section 6.04, neither the Company Board nor any committee thereof shall (A) fail to make the Company Board Recommendation, (B) approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Takeover Proposal or enter into any Company Acquisition Agreement or resolve, agree, approve, recommend or publicly propose to take any such action, or (C) withdraw, amend, modify or qualify, in a manner adverse to Parent or Merger Sub, or propose publicly to withdraw, amend, modify or qualify in a manner adverse to Parent or Merger Sub, the Company Board Recommendation (any of the foregoing clauses (A), (B) and (C) above, a "Company Adverse Recommendation Change"); it being understood and agreed that any "stop-look-listen" communication by the Company Board to the shareholders of the Company pursuant to Rule 14d-9(f) under the Exchange Act (or any related communication to shareholders of the Company) will not be deemed a Company Adverse Recommendation Change. The Company shall, and shall cause its Subsidiaries to, and shall direct and use reasonable best efforts to cause its and their respective Representatives to, immediately cease and cause to be terminated, and shall not authorize or knowingly permit any of its or their Representatives to continue, any and all existing discussions or negotiations, if any, with any third party conducted prior to the date hereof with respect to any Takeover Proposal.

(b)        Notwithstanding Section 6.04(a), prior to the Offer Closing, the Company Board, directly or indirectly through any Representative, may, subject to compliance with Sections 6.04(c) and 6.04(d), (i) (A) in response to a bona fide written Takeover Proposal made after the date hereof that the Company Board determines in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, constitutes or would reasonably be expected to result in, a Superior Proposal, and which Takeover Proposal did not result from a breach of Section 6.04(a), (1) contact the Person making such Takeover Proposal for the purpose of clarifying the proposal and any material contingencies and the likelihood of consummation to make the determinations

described in the definition of "Superior Proposal," (2) furnish non-public information relating to the Company or any of its Subsidiaries to the Person making such Takeover Proposal and its Representatives pursuant to an executed confidentiality agreement that constitutes an Acceptable Confidentiality Agreement, and (3) engage or participate in negotiations or discussions with such Person and its Representatives regarding such Takeover Proposal, and (B) if requested by a Third Party that has entered into a confidentiality, standstill or similar agreement with the Company prior to the date hereof (including where such request is prohibited under the terms of the applicable confidentiality and standstill agreement), waive any prohibition with respect to the submission of a Takeover Proposal or amendment thereto in any such agreement, in any such case, if the Company Board determines, in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, that failure to do so would be inconsistent with its fiduciary duties under applicable Law, (ii) terminate this Agreement pursuant to Section 8.04(a) and/or make a Company Adverse Recommendation Change in response to a material event, development or change in circumstance (not in connection with a Takeover Proposal) that is unknown by the Company Board as of the date of this Agreement, if the Company Board determines in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, that the failure to do so would be inconsistent with its fiduciary duties under applicable Law; provided that the Company shall provide Parent with no fewer than three (3) days' notice of any Company Adverse Recommendation Change prior to such change (and during such three (3) day period, the Company agrees that the Company and its Representatives shall negotiate in good faith with Parent and its Representatives regarding such revisions to the terms of the Offer, the Merger and the other transactions contemplated by this Agreement proposed by Parent as shall be necessary or appropriate to address such event, development or change in circumstances), provided, that in the event of a termination of this Agreement pursuant to this clause (ii), the Company complies with its obligations to pay the Termination Fee in Section 8.06(b)), (iii) if the Company Board determines in response to a Takeover Proposal that such proposal is a Superior Proposal, and the Company Board determines in good faith, after consultation with the Company's outside legal counsel and the Company Financial Advisor, that the failure to do so would be inconsistent with its fiduciary duties under applicable Law, terminate this Agreement pursuant to Section 8.04(a) and/or make a Company Adverse Recommendation Change and, in the case of a termination, the Company shall, substantially concurrently with the termination of this Agreement, enter into the Company Acquisition Agreement implementing such Superior Proposal provided, that in the event of a termination of this Agreement pursuant to this clause (iii), the Company complies with its obligations to pay the Termination Fee in Section 8.06(b) and/or (iv) take any action that any court of competent jurisdiction orders the Company to take (which Order remains unstayed). Nothing contained herein shall prevent the Company Board from disclosing to the Company's shareholders a position contemplated by Rule 14d-9 and Rule 14e-2(a) or Item 1012(a) of Regulation M-A promulgated under the Exchange Act or from making any

14

disclosure to the shareholders of the Company with regard to a Takeover Proposal, if the Company Board determines in good faith, after consultation with the Company's outside legal counsel, that failure to do so could reasonably be expected to violate applicable Law or would be inconsistent with its fiduciary duties under applicable Law.

(c)    The Company shall, within forty-eight (48) hours after receipt thereof, (i) notify Parent in writing of the receipt by the Company or any of its Representatives of any Takeover Proposal or request for information or inquiry, in each case, from any third party, that expressly contemplates or that the Company believes would reasonably be expected to lead to a Takeover Proposal, and (ii) the third party making, and details of the material terms and conditions of, any such Takeover Proposal, request or inquiry (including any change to the financial terms, conditions or other material terms thereof and the terms of any and all agreements in connection therewith (including any financial arrangements)). The Company shall keep Parent reasonably informed of any related material developments, discussions and negotiations related to any such Takeover Proposal or inquiry and shall make available to Parent all material non-public information made available to any Person making any such Takeover Proposal at substantially the same time as it provides such information to such other Person.

(d)    The Company may not enter into (or permit any Subsidiary to enter into) a Company Acquisition Agreement (other than an Acceptable Confidentiality Agreement), unless: (i) the Company notifies Parent, in writing, at least three (3) days (the "Notice Period") before entering into (or causing a Subsidiary to enter into) a Company Acquisition Agreement, of its intention to take such action, which notice shall state expressly that the Company has received a Takeover Proposal that the Company Board intends to declare a Superior Proposal and that the Company intends to enter into a Company Acquisition Agreement; (ii) the Company attaches to such notice the most current version of the proposed agreement; (iii) the Company shall, during the Notice Period, negotiate with Parent in good faith to make such adjustments in the terms and conditions of this Agreement so that such Takeover Proposal ceases to constitute a Superior Proposal, if Parent, in its discretion, proposes to make such adjustments (it being agreed that in the event that, after commencement of the Notice Period, there is any material revision to the terms of a Superior Proposal, including any revision to price or form of consideration or any material change to other terms of such Superior Proposal occurring prior to the Company's effecting a Company Adverse Recommendation Change or terminating this Agreement pursuant to Section 8.04(a), the Notice Period shall be extended, if applicable, to ensure that at least two (2) Business Days remain in the Notice Period subsequent to the time the Company notifies Parent of any such material revision (it being understood that there may be multiple extensions)); and (iv) the Company Board determines in good faith, after consulting with its outside legal counsel and its Company Financial Advisor, that such Takeover Proposal continues to constitute a Superior Proposal after taking into account any adjustments made by Parent during the

Notice Period in the terms and conditions of this Agreement.

33.    The presence of the no solicitation provision, therefore, can only have been designed to provide an even greater layer of protection for the Proposed Transaction and effectively dissuade the emergence of competing offers.

34.    The Merger Agreement also has unreasonably high termination fee of $1 million, or 5% of the Company's market capitalization on October 15, 2012, the day the merger was announced. More specifically, regarding the Termination Fee, the Merger Agreement states:

> (ii)    Company in the event of the termination of this Agreement pursuant to Sections 8.02 (under circumstances involving a breach of any representation, warranty, covenant or agreement of the Parent or Merger Sub set forth in this Agreement, where such breach has been the proximate cause of, or resulted in, the event described in subsection (a), (b) or (c) of such section), 8.04(b) or 8.04(c).
>
> (b)    The Company's retention of Earnest Money Deposit pursuant to Section 8.06(a) or otherwise shall in no event be deemed to be liquidated damages for any breach by the Parent or Merger Sub hereunder and shall not be exclusive of any other remedy available to the Company contained in this Agreement, at Law or in equity, but shall be credited against any other money damages that the Company may be determined to be entitled under this Agreement at Law or in equity.
>
> (c)    If this Agreement is terminated by Parent pursuant to Section 8.03(a) or 8.03(b), then the Company shall pay to Parent (by wire transfer of immediately available funds), within two (2) Business Days after such termination, a fee in an amount equal to the Termination Fee.
>
> (d)    If this Agreement is terminated by the Company pursuant to Section 8.04(a), then the Company shall pay to Parent (by wire transfer of immediately available funds), at or prior to such termination, the Termination Fee.
>
> (e)    Notwithstanding anything in this Agreement to the contrary, in the event that the Termination Fee is paid to Parent in accordance with this Section 8.06, the payment of such Termination Fee shall be the sole and exclusive remedy of Parent, Merger Sub, and their respective subsidiaries, shareholders, Affiliates, officers, directors, employees and Representatives against the Company or any of its directors, officers, employees, Representatives or Affiliates with respect to (i) any loss or damage (including consequential, special, indirect or punitive damages) suffered, directly or indirectly, as a result of the failure of any transactions contemplated hereby, including the purchase of the shares of Company Common Stock pursuant to the Offer and the Merger, to be

16

consummated, (ii) the termination of this Agreement, (iii) any liabilities or obligations arising under this Agreement, or (iv) any claims or actions arising out of or relating to any breach, termination or failure of or under this Agreement.

(f)     Parent and Merger Sub, on the one hand, and the Company, on the other hand, acknowledge and hereby agree that the provisions of this Section 8.06 are an integral part of the transactions contemplated by this Agreement, and that, without such provisions, the other would not have entered into this Agreement. Accordingly, if the Company shall fail to pay in a timely manner the amounts due to Parent pursuant to this Section 8.06, and, in order to obtain such payment, the Parent makes a claim against the Company that results in a judgment against the Company, the Company shall pay to the Parent the reasonable costs and expenses of the Parent (including its reasonable attorneys' fees and expenses) incurred or accrued in connection with such suit. The parties acknowledge and agree that in no event shall (i) the Company be obligated to pay the Termination Fee on more than one occasion.

(g)     Except as otherwise provided in this Agreement, whether or not the Offer or the Merger is consummated, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the party incurring such Expenses.

35.     In yet a further attempt to "lock-up" the Proposed Transaction, the Company has granted an irrevocable "Top-Up Option" to Flynt allowing it to acquire up to 90% plus one share of Company common stock, without a shareholder vote and without any requirement of establishing the entire fairness of the Proposed Transaction:

Section 1.04                    Top-Up Option.

(a)     The Company hereby grants to Merger Sub an irrevocable option (the "Top-Up Option"), exercisable only on the terms and conditions set forth in this Section 1.04, to purchase at a price per share equal to (i) the Offer Price paid in the Offer plus (ii) a CPR, that number of shares of Company Common Stock (the "Top-Up Shares") equal to the lowest number of shares of Company Common Stock that, when added to the number of shares of Company Common Stock owned by Parent and Merger Sub at the time of exercise of the Top-Up Option, shall constitute one share more than 90% of the Fully Diluted Shares immediately after the issuance of the Top-Up Shares (the "Short Form Threshold"); provided, that the Top-Up Option will not be exercisable unless, immediately after such exercise and the issuance of Top-Up Shares pursuant thereto, the Short Form Threshold would be reached (after giving effect to the issuance of the Top-Up Shares); provided, further, that (i) the Top-Up Option shall not be exercisable for a number of shares of Company Common Stock in excess of the shares of

Company Common Stock authorized and unissued at the time of exercise of the Top-Up Option (giving effect to the shares of Company Common Stock issuable pursuant to all then-outstanding stock options, restricted stock units and any other rights to acquire Company Common Stock as if such shares were outstanding) and (ii) the exercise of the Top-Up Option and the issuance and delivery of the Top-Up Shares shall not be prohibited by any Law or Order.

(b)     The Top-Up Option shall be exercisable only once, in whole but not in part, at any time prior to the third (3rd) Business Day following the purchase of and payment for shares of Company Common Stock pursuant to the Offer by Merger Sub, or if any subsequent offering period is provided, during the three (3)-Business Day period following the expiration date of such subsequent offering period, and only if Merger Sub shall beneficially own as of such time at least a majority of the outstanding shares of Company Common Stock.

(c)     In the event Merger Sub wishes to exercise the Top-Up Option, Merger Sub shall notify the Company in writing, and shall set forth in such notice (i) the number of shares of the Company Common Stock owned by Parent and Merger Sub at the time of such notice (giving effect to the Offer Closing) and (ii) a place and a time for the closing of such purchase which shall, unless the Independent Directors otherwise agree, be at the Company's principal offices not less than one (1) Business Day after receipt of such notice. The Company shall, promptly following receipt of such notice, deliver written notice to Merger Sub specifying, based on the information provided by Merger Sub in its notice, the number of Top-Up Shares to be purchased by Merger Sub. At the closing of the purchase of Top-Up Shares, the purchase price payable for each Top-Up Share shall consist of (i) an amount equal to the Offer Price (the "Initial Top-Up Payment") plus (ii) a CPR. The aggregate Initial Top-Up Payment (calculated by multiplying the number of such Top-Up Shares by the Offer Price) shall be paid to the Company at Parent's election, either (i) entirely in cash, by wire transfer of same-day funds or (ii) by issuing to the Company a promissory note having a principal amount equal to the aggregate purchase price pursuant to the Top-Up Option (the "Promissory Note"). The Promissory Note (i) shall bear simple interest at a rate of four percent (4.0%) per annum, (ii) shall mature on the first anniversary of the date of execution of the Promissory Note, (iii) shall be full recourse to Parent and Merger Sub, (iv) may be prepaid, at any time, in whole or in part, without premium or penalty, and (v) shall have no other material terms, provided, however, that the Promissory Note and the issuance of the Top-Up Shares shall in any case be in compliance with all of the requirements of Section 7-106-202 of the CBCA. The CPR shall be payable in cash, as provided in the CPR Agreement. The Company shall cause to be issued to Merger Sub a certificate representing the Top-Up Shares or, if the Company does not then have certificated shares of Company Stock, the applicable number of Book-Entry Shares. Such certificates or Book-Entry Shares may include any legends that are required by federal or state securities Laws.

(d)      In the event Merger Sub wishes to exercise the Top-Up Option, Merger Sub shall notify the Company in writing, and shall set forth in such notice (i) the number of shares of the Company Common Stock owned by Parent and Merger Sub at the time of such notice (giving effect to the Offer Closing), (ii) the manner in which it intends to pay the Initial Top-Up Payment, and (iii) a place and a time for the closing of such purchase which shall, unless the Independent Directors otherwise agree, be at the Company's principal offices not less than one (1) Business Day after receipt of such notice. The Company shall, promptly following receipt of such notice, deliver written notice to Merger Sub specifying, based on the information provided by Merger Sub in its notice, the number of Top-Up Shares to be purchased by Merger Sub.

(e)      Parent and Merger Sub acknowledge that any Top-Up Shares issued upon exercise of the Top-Up Option will not be registered under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act") and that all such shares will be issued in reliance upon an applicable exemption from registration under the Securities Act. Each of Parent and Merger Sub hereby represents and warrants to the Company that Merger Sub is, and will be, upon the purchase of the Top-Up Shares, an "accredited investor," as defined in Rule 501 of Regulation D under the Securities Act. Merger Sub agrees that the Top-Up Option and the Top-Up Shares to be acquired upon exercise of the Top-Up Option are being and will be acquired by Merger Sub for the purpose of investment and not with a view to, or for resale in connection with, any distribution thereof (within the meaning of the Securities Act).

(f)      Any dilutive impact on the value of the shares of Company Common Stock as a result of the issuance of the Top-Up Shares or the payment by Merger Sub to the Company of consideration for the Top-Up Shares, will not be taken into account in any determination of the fair value of any Dissenting Shares pursuant to Article 113 of the CBCA as contemplated by Section 3.03 and none of the parties hereto shall take any contrary position in any appraisal proceeding.

(g)      Without the prior written consent of the Company, the right to exercise the Top-Up Option granted pursuant to this Agreement may not be assigned by Merger Sub other than to Parent or a direct or indirect wholly-owned Subsidiary of Parent, including by operation of Law or otherwise, and any attempted assignment in violation of this Section 1.04(e) will be null and void.

36.      These extensive deal protection devices were designed to preclude any competing offers that could present better value for the Company's shareholders.  Through the use of the no-solicitation provision, matching rights, Top-Up Option, and the termination fee described

herein, the Individual Defendants have effectively locked up the Proposed Acquisition at terms favorable to themselves and Flynt, and detrimental to New Frontier's common shareholders.

37.     Thus, the terms of the Proposed Transaction are inadequate and unfair as to price and process, and are in violation of Defendants' fiduciary obligations to the public shareholders of New Frontier.

38.     Accordingly, in the absence of injunctive relief, shareholders may be forced to accept inadequate consideration for their shares.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to C.R.C.P. 23, *et seq.*, individually and on behalf of all holders of New Frontier common units who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

40.     This action is properly maintainable as a class action because, *inter alia*:

(a)     The Class is so numerous that joinder of all members is impracticable. New Frontier's units are publicly traded on the NASDAQ and, as of October 24, 2012, there were 16.19 million shares outstanding;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. These common questions include, *inter alia*: (i) whether the Individual Defendants have breached any of their fiduciary duties to Plaintiff and the other members of the Class, including the duties of good faith, due care, honesty and fair dealing; (ii) whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage competing offers for the

Company or its assets; and (iii) whether the Individual Defendants have irreparably harmed Plaintiff and the other members of the Class;

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the rest of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interests; and

(e)     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty Against the Individual Defendants)

41.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42.     By the acts, transactions and courses of conduct alleged herein, Defendants have violated their fiduciary duties of good faith, loyalty, and due care at the expense of Plaintiff and other members of the Class.

43.     As alleged herein, the Individual Defendants have failed to, *inter alia*:

44.   Apprise themselves of the true value of the Company or the benefits of an alternative transaction;

45.   Ensuring that the Proposed Transaction maximizes shareholder value; and

46.   Otherwise take the steps necessary to comply with their fiduciary duties.

47.   As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value and the disclosure of material information.

48.   In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

     (a) Undertake an appropriate evaluation of New Frontier's value;

     (b) Adequately evaluate the Proposed Transaction;

     (c) Openly consider other potentially value-maximizing transactions;

     (d) Refrain from favoring their own interests over those of the public shareholders, to, among other things, ensure that conflicts of interest do not unfairly influence the shareholders' decisions or available options; and

     (e) Disclose all material facts necessary to permit the Company's public shareholders to make an informed decision with respect to the Proposed Transaction or any alternate transaction.

49.   Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm as result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiff and the Class have no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty Against Flynt)**

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     Defendant Flynt is sued herein as an aider and abettor of the breaches of fiduciary duties outlined above by the Individual Defendants, as members of the Board of New Frontier. Flynt rendered substantial assistance to such breaches.

52.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

53.     Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm as result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands the following relief against Defendants:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representative and his counsel as Class counsel;

B.     Preliminarily and permanently enjoining the Individual Defendants, and anyone acting in concert with them, from proceeding with the sale of the Company unless and until they have acted in accordance with their fiduciary duties;

C.     Requiring the Individual Defendants to properly exercise their fiduciary duties to Plaintiff and the Class by, among other things: (i) ascertaining the true value of the Company; (ii) considering whether the Proposed Transaction or an alternate transaction maximizes shareholder value; (iii) ensuring that an alternate transaction is not unreasonably precluded; and

(iv) making full and fair disclosure of all material facts to Plaintiff and the Class in connection with any potential transaction;

      D.     Declaring that the Individual Defendants have violated their fiduciary duties to Plaintiff and the Class;

      E.     Awarding Plaintiff the costs of this action, including a reasonable allowance for attorneys' and experts' fees and costs; and

      F.     Granting such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated November 2, 2012

*Pursuant to C.R.C.P. 121, 1-26(7), a*
*duly signed copy of this pleading is on file*
*the offices of [Local Counsel]*

By:

s/Charles W. Lilley
s/Karen Cody-Hopkins
_____

Charles W. Lilley, #9443
Karen Cody-Hopkins, of Counsel, #35367
730 17th Street, Suite 670
Denver, CO 80202
Tel.: (303) 293-9800
Fax: (303) 298-8975
clilley@lilleylaw.com
karen@ciodyhopkinslaw.com

Katharine M. Ryan
Richard A. Maniskas
**RYAN & MANISKAS, LLP**
995 Old Eagle School Rd.
Wayne, PA 19087
Telephone: 484-588-5516
Facsimile: 484-450-2582

Brian P. Murray
Benjamin D. Bianco
**MURRAY FRANK LLP**

275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

*Attorneys for Plaintiffs*