# EXHIBIT 2

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY, COLORADO<br>Court Address:<br>1777 Sixth Street P.O. Box 4249, Boulder, CO, 80306-4249<br><br>**Plaintiff(s)** GOPAL CHAKRAVARTHY<br>v.<br>**Defendant(s)** ALAN ISAACMAN et al. | DATE FILED: January 11, 2013<br><br><br>⚠ **COURT USE ONLY** ⚠ |
| | Case Number: 2012CV30051<br>Division: 2          Courtroom: |
| **Order Re: Plainitff's Amended Motion for Expedited Proceedings** | |

ACTION TAKEN.

Denied.  See 01/11/13 Order Re: Plaintiff's Motion for Reconsideration.

Issue Date: 1/11/2013

*Maria E. Berkenkotter*

MARIA E BERKENKOTTER
District Court Judge

| | |
|---|---|
| ☐ Small Claims   ☐ County Court   ☒ District Court<br>☐ Probate Court   ☐ Juvenile Court   ☐ Water Court<br>City and County of Boulder, Colorado<br>Court Address:  1777 Sixth Street<br>                        Boulder, Colorado  80302 | |
| **PLAINTIFF:**  GOPAL CHAKRAVARTHY, on behalf of himself and all others similarly situated, and derivatively on behalf of NEW FRONTIER MEDIA, INC.,<br><br>v.<br><br>**DEFENDANTS:** ALAN ISAACMAN, HIRAM J. WOO, MELISSA HUBBARD, WALTER TIMOSHENKO, FLYNT BROADCASTING, INC. and LFP BROADCASTING LLC,<br><br>**NOMINAL DEFENDANT:** NEW FRONTIER MEDIA, INC., | ▲  **COURT USE ONLY**  ▲<br><br>Case Number: 2012CV30051<br><br>Ctrm:  2 |
| Attorneys for Plaintiff and Class:<br>Charles W. Lilley, #9443<br>Karen Cody-Hopkins, Of Counsel, #35367<br>Charles Lilley & Associates P.C.<br>730 17th Street, Suite 670<br>Denver, Colorado 80202<br>Phone: 303-293-9800 Fax: 303-298-8975<br>clilley@lilleylaw.com karen@codyhopkinslaw.com | |

## PLAINTIFF'S AMENDED MOTION AND BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS

### CRCP 121 §1-15(8)MEET & CONFER:

The Complaint was filed Nov. 7, 2012.  On November.7, 2012 co-counsel Evan Smith of Brodsky & Smith, LLC tried to call Stuart Bennett of Jones & Keller, counsel for Defendants; as no one was available, Smith sent an email to Bennett advising of the case filing and asking to meet and confer regarding expedited discovery.  Smith included the proposed Order filed with the Plaintiff's Motion for Expedited Proceedings.  On November 7, 2012, Mr. Bennett acknowledged receiving Smith's email but due to travel would not be able to respond further. [Plaintiff's Co-Counsel also spoke to an associate of Mr. Bennett.] Given the upcoming holiday and short time frame before the November 27, deadline, Plaintiff filed Plaintiff's Motion for Expedited Proceedings on November 8, 2012 and it was accepted November. 9, 2012.  On November 9-10, 2012, Plaintiff attempted both to serve Defendants and/or to get waivers of

service and get an update on Defendants' position re: expedited discovery. Defendant's counsel indicated Plaintiffs could send them waiver forms but still gave no response on expedited discovery. On November 14, 2012, Mr. Smith spoke to Mr. Bennett and was told the defendants would not agree to expedited discovery.

On November 19, 2012, Plaintiff's Co-counsel Lilley contacted Defendant's Counsel Stuart Bennett regarding **this Motion to Reconsider.** Defendant's Counsel continues to oppose the requested expedited discovery and thus opposes this Motion to Reconsider.

Plaintiff, by his undersigned attorneys, respectfully moves this Court for an Order, in the form attached hereto, expediting discovery in this action. The grounds for this Motion are as follows:

## PRELIMINARY STATEMENT

Plaintiff initiated this shareholder class action on behalf of himself and all other public shareholders of New Frontier Media, Inc. ("NFM" or the "Company") against NFM and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on October 15, 2012 (the "Proposed Transaction"), pursuant to which NFM will be acquired by LFP Broadcasting, LLC ("LFP Broadcasting") and its wholly-owned subsidiary, Flynt Broadcast, Inc. ("Merger Sub," and together with LFP Broadcasting, "LFP"). ¶ 1.[1]

On October 15, 2012, the Board caused NFM to enter into a definitive agreement and plan of merger (the "Merger Agreement"). ¶ 2. Pursuant to the Merger Agreement, LFP has commenced a tender offer (the "Tender Offer") to purchase all of the outstanding shares of NFM common stock for $2.02 per share in cash, without interest. *Id.* NFM shareholders may also be entitled to receive additional contingent cash payments, not to exceed $0.06 per common share, under certain conditions. *Id.* The Tender Offer will remain open for a minimum of twenty business days following the commencement. *Id.*

The Proposed Transaction is the product of a flawed process that resulted from the Board's failure to maximize shareholder value and deprives NFM's public shareholders of the ability to participate in the Company's long-term prospects. ¶ 3. Furthermore, in approving the Merger Agreement, the Individual Defendants breached their fiduciary duties to plaintiff and the Class. *Id.* Moreover, as alleged in the Complaint, NFM and LFP aided and abetted the Individual Defendants' breaches of fiduciary duties. *Id.*

Compounding the unfairness of the Proposed Transaction is the Individual Defendants' attempt to obtain shareholder approval of the Proposed Transaction through materially incomplete and misleading disclosures in the Solicitation/Recommendation Statement filed with the United States Securities and Exchange Commission (the "SEC") on October 29, 2012 (the "Solicitation Statement"). ¶ 4. The Solicitation Statement is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction. *Id.*

---

[1] Citations to "¶ __" are to paragraphs of the Class Action Complaint (the "Complaint"). To the extent not otherwise defined herein, capitalized terms shall have the same meaning as in the Complaint.

## FACTUAL BACKGROUND

The history of the Proposed Transaction is so rife with conflict, disagreement and discontent that it culminated in the firing of NFM co-founder and CEO Michael Weiner ("Weiner") and the resignation of two-thirds of the NFM Board, including then Board Chairman Weiner (and David Nicholas ["Nicholas"]), over the Special Committee's decision to agree to the Proposed Transaction. The conflicted process is evidenced by a series of scathing mailings to and from current and former NFM Board members following the Company's receipt of an unsolicited offer to be acquired by Longkloof Limited ("Longkloof") and are referenced, in pertinent part, below.

On March 9, 2012, NFM received the first unsolicited offer to purchase the Company from Longkloof, an investment holding company with an approximate 15% interest in NFM, for $1.35 per share. ¶ 41. In a letter to NFM shareholders, Longkloof indicated that it had attempted to engage the NFM Board in "meaningful discussions" with respect to acquiring the Company but had been rebuffed in its attempts. ¶ 42. The Longkloof letter questioned the Board's capabilities given the precipitous decline of NFM's stock price over the past five years from above $9.00 to (its then current trading price of) $1.13 as well as the Board's commitment and direction to the Company given the lack of equity ownership by the directors. *Id.*

On March 23, 2012, NFM received a second unsolicited offer, this from Manwin Holding SARL ("Manwin"), to be acquired for $1.50 per share cash. ¶ 43. Following receipt of the unsolicited offers by Longkloof and Manwin, on April 3, 2012, NFM executed indemnity agreements with each member of the Company's Board of Directors and executive officers: namely, each of Ms. Melissa Hubbard and Messrs. Weiner, Alan Isaacman ("Isaacman"), Nicholas, Hiram J. Woo, Walter Timoshenko, Grant Williams, Scott Piper and Marc Callipari. Isaacmen, Chairman of the Special Committee stated at the time, "Our Board of Directors remains very enthusiastic about NFM Media's future prospects and has made no decision to sell the Company." ¶ 44.

Unable to engage the Company in meaningful discussions related to its $1.35 per share offer, on May 2, 2012, NFM received a notice from an affiliate of Longkloof, Hosken Consolidated Investments ("Hosken"), that it intended to nominate four individuals for election to the NFM Board of Directors at the Company's 2012 Annual Meeting of Shareholders. ¶ 45. On May 23, 2012, Longkloof increased its offer to $1.75 per share. ¶ 46. Threatened with Hosken's proxy contest, on May 31, 2012, NFM filed suit against Hosken and Longkloof to stop the proxy contest. *Id.* Longkloof counterclaimed on June 11, 2012. ¶ 48. The Longkloof counterclaim alleged the NFM Board breached, and is breaching, its fiduciary duties in denying Longkloof's nomination slate of four directors and in stonewalling Longkloof's previously announced all-cash, fully financed offer. *Id.* The counterclaim also alleged that the Board is seeking to entrench itself in order to continue to pay themselves extravagant directors' fees that ranged between $87,500 and $110,000 per director in fiscal 2012. *Id.*

Longkloof, Hosken (collectively, the "Longkloof Parties") and NFM agreed to settle their litigation on July 12, 2012. ¶ 49. Under the terms of the settlement agreement, the Longkloof Parties agreed to immediately terminate their proxy contest, withdraw their notice of intent to

nominate four candidates for election to the Company's Board of Directors (the "Board"), and not support, for the balance of 2012, any other person not recommended by the Board in seeking representation on the Board.  *Id.*  In addition, the Longkloof Parties agreed to certain standstill restrictions through December 31, 2012, and the Company agreed that if it does not engage in a sale, merger or similar change of control transaction by December 31, 2012, Longkloof will have the right to designate one person for appointment to the Board for a term expiring at the 2013 annual meeting of shareholders and, under certain circumstances, the Company will be obligated to include such designee on the slate of nominees presented by the Company to shareholders at the 2013 annual meeting of shareholders.  *Id.*

Motivated to enter into an alternative transaction as soon as possible to negate the expiration of certain standstill restrictions contained in the July 12, 2012, settlement agreement, on October 15, 2012, NFM and LFP jointly announced the terms of the Proposed Transaction. ¶¶ 56-57.

The following excerpts of communications between the NFM Board and certain of its directors illustrate a clear difference of opinion as to the adequacy of the review process undertaken by the Special Committee, the level of communication among board members, the incentivising of Board members to be apart of the review process and which if any proposed deal was in the best interests of NFM.  *Id.*  So large was the discrepancy in NFM director opinion that, ultimately, NFM co-founder, President, CEO and Board Chairman Weiner resigned/was fired as was long-time director Nicholas.  *Id.*

For example, on September 18, 2012, NFM issued a press release indicating that Weiner was terminated as CEO on September 15, 2012.  ¶ 50.  Then, on September 29, 2012, Nicholas tendered his resignation from the Board.  ¶ 51.  In a letter to the Board, Nicholas cited many reasons for his resignation, including (a) the Special Committee's self-serving interests and desire to pay themselves "excessive" fees for a job that should require no additional compensation, (b) the fractured review process that "continuously exclude[d]" him, (c) the lack of communication within the Committee that "curtailed [his] ability to carry out [his] fiduciary duties, and (d) the termination of Weiner, a decision that was made without input or approval from all Board members.

The Board countered with a mailing of its own on October 4, 2012, criticizing Nicholas' "ability to act in the best interests of shareholders and fulfill [his] fiduciary duties," for disagreeing with the direction, leadership and evaluations to date performed by the Special Committee.  ¶ 52.

By letter dated October 8, 2012, Nicholas responded,
Let me be clear for the record that my disappointment with your transgressions and my concerns about potential breaches of your fiduciary duties should not be confused, as suggested in your letter, as malcontent or "sour grapes" caused by your decision not to re-nominate me for election at the upcoming annual meeting. I assure you that my reputation in the industry during the past thirty-two years has not, and will not, be impacted by your self-serving and transparent attempt to demonize me. I am nevertheless compelled, in the interest of full disclosure to

4

shareholders, to address various inaccuracies in your letter and to reiterate some of the concerns you failed to address […]

The Special Committee has wasted corporate assets and in my view damaged the Company's business. Ultimately, each of you will be held accountable for any destruction of shareholder value that has resulted from your actions.

¶ 53.

Determined to have the last word, the Board responded on October 10, 2012, "It is clear that you and the members of the Special Committee will continue to have extremely different and contrasting views as to how best to serve the interests of the shareholders of NFM Media and how a member of the board of directors of a public company should comply with his or her fiduciary duties." ¶ 54. Also on October 10, 2012, Weiner resigned from the Board. ¶ 55. Weiner's October 16, 2012, resignation letter questioned whether actions by the Board "ma[d]e the Company a less attractive acquisition candidate[,]" as well as whether "the Special Committee treat[ed] all bidders equally and conduct[ed] a fair and exhaustive review process[,]" and whether "any member of the Special Committee ha[s] a personal or business relationship with any representatives of the bidders[.]" *Id.* Weiner stated that he believes the Board took actions that "were not in the best interests of shareholders[.]" *Id.*

It is clear that the significant issues raised by Weiner and Nicholas are not academic. ¶ 58. Committing to a process that fails to allow a full and fair bidding process will be detrimental to achieving the most value for shareholders. *Id.* Indeed, at least one Yahoo! Finance Analyst has set a $4.00 per share price target for NFM stock and the stated book value of the Company for the last quarter was $2.79, more than 25% higher than the deal struck with LFP. *Id.*

## **ARGUMENT**

## I.   **EXPEDITED PROCEEDINGS ARE NECESSARY AND APPROPRIATE, AND THUS SHOULD BE GRANTED**

Pursuant to Colorado Civ. R. Proc. 26(d) "a party may not seek discovery from any source before submission of the proposed Case Management Order . . . unless the Court upon motion orders otherwise." Colorado courts are willing to grant expedited discovery where it is appropriate. *See, e.g., Bowlen, PDB Sports, Ltd. v. District Court, County of Adams*, 733 P.2d 1179, 1181 (Col. Sup. Ct. 1987); *Van Schaack Holdings, Ltd. v. L.C. Fulenwider, Jr.*, 798 P.2d 424, 426 (Col. Sup. Ct. 1990). Plaintiff, therefore, seeks an order for expedited discovery in anticipation of filing a motion for preliminary injunction to enjoin the Proposed Transaction.

Courts act "with a certain solicitude for plaintiffs" and have "followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Giammargo v. Snapple*

*Beverage Corp.*, C.A. No. 13845, 1994 Del. Ch. LEXIS 199, at *6 (Del. Ch. Nov. 15, 1994).[2] "A party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted.  Exceptions to that norm are rare."  *In re Int'l Jensen Inc. S'holders Litig.*, Consol. C.A. No. 14992, 1996 Del. Ch. LEXIS 77, at *1-2 (Del. Ch. July 16, 1996).  As the Supreme Court of Delaware has observed, "courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 399 (Del. 1997).

The threshold for obtaining expedited proceedings is low.  The Court needs to ascertain "'whether in the circumstances the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding.'"  *See Police & Fire Ret. Sys. of The City of Detroit v. Bernal*, C.A. No. 4663-CC, 2009 Del. Ch. LEXIS 111, at *3 (Del. Ch. June 26, 2009) (quoting *Giammargo*, 1994 Del. Ch. LEXIS 199, at *6).  Moreover, in granting a motion to expedite discovery, courts have noted that "[m]otions to expedite require something of an almost superficial factual assessment in order to determine whether imposing the burdens resulting from expedition is warranted." *Cnty. of York Emps. Ret. Plan v. Merrill Lynch & Co.*, *Inc.*, C.A. No. 4066-VCN, 2008 Del. Ch. LEXIS 162, at *21 (Del. Ch. Oct. 28, 2008).

### A.    The Complaint States Colorable Disclosure Claims

Courts have expressed a strong preference to adjudicate claims seeking injunctive relief to remedy defendants' alleged violations of the fiduciary duty of disclosure.  *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356-63 (Del. Ch. 2008).  The facts pled in the Complaint, as shown below, establish colorable claims for relief meriting expedited proceedings in advance of a preliminary injunction hearing.  These facts are also sufficient to satisfy the requisite showing of irreparable injury.  *Rosen v. Wind River Sys., Inc.*, C.A. No. 4674-VCP, 2009 Del. Ch. LEXIS 114, at *8-10 n.10 (Del. Ch. June 26, 2009).[3]

On October 29, 2012, the Company filed the 14D-9 with the SEC, which recommends that NFM shareholders accept the offer and tender all of their shares in the Tender Offer.  ¶ 73. The 14D-9 misrepresents and omits material information necessary for NFM shareholders to make an informed decision on whether to tender their shares in the Offer.  *Id.*  Specifically, the 14D-9 omits material information with respect to the process and events leading up to the Proposed Transaction, and the opinion and analyses of NFM's financial advisor.  *Id.*  This

---

[2] Colorado courts have looked to Delaware cases for corporate law issues.  *See Pueblo Bancorporation v. Lindoe, Inc.,* 63 P.3d 353, 365 (Colo., 2003)(Because the General Assembly enacted Colorado's corporate code based largely on the Model Act [i.e. Delaware's], we presume that it intended, to some degree, to place Colorado's corporate law in step with the law of other states.)

[3] "Irreparable harm generally exists where the injury cannot be adequately compensated in damages." *Alpha Builders, Inc. v. Sullivan*, C.A. No. 698, 2004 Del. Ch. LEXIS 162, at *19 (Del. Ch. Nov. 5, 2004).  A claim for irreparable harm "must be of such a nature that no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice." *State v. Del. State Educ. Ass'n*, 326 A.2d 868, 875 (Del. Ch. 1974).

omitted information, if disclosed, would significantly alter the total mix of information available to the public holders of NFM's shares.  *Id.*

      As courts have held, shareholders are entitled to an accurate description of the "process" directors used "in coming to their decision to support the Merger."  *See Nagy v. Bistricer*, 770 A.2d 43, 60 (Del. Ch. 2000).  The court in *Nagy* further held that "[i]nformation of this kind is self-evidently material to [a shareholder's] decision whether to accept the merger consideration or to seek appraisal." *Id.*; *see also Arnold v. Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1280 (Del. 1994) (holding that directors are obligated to provide "an accurate, full, and fair characterization" of the "history leading up to the [m]erger . . .").

      Here, the 14D-9 is deficient because it fails to disclose fully the following information with respect to the process that led to the Proposed Transaction:

      a.    Whether Weiner had the permission of the board as of July 8, 2010 to begin soliciting interest in a potential transaction.

      b.    Whether the board was aware of the confidentiality agreement with LFP in July 2010 and the information being provided to LFP.

      c.    What form or type of "potential transaction" Weiner was contemplating when he reached out to LFP on July 8, 2010, as well as the motivating factor(s) for Weiner to explore a transaction at this time.

      c.    The criteria NFM and Weiner used to identify LFP as a potential partner in a transaction.

      d.    The information was supplied to LFP by NFM prior to July 27, 2010, in order to evaluate a potential transaction as well as the reasons expressed by LFP for not making an offer to acquire the Company at that time.

      e.    Whether NFM had consulted with a financial advisor prior to the July 27, 2010 meeting with LFP and prior to supplying information to LFP to review.

      f.    Whether NFM had discussions with any other companies regarding a potential transaction between July 27, 2010, and July 2011 and whether such discussions were solicited or unsolicited.

      g.    Who initiated the contact between LFP and the Company during July 2011.

      h.    The extent and scope of the personal relationship and personal business dealings between Weiner and Adam Rothstein.

      i.    The specific reasons that the Special Committee retained Avondale as its advisor.

j.      The specific revisions to the Special Committee's arrangement with Avondale that would, in the case that the Company were to pursue a sale transaction, incentivize Avondale to pursue a transaction to maximize shareholder value.

k.      The primary reason that the Special Committee reduced its size form 5 to 3 in and around April 23, 2012; namely, the plan to remove Weiner and Nicholas from the Special Committee.

l.      Whether Avondale or the Special Committee requested information from Manwin and/or LFP similar to the information requested from Longkloof on or about April 6, 2012.

m.      The criteria utilized by Avondale with respect to the 20+ potential buyers contacted to solicit interest, the exact number of potential buyers contacted and the number of strategic versus financial potential buyers.

n.      The content of the call between Avondale and Mr. Rothstein on May 15, 2012.

o.      All reasons for the Board's decision to file suit against Longkloof.

p.      The basis for the Special Committee's decision that it would "preempt" its process if Manwin submitted an acquisition proposal of a minimum of $2.50 a share.

q.      The distinctions, if any, between the confidentiality agreement that the Company wanted Longkloof to sign in July 2012 and those requested of Manwin and LFP.

r.      Whether the Special Committee or Avon dale requested that Bidder C propose a cash only offer in light of the complexity of the offer received on or about July 17, 2012.

s.      The specific issues raised by Longkloof that caused it in September 2012 to value NFM "substantially below $2.00."

t.      Avondale and or the Special Committee's efforts to determine the details of Bidder C's planned financing of it $1.90 indication of interest and the specific concerns Avondale and/or the Special Committee has with Bidder C's ability to finance the transaction.

u.      Whether Longkloof, Manwin or Bidder C ties their indications of interest to the Company's Net Available Cash similar to LFP.

    v.       The specific reasons that Mr. Weiner was terminated as CEO on September 15, 2012 and removed as Chairman of the Board.

    w.      The specific reasons provided by Mr. Nicholas for his resignation from the Board on or about September 29, 2012.

    x.       The specific reasons provided by Mr. Weiner for his resignation from the Board on or about October 10, 2012.

    y.       The correspondence between Mr. Nicholas and the Special Committee/Board of Directors and Mr. Weiner and the Special Committee/Board of Directors not provided in the Proxy.

¶ 74.

The 14D-9 also omits material information with respect to the financial matters disclosed in the 14D-9, including the analyses conducted by NFM's financial advisors, Avondale Partners LLC ("Avondale"). ¶ 75. The failure to disclose is particularly acute given that the information that should be provided to shareholders is set forth in the presentations made by Avondale to the Board. *Id.* Based on the completion of a narrowly prescribed fairness opinion, as set forth herein, the 14D-9 fails to provide adequate information to evaluate both the deal and Avondale's analysis thereof as follows:

***Discounted Cash Flow Analysis*** (p.44)
1.     The definition of cash flow used.

2.     The inputs and assumptions to derive the range of discount rates (20.0% to 30.0%).

3.     How stock-based compensation was treated in the analysis (i.e. cash or non-cash expense).

4.     How, if at all, the value of the Company's NOLs was accounted for.

***Precedent Transactions Analysis*** (p.44 – 45)
1.     The Enterprise Value / LTM EBIT multiples for each of the comparable precedent transactions selected by Avondale in its analysis.

2.     Multiples observed by Avondale other than EV / LTM EBIT multiples for the selected precedent transactions (ex. EV / LTM Revenue).

***Comparable Company Analysis*** (p.46)
1.     The following multiples for each of the comparable public companies:
    a.     Enterprise Value / LTM EBIT
    b.     Enterprise Value / CY2012E EBIT
    c.     Enterprise Value / CY2013E EBIT

    d.     Price / LTM EPS  
    e.     Price / CY2012E EPS  
    f.     Price / CY2013E EPS  

**Projections**

1.    The financial projections provided by New Frontier management and relied upon by Avondale for purposes of its analysis, for fiscal years 2013-2017, for the following items:

    a.     Tax rate  
    b.     Capital expenditures  
    c.     Unlevered free cash flow  

*Id.*

There is a substantial likelihood that a reasonable NFM shareholder would consider each of these omitted facts important in deciding whether to tender his or her shares or seek appraisal. *See Van Schaack Holdings, Ltd. v. Van Schaack*, 867 P.2d 892, 899 (Colo. 1994) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976); *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279 (Del. 1989)) (setting forth test for materiality of omitted fact); *In re Netsmart Techs., Inc., S'holders Litig.*, 924 A.2d 171, 199 (Del. Ch. 2007).  As a result of these material omissions, as set forth in the Complaint, Plaintiff has articulated colorable disclosure claims, thus satisfying the first part of his burden on an application for expedited discovery.  *See Giammargo*, 1994 Del. Ch. LEXIS 199, at *6 (in seeking expedited proceedings, plaintiffs bear burden of demonstrating: (1) a sufficiently colorable claim, and (2) a sufficient possibility of threatened irreparable injury); *Laborers Local 235 Benefit Funds v. Starent Networks Corp.*, C.A. No. 5002-CC, 2009 Del. Ch. LEXIS 210, at *1-2 (Del. Ch. Nov. 18, 2009) (finding that expedited discovery was warranted where even one disclosure claim alleged by the plaintiff was found to be colorable).[4]

When directors of corporations seek shareholder action, they are obligated to disclose fully and fairly all material information within their control.  *Netsmart*, 924 A.2d at 199.  While they do not have to provide information that is simply "helpful," once directors take it upon themselves to disclose information, that information must not be misleading.  *In re The MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 24-25 (Del. Ch. 2004).  To that end, once directors travel down the road of a "partial disclosure," they become obligated to provide shareholders with an accurate, full, and fair characterization of events.  *Id.* at 25; *see also In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001) ("directors must also avoid partial disclosures that create a materially misleading impression").  This is specifically the case with disclosures concerning the analyses and opinion of a financial advisor in support of a transaction:

> Once a board broaches a topic in its disclosures, a duty attaches to provide information that is "materially complete and unbiased by the omission of material facts."  For this reason, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that

---

[4] To the extent the Court agrees that Plaintiff has articulated colorable disclosure claims, the second requirement for expedited proceedings also has been met.  *See In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 452 (Del. Ch. 2002).

opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a "fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the[] board as to how to vote . . . rely."

*Netsmart*, 924 A.2d at 203-04 (citations omitted); *see also Pure Res.*, 808 A.2d at 449. "[I]nvestment bankers' analyses . . . usually address the most important issue to stockholders – the sufficiency of the consideration being offered to them for their shares in a merger or tender offer." *Pure Res.*, 808 A.2d at 449.

Each of the above-referenced omitted facts is material, especially considering the fact that most arise from "partial disclosures" by defendants. Without the omitted material information to complete the picture, NFM's shareholders will be left without a meaningful opportunity to decide whether to tender their shares or seek appraisal.

**B.     The Complaint States Colorable Claims Against Defendants For Violating Their Fiduciary Duties In Connection With The Proposed Transaction**

Without expedited discovery, Plaintiff will not be able to present his motion for preliminary injunction on a full and fair record as to his claims that the Individual Defendants violated their fiduciary duties in connection with their approval of the Proposed Transaction. That motion seeks to enjoin Defendants from taking any action to consummate the Proposed Transaction. Absent equitable relief, it will be impossible to determine just how much a potential acquiror would have paid for NFM. *See Bernal,* 2009 Del. Ch. LEXIS 111, at *4. Courts have stated that such circumstances are adequate to state a colorable claim for irreparable harm that cannot be remedied by money damages. *See In re Int'l Jensen Inc.*, 1996 Del. Ch. LEXIS 77, at *6. Thus, without expedited discovery, Plaintiff and NFM's other shareholders will be damaged irreparably because injunctive relief may be the "only realistic remedy" here regarding plaintiff's challenge to the Proposed Transaction. *Bernal*, 2009 Del. Ch. LEXIS 111, at *7.

Among other things, the Complaint alleges, to the detriment of NFM's shareholders, that the Merger Agreement's terms substantially favor LFP and are calculated to unreasonably dissuade potential suitors from making competing offers. ¶ 62. For example, the Merger Agreement contains certain provisions that unduly benefit LFP by making an alternative transaction either prohibitively expensive or otherwise impossible. For example, the Merger Agreement contains a termination fee provision that requires NFM to pay $1,000,000.00 to LFP if the Merger Agreement is terminated under certain circumstances. *Id.* In contrast, the Merger Agreement does not require LFP to pay a reciprocal termination fee to NFM under *any* circumstances. ¶ 63.

The Merger Agreement also contains a "No Solicitation" provision that restricts NFM from considering alternative acquisition proposals by, *inter alia*, constraining NFM's ability to solicit or communicate with potential acquirers or consider their proposals. ¶ 64. Specifically, the provision prohibits NFM from soliciting any alternative proposal, but permits the Board to

consider an *unsolicited* proposal only if it constitutes or is reasonably calculated to lead to a "Superior Proposal" as defined in the Merger Agreement. *Id.* However, even the Board's consideration of unsolicited proposal is restricted: prior to considering any such proposal, the Board must determine, in consultation with its financial advisors, that its fiduciary duties *require* it to consider the proposal. *Id.* Thus, the Board cannot consider alternative proposals even if it reasonably believes that any such proposal would be beneficial to shareholders. *Id.* Significantly, in its May 23, 2012 letter to the Board, Longkloof specifically offered to allow a go shop period with respect to is offer. Failing to similarly negotiate such an agreement with LFP raises questions as to not only the effort to maximize shareholder value but also with respect to the continued question of the bias on the part of the Special Committee. ¶ 65.

Further, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, Defendants agreed to provide LFP information in order to match any other offer, thus providing LFP access to the unsolicited bidder's financial information and giving LFP the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of LFP. ¶ 66.

Additionally, the Merger Agreement contains provisions that permit LFP to purchase NFM regardless of whether a majority of the Company's shareholders support the deal or not by way of a Top-Up Option. ¶ 67. The Top-Up Option ensures that LFP will acquire control of at least 90% of the Company's outstanding common stock without regard to whether a single shareholder tenders their shares in the Tender Offer, and squeeze out the Company's minority common stockholders for the entirely unfair price of $2.02 per share. ¶ 68. Moreover, although Colorado law provides that a plan of merger shall be approved by a majority of all the votes entitled to be cast on the merger, the Merger Agreement itself demonstrates the Defendants' intent to facilitate LFP's acquisition of NFM without such a vote. Section 6.05(d) addresses a merger without a meeting of shareholders:

> Notwithstanding the foregoing and anything to the contrary contained in this Agreement, if, following the Offer Closing and the exercise, if any, of the Top-Up Option, the shares of Company Common Stock beneficially owned by Parent, Merger Sub and their Affiliates equal or exceed the Short Form Threshold, the parties hereto shall take all necessary and appropriate action, including with respect to the transfer to Merger Sub of any shares of Company Common Stock held by Parent or its Affiliates, to cause the Merger to become effective as soon as practicable following the Offer Closing without the Company Shareholders Meeting in accordance with Section 7-111-104 of the CBCA.

¶ 69.

Generally, courts look closely at the reasonableness of deal protection measures in merger agreements and undertake a "nuanced, fact-intensive inquiry." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015-16 (Del. Ch. 2005); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985). There are no pre-conceived thresholds upon which a deal protection term will be either approved or rejected, and the Court's analysis will consider "the preclusive or coercive power of all deal protections included in a transaction, taken as a whole." *La. Mun.*

*Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del. Ch. 2007).[5]

Directors have a duty to conduct a fair process that does not favor any bidder to the detriment of their own shareholders. Although courts have held that it is permissible for a board to deal exclusively with one party or to focus on a single-bidder, such an approach is only appropriate if "the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction." *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del. 1989). Moreover, "a board may never favor one bidder over another for a selfish or inappropriate reason" unless the board "in good faith and advisedly it believes shareholder interests would be thereby advanced." *In re Fort Howard Corp. S'holders Litig.*, C.A. No. 9991, 1988 Del. Ch. LEXIS 110, at *41 (Del. Ch. Aug. 8, 1988); *see also In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (2007) (noting that "any favoritism [directors] display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares"); *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 781-82 (Del. Ch. 1988) (explaining that "the board may tilt the playing field if, but only if, it is in the shareholders' interest to do so."). This duty extends to the use of deal protection provisions, which may operate to the detriment of shareholders by discouraging value-maximizing alternative transactions. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 (Del. 1986); *Omnicare Inc. v. NCS Healthcare Inc.*, 818 A.2d 914, 939 (Del. 2003); *Paramount Commcn's Inc. v. QVC Network*, 637 A.2d 34, 49 (Del. 1994).

In light of the foregoing and the additional allegations in the Complaint, Plaintiff has asserted colorable claims concerning the fairness of the Proposed Transaction. As a result, Plaintiff respectfully submits that expedited discovery is appropriate, given, *inter alia*, allegations that the Individual Defendants breached their fiduciary duties by agreeing to an inadequately priced transaction via a conflicted sales process, exacerbated by their agreement to a basket of onerous deal protection measures that unreasonably preclude other bidders from making superior offers for the Company.

In *Bernal*, the plaintiff alleged that a number of deal protection devices, including a no-shop clause and a termination fee, locked up a deal in favor of one bidder, and dissuaded disinterested parties from making an offer for the Company. The plaintiff in *Bernal* moved for expedited discovery on the basis of this claim, and the defendants opposed expedition. *Bernal*, 2009 Del. Ch. LEXIS 111, at *2. In granting the request for expedited discovery, the *Bernal* court noted that it need only determine whether the plaintiff has stated a "sufficiently *colorable* claim to justify proceeding on an expedited schedule." *Id.* at *5 (emphasis in original).[6] The court ruled that, under the circumstances, the plaintiff had "alleged facts that state a colorable claim that the Data Domain board is favoring one bidder over others, thereby deterring bids from third parties that could provide greater value to Data Domain shareholders." *Id.*

---

[5] For example, while a "3% rule for termination fees might be convenient for transaction planners, it is simply too blunt an instrument, too subject to abuse, for this Court to bless as a blanket rule." *Crawford*, 918 A.2d at 1181 n.10 (internal citations omitted).

[6] In doing so, the court noted that it accepted as true the well-pleaded factual allegations in the complaint. *Bernal*, 2009 Del. Ch. LEXIS 111, at *3.

Under the well-pleaded factual allegations in the Complaint, which are to be accepted as true for purposes of this Motion, plaintiff has similarly stated a colorable claim for injunctive relief. Here, as in *Bernal*, Plaintiff also has established a sufficient likelihood of irreparable injury. As held in *Bernal*, the deal protection measures in the Merger Agreement are currently having an adverse impact on NFM shareholders by deterring potential bidders. "Harm resulting from such deterrence is incalculable." *Id.* at *6.[7]

Finally, Defendants' violations alone establish the requisite irreparable injury. Where, as here, a board of directors has agreed to a sale of control in breach of its fiduciary duty to obtain the best transaction reasonably available, injunctive relief is appropriate. *See QVC Network*, 637 A.2d at 51. Courts have held that injunctive relief is appropriate where, as here, the process leading to approval of a sale of control has been flawed by the directors' breach of their obligation to obtain the highest value reasonably available. *See id.* at 43-47.

### C.    The Discovery Sought By Plaintiff

Plaintiff seeks limited expedited discovery for purposes of a hearing on a motion for a preliminary injunction directed at enjoining the Proposed Transaction until curative disclosures can be made. Plaintiff seeks the following core documents from Defendants:

1.    All minutes (including drafts) and/or notes from any meeting of the board of directors of NFM concerning the Transaction and any material distributed at or in connection with those meetings;

2.    Any financial projections reviewed and/or considered by any of the Defendants and/or Avondale Partners LLC ("Avondale") in connection with the Transaction or any alternative thereto;

3.    Documents relating to any presentations by NFM's management and/or their advisors to the Board concerning the Company's growth prospects;

4.    Any documents provided to or received from NFM's financial advisor(s) including, but not limited to, any engagement letter and/or fairness opinion letter and any investment bankers' books or analysis documents (including drafts and/or excel spreadsheets in native format) concerning the Transaction or any alternative thereto;

5.    Documents sufficient to identify the amounts paid to Avondale by NFM or Defendants and/or any of their respective affiliates during the past five years;

6.    Documents concerning any discussion or negotiations concerning any employment or consulting agreements in place or contemplated by Defendants (or

---

[7] The court in *Bernal* further noted that in light of Delaware Supreme Court precedent, in cases such as this one, the shareholders' only "realistic" remedy for certain breaches of fiduciary duty in connection with a sale of control may be injunctive relief. *Id.* at *7.

any of its affiliates) concerning any current NFM officer, director or member of senior management;

7.      Documents sufficient to show any projections or analyses of the financial results of the company following consummation of the Proposed Transaction; and

8.      Any communications among any of the Defendants, including emails or test messages, concerning the Proposed Transaction or any alternative thereto, or employment arrangements concerning any NFM officer, director or member of senior management.

9.      Special committee meeting minutes from January 2012 through the present.

10.     All presentations to the special committee.

Plaintiff also seeks to depose a limited number of witnesses with knowledge of the events surrounding the Proposed Transaction:

1.      Alan Isaacman

2.      Person Most Knowledgeable from Avondale with respect to the Proposed Transaction

3.      Person Most Knowledgeable from LFP with respect to the Proposed Transaction

Plaintiff respectfully requests that his request for the above referenced core documents be made available within three days (3) and the witnesses be made available for depositional purposes within seven (7) days following the Courts Order due to the fact that Defendants have chosen the very fast moving tender process that will expire on **November 27, 2012.**

## CONCLUSION

For the reasons set forth above, and as detailed in the Complaint, Plaintiff respectfully requests entry of an Order, in the form filed herewith, scheduling a preliminary injunction hearing, and authorizing plaintiff to conduct expedited discovery in support thereof.

Dated: November 19, 2012                         Respectfully submitted,

*Pursuant to C.R.C.P. 121, 1-26(7),a*
*duly signed copy of this pleading is on file*
*the offices of [Local Counsel]*

s/Charles W. Lilley
s/Karen Cody-Hopkins
Charles W. Lilley, #9443
Karen Cody-Hopkins, of Counsel, #35367

15

730 17th Street, Suite 670
Denver, CO 80202
Tel.: (303) 293-9800
Fax: (303) 298-8975
clilley@lilleylaw.com
karen@ciodyhopkinslaw.com

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
610-667-6200
610-667-9029 (facsimile)

*Attorneys for Plaintiff*

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY, COLORADO<br>Court Address:<br>1777 Sixth Street P.O. Box 4249, Boulder, CO, 80306-4249<br><br>**Plaintiff(s)** GOPAL CHAKRAVARTHY<br>v.<br>**Defendant(s)** ALAN ISAACMAN et al. | DATE FILED: January 11, 2013<br><br><br>⚠ **COURT USE ONLY** ⚠ |
| | Case Number: 2012CV30051<br>Division: 2          Courtroom: |
| **Order Re: Plaintiff's Motion to Reconsider** | |

ACTION TAKEN.

The Court denies the Motion to Reconsider on the merits of the request for expedited discovery.  Asserting the request is "in anticipation of filing a motion for preliminary injunction" is quite different than a motion for expedited discovery filed in conjunction with a Motion for Preliminary Injunction.

Issue Date: 1/11/2013

*Maria E. Berkenkotter*

MARIA E BERKENKOTTER
District Court Judge

<table>
<tr><td>

☐ Small Claims   ☐ County Court   ☒ District Court<br>
☐ Probate Court   ☐ Juvenile Court   ☐ Water Court<br>
City and County of Boulder, Colorado<br>
Court Address:  1777 Sixth Street<br>
                 Boulder, Colorado  80302

**PLAINTIFF:**  GOPAL CHAKRAVARTHY, on behalf of himself and all others similarly situated, and derivatively on behalf of NEW FRONTIER MEDIA, INC.,

v.

**DEFENDANTS:** ALAN ISAACMAN, HIRAM J. WOO, MELISSA HUBBARD, WALTER TIMOSHENKO, FLYNT BROADCASTING, INC. and LFP BROADCASTING LLC,

**NOMINAL DEFENDANT:** NEW FRONTIER MEDIA, INC.,

Attorneys for Plaintiff and Class:<br>
Charles W. Lilley, #9443<br>
Karen Cody-Hopkins, Of Counsel, #35367<br>
Charles Lilley & Associates P.C.<br>
730 17th Street, Suite 670<br>
Denver, Colorado 80202<br>
Phone: 303-293-9800 Fax: 303-298-8975<br>
clilley@lilleylaw.com karen@codyhopkinslaw.com

</td><td>

▲  **COURT USE ONLY**  ▲

Case Number: 2012CV30051

Ctrm:  2

</td></tr>
</table>

### PLAINTIFF'S MOTION TO RECONSIDER ORDER STRIKING PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY

       Plaintiff, by his undersigned attorneys, respectfully moves this Court to reconsider its November 16, 2012 Order denying requested expedited discovery.  Plaintiff believes the Court may use its discretion to consider Plaintiff's Amended Motion for Expedited Discover after reviewing the reasons stated below.{See Exhibit A & B Plaintiff's Amended Motion for Expedited Discover and Proposed Order].

       **CRCP 121 §1-15(8):** On November 19, 2012, Plaintiff's Co-counsel Lilley contacted Defendant's Counsel Stuart Bennett regarding **this Motion to Reconsider.** Defendant's Counsel continues to oppose the requested expedited discovery and thus opposes this Motion to Reconsider.

The grounds for this Motion to Reconsider are as follows:

On November 8, 2012, Plaintiff filed a Motion for Expedited Discover asking this Court for an Order granting specific expedited discovery related to a very fast moving tender process that will expire on November 27, 2012.  Plaintiff inadvertently forgot to include in the Motion details about their CRCP 121 § 1-15(8) Meet and Confer communications with Defendant's Counsel.

## PRE-MOTION MEET & CONFER EFFORTS

The Complaint was filed Nov. 7, 2012.  On November.7, 2012 co-counsel Evan Smith of Brodsky & Smith, LLC tried to call Stuart Bennett of Jones & Keller, counsel for Defendants; as no one was available, Smith sent an email to Bennett advising of the case filing and asking to meet and confer regarding expedited discovery.  Smith included the proposed Order filed with the Plaintiff's Motion for Expedited Proceedings.  On November 7, 2012, Mr. Bennett acknowledged receiving Smith's email but due to travel would not be able to respond further. [Plaintiff's Co-Counsel also spoke to an associate of Mr. Bennett.] Given the upcoming holiday and short time frame before the November 27, deadline, Plaintiff filed Plaintiff's Motion for Expedited Proceedings on November 8, 2012 and it was accepted November. 9, 2012.  On November 9-10, 2012, Plaintiff attempted both to serve Defendants and/or to get waivers of service and get an update on Defendants' position re: expedited discovery.  Defendant's counsel indicated Plaintiffs could send them waiver forms but still gave no response on expedited discovery.  On November 14, 2012, Mr. Smith spoke to Mr. Bennett and was told the defendants would not agree to expedited discovery.  On November 16, 2012, Defendants filed a Response to Plaintiff's Motion.  On November 16, 2012 this Court issued an Order striking Plaintiff's Motion for failure to meet and confer pursuant to CRCP 121 § 1-15(8)

Plaintiff requests that Plaintiff be allowed to amend their previously filed Motion by adding the CRCP 121 § 1-15(8) Meet & Confer information and moves this Court for an Order, in the form attached hereto, expediting critical discovery in this action.  Time is of the essence with the holiday and November 27, 2012 deadline imminent.

Defendants already filed a Response to Plaintiff's Motion for Expedited Proceedings on November 16, 2012. And the Court can accept Defendant's  Response to Plaintiff's Amended Motion for Expedited Proceedings as the **only** difference between the two Motions is in the Section labeled "CRCP 121 § 1-15(8) Meet and Confer communications."

Plaintiff respectfully requests that his request for the above referenced core documents be made available within three days (3) and the witnesses be made available for depositional purposes within seven (7) days following the Courts Order due to the fact that Defendants have chosen the very fast moving tender process that will expire on November 27, 2012.

## CONCLUSION

For the reasons set forth above, and as detailed in the Complaint, Plaintiff respectfully requests entry of an Order asking the Court to reconsider its ruling striking Plaintiff's original Motion for Expedited Discover, and requesting an expedited ruling on Plaintiff's Amended Motion for Expedited Discover in the form filed herewith, scheduling a preliminary injunction hearing, and authorizing plaintiff to conduct expedited discovery in support thereof.

Dated: November 19, 2012                              Respectfully submitted,

*Pursuant to C.R.C.P. 121, 1-26(7),a*
*duly signed copy of this pleading is on file*
*the offices of [Local Counsel]*

s/Charles W. Lilley
s/Karen Cody-Hopkins
Charles W. Lilley, #9443
Karen Cody-Hopkins, of Counsel, #35367
730 17th Street, Suite 670
Denver, CO 80202
Tel.: (303) 293-9800
Fax: (303) 298-8975
clilley@lilleylaw.com
karen@ciodyhopkinslaw.com

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
610-667-6200
610-667-9029 (facsimile)

*Attorneys for Plaintiff*