# EXHIBIT 4

<table>
<tr><td>

☐ Small Claims  ☐ County Court  ☒ District Court
☐ Probate Court  ☐ Juvenile Court  ☐ Water Court

City and County of Boulder, Colorado
Court Address:  1777 Sixth Street
                   Boulder, Colorado  80302

</td><td>

DATE FILED: November 7, 2012 11:01 AM
FILING ID: 90260492

</td></tr>
</table>

**PLAINTIFF:** GOPAL CHAKRAVARTHY, on behalf of himself and all others similarly situated, and derivatively on behalf of NEW FRONTIER MEDIA, INC.,

**DEFENDANTS:** ALAN ISAACMAN, HIRAM J. WOO, MELISSA HUBBARD, WALTER TIMOSHENKO, FLYNT BROADCASTING, INC. and LFP BROADCASTING LLC,

**NOMINAL DEFENDANT:** NEW FRONTIER MEDIA, INC.,

Attorneys for Plaintiff:
Charles W. Lilley, #9443
Karen Cody-Hopkins, Of Counsel, #35367
Charles Lilley & Associates P.C.
730 17th Street, Suite 670
Denver, Colorado 80202
Phone: 303-293-9800
Fax: 303-298-8975
clilley@lilleylaw.com
karen@codyhopkinslaw.com

▲ COURT USE ONLY ▲

Case Number:

Ctrm:

**CLASS ACTION COMPLAINT**

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## NATURE OF THE ACTION

1.     This is a derivative action brought by shareholders of nominal party New Frontier Media, Inc. ("NFM" or the "Company") on behalf of the Company, and a class action brought on

behalf of the public stockholders of NFM who have been, and continue to be, deprived of the opportunity to realize fully the benefits of their investment in the Company.

2.      This action arises from breaches of fiduciary duties by the Director Defendants (as defined below) in connection with LFP Broadcasting LLC ("LFP") and Flynt Broadcasting, Inc.'s (the "Merger Sub") (the Director Defendants, NFM, LFP and Merger Sub are collectively referred to herein as "Defendants") October 15, 2012, proposed cash offer (the "Offer") to acquire all of the issued and outstanding shares of Company common stock at a price per share equal to (1) $2.02 (the "Offer Price"), and (2) one contingent right per company share ("CPR") (the "Proposed Transaction").  Each CPR represents a contractual right to receive a contingent cash payment not to exceed $.06 per share.  The Offer was commenced on October 29, 2012 and expires on November 27, 2012.  no later than 10 business days from the date of the Merger Agreement and will keep the Offer open for at least 20 business days.

3.      Plaintiff alleges that he, along with all other public shareholders of NFM common stock, is entitled to enjoin the Proposed Transaction or, alternatively, to recover damages in the event that the Proposed Transaction is consummated.  The consideration offered to NFM shareholders is grossly inadequate.

4.      In pursuing their unlawful objective to squeeze out NFM's public shareholders, the Director Defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and they have also aided and abetted such breaches by other NFM officers and directors.  Although a special committee (the "Special Committee") was formed by the Company to evaluate the Proposed Transaction, the Special Committee is at clear odds with one another, so much so that prior to entering into the Proposed Transaction, two

directors resigned from their posts in defiance over the chosen direction of the Company. Thus, the Special Committee is not capable of a fair evaluation of the Proposed Transaction.

5.      In fact, in CEO, President and Board Chairman Michael Weiner's resignation letter to the Board, he specifically questioned, among other things, (a) whether shareholders can be assured the activities of the Special Committee are actually benefiting shareholders, (b) the valuation analysis performed by the Company, (c) whether the Special Committee treated all bidders equally, (d) whether the Special Committee engaged the Company in a fair and exhaustive review process, and (e) whether members of the Special Committee have business or personal relationships with any representatives of the bidders, and various other acts and omissions of the committee.

6.      On October 29, 2012, the Company filed its Solicitation/Recommendation Statement Under Section 14(D) of the Securities Exchange Act Of 1934 with the Securities and Exchange Commission ("SEC") on Schedule 14D-9 (the "Proxy"). That same day, LFP filed its Offer to Purchase for Cash (the "Tender Offer") with the SEC. The Proxy contains numerous material misstatements and omissions. As explained below, the Proxy exposes some general details of the highly conflicted sales process, but fails to disclose material facts concerning the Proposed Acquisition – preventing shareholders from casting an informed vote for or against the Proposed Acquisition. For example, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the significantly conflicted sales process for NFM, including the failure to disclose the infighting among the members of the Board; (b) NFM's financial projections; and (c) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinion" provided by the Special Committee's financial advisor, Avondale Partners LLC ("Avondale"). Moreover, review of the Proxy further

establishes that the price offered to NFM shareholders is woefully inadequate and can not be supported by a properly prepared valuation of the Company.

7.      To ensure a deal with LFP, the Individual Defendants agreed to several preclusive deal mechanisms which effectively discourage other bidders from making successful topping bids and prevent NFM shareholders from recognizing the full, fair and adequate value of their shares.  Among the preclusive mechanisms in the deal are:  (i) a "no solicitation" clause that prevents the Company from attracting, contacting or providing any potential alternative acquirers with Company information; (ii) a "matching rights" provision intended to give LFM any and every opportunity to ensure that an alternative transaction ceases to constitute a Superior Proposal; (iii) a termination fee of $1,000,000; and (iv) a Top-Up Option that will allow LFP to acquire NFM regardless of whether a majority of the Company's shareholders support the deal or not.

8.      In approving the Proposed Acquisition, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, inter alia, (i) agreeing to sell NFM without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) failing to disclose all material information concerning the Proposed Acquisition.  Moreover, as alleged further herein, LFP aided and abetted the Individual Defendants' breaches of fiduciary duty. Accordingly, this action seeks to enjoin the Proposed Acquisition and compel the Individual Defendants to properly exercise their fiduciary duties to NFM's shareholders.

9.      The Proposed Transaction will deprive NFM shareholders of important information regarding the value of their Company shares, and it will also deny them adequate consideration in light of the Company's growth, anticipated operating results, net asset value,

and future profitability.  Under these facts and circumstances, the decision of the Director Defendants to consider the Proposed Transaction constitutes nothing more than a sham and breach of their fiduciary duties.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that is incorporated in, conducts business in, and maintains operations in this State, or is an individual who has sufficient minimum contacts with the State of Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to NFM occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12.     This action is not removable under the Securities Litigation Uniform Standard Act ("SLUSA"), 15 U.S.C. § 78bb(f), because this action is based upon the statutory or common law of the State of Colorado, in which NFM  is incorporated, and seeks injunctive relief. Additionally, this action involves: (1) a communication with respect to the sale of NFM common stock; (2) that was made by and on behalf of NFM  to its shareholders; and (3) concerns decisions of NFM shareholders with respect to voting their securities, or acting in response to a possible acquisition offer.

## PARTIES

13.     Plaintiff Gopal Chakravarthy is, and at all relevant times has been, an owner of shares of NFM common stock.

14.     Nominal Defendant NFM is a Colorado corporation headquartered at 6000 Spine Road, Suite 100, Boulder, Colorado, 80301.  NFM engages in the provision of transactional television services; and distribution of general motion picture entertainment.  NFM operates in three segments: Transactional TV, Film Production, and Direct-to-Consumer.  The Transactional TV segment distributes branded adult entertainment pay-per-view (PPV) networks and video-on-demand (VOD) content through electronic distribution platforms, including cable television and direct broadcast satellite operators.  The Film Production segment produces and distributes mainstream and erotic films that are distributed on domestic and international premium channels, PPV channels, and VOD systems across a range of cable and satellite distribution platforms.  This segment also distributes various independently produced motion pictures to worldwide markets, and provides producer-for-hire services to Hollywood studios.  The Direct-to-Consumer segment aggregates and resells adult content to subscribers through its consumer Web sites. The company primarily serves cable and satellite operators, movie channel providers, and Hollywood studios principally in the United States, Europe, the Middle East, Africa, Latin America, Canada, and Asia.  NFM common stock is traded on the NasdaqGS stock exchange under the symbol "NOOF."

15.     Defendant Alan Isaacman ("Isaacman") has served as a director of the Company since 2009.  Isaacman has served as Chairman of the NFM Board since September 18, 2012.  Isaacman is the beneficial owner of 366,235 NFM shares representing 2.3% of all outstanding Company shares.

16.     Defendant Hiram J. Woo ("Woo") has served as a director of the Company since 2001.  According to the 2012 Proxy, Woo is Chairman of the Company's Audit Committee and Nominations Committee and is a member of the Compensation Committee, Special Committee, and Executive Committee.  Woo is the beneficial owner of 67,790 NFM shares.

17.     Defendant Melissa Hubbard ("Hubbard") has served as a director of the Company since 2002.  According to New Frontier's Annual Proxy Statement filed with the SEC on Form DEF 14A on September 21, 2012 (the "2012 Proxy"), Hubbard is a member of the Company's Audit Committee and Executive Committee.  She is also a member of a special committee of the Board that was formed to review potential strategic alternatives for the Company (the "Special Committee").  Hubbard is the beneficial owner of 142,500 NFM shares.

18.     Defendant Walter Timoshenko ("Timoshenko") has served as a director of the Company since 2007.  According to the 2012 Proxy, Timoshenko is Chairman of the Company's Compensation Committee and is a member of the Company's Nominations Committee, Special Committee, and Executive Committee.  Timoshenk is the beneficial owner of 32,000 NFM shares.

19.     Defendants Isaacman, Woo, Hubbard and Timoshenko are collectively referred to herein as the "Director Defendants."

20.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care and candor to NFM and its shareholders.

21.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship requires them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

22.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

23.     Defendant LFP, a Delaware limited liability company, markets the HUSTLER® brand through a wide range of media properties and licensing initiatives.  LFP maintains strong businesses in broadcasting, publishing, retail, internet, mobile, apparel, novelties, clubs and video, and owns the prominent HUSTLER Casino.  HUSTLER TV, now available in over 55 countries, has exclusive broadcasting rights to a large number of top studios.

24.     Defendant Flynt Broadcasting, Inc., a Colorado corporation and wholly-owned subsidiary of LFP, is the Merger Sub to the Proposed Transaction and will commence the Offer no later than 10 business days from the date of the Merger Agreement and will keep the Offer open for at least 20 business days.

25.     David Nicholas ("Nicholas") is not listed as a defendant in this action.  He served as a director of the Company from 2002 to September 29, 2012, when he tendered his resignation as a result of a disagreement with decisions made by the Special Committee of the Company's Board of Directors.

26.     Michael Weiner ("Weiner") is not listed as a defendant herein.  He served as a director of the Company from 1995 to September 12, 2012, and as President and Chairman of the Board from 2003 to September 15, 2012.  In January 2004, Weiner was appointed CEO of NFM.  Prior to being appointed President, Weiner held the title of Executive Vice President and NFM co-founder.  On September 15, 2012, Defendant Weiner was terminated as CEO.  Thereafter, on October 10, 2012, he resigned as a member of the Board of Directors.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on plaintiff's own behalf and as a class action pursuant to Colorado Rule of Civil Procedure § 23 on behalf of all shareholders of NFM (except defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants) and their successors in interest, who have been or will be adversely affected by the conduct of defendants alleged herein.

28.     This action is properly maintainable as a class action for the following reasons:

a.     The class of shareholders for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  According to the most recent Form 10-Q, as of November 1, 2012, there were approximately 16.19 million shares of NFM's common stock issued and outstanding.  Upon information and belief, the Company's common stock is owned by thousands of shareholders of record scattered throughout the United States.

b.     A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein, and no unusual difficulties are likely to be encountered in the management of this action as a class action.  The likelihood of individual class members prosecuting separate claims is remote.

c.     There are questions of law and fact which are common to members of the class and which predominate over any questions affecting any individual members.  The common questions include, *inter alia*, the following:

(i)     Whether one or more of the defendants has engaged in a plan and scheme to enrich themselves at the expense of NFM's public stockholders;

(ii)    Whether the Director Defendants have breached their fiduciary duties owed by them to plaintiffs and members of the class, and/or have aided and abetted in such breach, by virtue of their participation and/or acquiescence and by their other conduct complained of herein;

(iii)   Whether defendants have failed to fully disclose the true value of NFM's assets and earning power and the future financial benefits which the Defendants will obtain from the completion of the Proposed Transaction;

        (iv)     Whether the Director Defendants have wrongfully failed and refused to seek a purchase of NFM at the highest possible price and, instead, have sought to chill potential offers and allow the valuable assets of NFM to be acquired by LFP at an unfair and inadequate price;

        (v)     Whether the LFP has induced or aided and abetted breaches of fiduciary duty by members of NFM's Board of Directors;

        (vi)     Whether Plaintiff and the other members of the class will be irreparably injured by the Proposed Transaction; and

        (vii)     Whether Defendants have breached or aided and abetted the breaches of the fiduciary and other common law duties owed by them to plaintiffs and the other members of the class.

29.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of the other members of the class and Plaintiff has the same interest as the other members of the class.  Accordingly, Plaintiff is an adequate representative of the class and will fairly and adequately protect the interests of the class.

30.    Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

31.    For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action.

32.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

33.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## SUBSTANTIVE ALLEGATIONS

34.     NFM engages in the provision of transactional television services; and

distribution of general motion picture entertainment.  NFM operates in three segments:

Transactional TV, Film Production, and Direct-to-Consumer.  The Transactional TV segment

distributes branded adult entertainment pay-per-view (PPV) networks and video-on-demand

(VOD) content through electronic distribution platforms, including cable television and direct

broadcast satellite operators.  The Film Production segment produces and distributes mainstream

and erotic films that are distributed on domestic and international premium channels, PPV

channels, and VOD systems across a range of cable and satellite distribution platforms.  This

segment also distributes various independently produced motion pictures to worldwide markets,

and provides producer-for-hire services to Hollywood studios.  The Direct-to-Consumer segment

aggregates and resells adult content to subscribers through its consumer Web sites.

### NFM IS WELL POSITIONED TO GENERATE LONG-TERM VALUE

35.     On February 4, 2011, NFM reported Q3 2011 financial results wherein revenue

increased to $37.8 million from $35.3 million in the same prior year period.  The press release

quoted defendant Weiner as stating that, "we believe our cash position will allow us to execute

against our growth plans and capitalize on strategic opportunities. We believe the strategic

investments we are making in the Company will generate long-term shareholder value."  On

February 4, 2011, NFM stock opened the days trading at $2.08 per share and reached as high as

$2.14 per share before closing at $2.10 per share.  Weiner was also quoted in the press release, in

relevant part, as follows:

> New Frontier Media maintained a solid financial position during the third quarter
> of fiscal 2011.  Within the Transactional TV segment, we continue to generate
> gains from our expansion into international markets including a new launch in
> Asia. We also experienced the second consecutive quarter of stabilization within
> our domestic VOD revenue, and we are exploring options that we believe could

stabilize our domestic PPV revenue. We have been focusing on our core Transactional TV segment and have been making investments to support the segment's growth. These investments have included expanding our PPV offerings to Latin America and Europe, making necessary investments to upgrade our technology infrastructure to support growth, and developing new content packages which are specifically tailored to these markets.

We were also pleased that the Film Production segment returned to profitability during the quarter. The segment completed a producer-for-hire arrangement during the quarter and continues to have success with the distribution of mainstream content on domestic VOD platforms and to retail customers through mainstream distribution agreements. Going forward, we are selectively reducing the cost structure and focusing on the most profitable components of the segment.

New Frontier Media currently distributes over 15,000 video assets a month to over 28 countries worldwide. In the next several months, we expect that our distribution will grow in existing and new countries in Latin America and Asia, and we also expect to make inroads into Eastern Europe. We believe for reasons discussed above, the Company is well positioned for this growth. The Company had approximately $14.7 million in cash as of December 31, 2010, and we believe our cash position will allow us to execute against our growth plans and capitalize on strategic opportunities. We believe the strategic investments we are making in the Company will generate long-term shareholder value.

36.     On June 3, 2011, the Company reported Q4 and full year 2011 results wherein Weiner indicated that, "New Frontier Media achieved many of its strategic objectives in fiscal year 2011 and ended the fiscal year with a solid balance sheet." With respect to the future, defendant Weiner stated NFM was "well positioned to generate long-term value." Per Weiner, the press release also provided, in pertinent part:

New Frontier Media achieved many of its strategic objectives in fiscal year 2011 and ended the fiscal year with a solid balance sheet. Within the Transactional TV segment, we grew our international revenue during the fiscal year to $5.9 million, or a 64% increase as compared to the prior year results. More importantly, we have increased our global distribution footprint, which we believe will fuel growth in years to come. We also believe our efforts to stabilize the domestic business have had a positive impact on improving the segment's revenue trends. The Film Production segment also had a solid performance during fiscal year 2011. The segment completed two producer-for-hire arrangements during the fiscal year and was successful in expanding its distribution of mainstream content to VOD platforms. The Film Production segment also benefited from the distribution of mainstream content to other retail customer markets through its agreements with large, independent film distributors.

Looking ahead to fiscal year 2012, we plan to focus our Transactional TV segment efforts on further growing international revenue through new launches on traditional and emerging platforms as well as through expanded content distribution and improved performance with existing customers. We will also continue to focus on improving the segment's domestic revenue trends by distributing new and unique content packages and by taking market share from our competitors. For the Film Production segment, our primary focus will be to maintain the owned content revenue trends and continue to improve the repped content revenue trends through the distribution of mainstream content to VOD and retail markets. We also expect that the Film Production segment will benefit in fiscal year 2012 from a lower cost structure.

We invested in the growth of New Frontier Media during fiscal year 2011 and expect to realize the benefits from those investments in fiscal year 2012 and beyond. In addition to other investments, we invested in storage and distribution equipment as well as a new, state of the art facility, and these investments are included in the $5.0 million of property and equipment purchases reflected in our fiscal year 2011 cash flows. Despite these investments, we had approximately $18.8 million in cash at the end of the fiscal year. Overall, we believe the Company is well positioned to generate long-term value.

37.     NFM's performance continued "in-line with [NFM] expectations during the first quarter of fiscal 2012," Weiner was quoted on August 5, 2012.  The press release indicating fiscal 2012 first quarter results provides, in pertinent part:

New Frontier Media's performance was in-line with our expectations during the first quarter of fiscal 2012.  We remain focused on stabilizing the domestic revenue within the Transactional TV segment, and we are continuing to expand our international relationships. In connection with our international expansion efforts, we are excited to announce the recent execution of an international distribution agreement with a large digital broadcast satellite operator in Mexico. We tentatively expect to launch services with the customer during the second or third quarter of fiscal 2012, and we expect to realize meaningful international revenue growth from this arrangement.

We are also pleased to see the Film Production segment return to profitability in the quarter. The Company is realizing the benefits of our actions during the second half of fiscal 2011 to reduce the segment's cost structure. In addition, we have refined our approach to film investments in an effort improve performance. We continue to be optimistic that our efforts will provide the segment with profitable results in fiscal year 2012.

We are committed to improving shareholder value and continue to believe that our strategy provides us with the necessary path to achieving that objective. Our strong balance sheet and cash position provide us with a solid base for

accomplishing this objective. Overall, we believe our investments and ability to successfully execute our strategic objectives will generate solid long-term value for New Frontier Media.

38.     During Q2 2012, "New Frontier Media continued to execute its strategic initiatives […]," said Weiner in the Company's November 14, 2011, press release.  Per Weiner, the release also indicated that NFM has recently repurchased Company shares and authorized additional repurchase of NFM shares.  The release states:

> We generated positive cash flow from operating activities of $1.4 million during the first half of fiscal year 2012, which included cash collections of $1.7 million from building improvement allowances and cash disbursements of $0.7 million from our initial production activities for the Film Production segment's episodic series arrangement. We also effectively completed our stock repurchase program during the quarter by repurchasing approximately $0.9 million of common stock, and we recently authorized the additional repurchase of up to the lesser of $1.0 million or 0.8 million shares of common stock.  To date, we have repurchased over 6.1 million shares of common stock.  Overall, we believe we are making good progress towards our strategic goals and expect the impact of these efforts will result in improved shareholder value over the long-term.

39.     With respect to NFM's stock repurchase program, on December 12, 2011, the Company announced it had repurchased approximately 2.1 million shares of its outstanding common stock at the market price of $1.10 per share.  Per the press release, Weiner explained:

> I am very pleased that our Board of Directors was able to respond so quickly to market opportunities that are from time to time presented to us, especially in circumstances that return immediate value to our shareholders.  Coming together on short notice to evaluate the opportunity, consider its effects and approve promptly an increase in our previously announced repurchase program to capitalize on this accretive transaction is an example of good leadership and corporate responsibility.  This buyback, and its timing for shareholders relative to the end of our calendar year, is a great way to conclude our previously announced repurchase program.

40.     "New Frontier Media maintained solid operations during the third quarter of fiscal year 2012," said Weiner in the Company's Q3 February 13, 2012, earnings press release. Weiner continued:

> We ended the quarter with approximately $11.7 million in cash.  Additionally, we

received approximately $0.8 million in cash in January 2012 from a tax refund and expect to receive an additional $2.3 million in cash during the first half of fiscal year 2013 from the delivery of the Film Production segment's episodic series. We have generated positive cash flow from operating activities of $0.7 million, which included cash collections of $1.7 million from building improvement allowances and cash disbursements of $1.7 million from our production activities for the Film Production segment's episodic series arrangement. During the first nine months of fiscal year 2012, we have also repurchased approximately $3.5 million of common stock, or 3.0 million shares, at an average total purchase price of $1.17 per share, and we believe the repurchase of these shares was a good use of our cash. We believe New Frontier Media remains solid and look forward to furthering the development of the Company in the future.

## HISTORY OF OFFERS

41.      As recently as March 9, 2012, NFM received its first unsolicited offer to purchase the Company. The proposal, from Longkloof Limited ("Longkloof"), an investment holding company with an approximate 15% interest in NFM, indicated its interest in purchasing all of the outstanding shares of NFM not beneficially owned by Longkloof for $1.35 per share. NFM announced Longkloof's interest by a press release which provides:

BOULDER, Colo., March 9, 2012 /PRNewswire/ -- New Frontier Media, Inc. (NasdaqGS: NOOF), a leading provider of transactional television services and distributor of general motion picture entertainment, confirmed that it has received an unsolicited, non-binding, conditional acquisition proposal from Longkloof Limited, an investment holding company, indicating its interest in pursuing the acquisition of all of the outstanding shares of New Frontier Media not beneficially owned by Longkloof for $1.35 per share in cash, subject to due diligence and other conditions. The Board of Directors of New Frontier Media has formed a Special Committee of independent directors to review and carefully evaluate the proposal received from Longkloof with its financial and legal advisors and determine the appropriate response to the proposal. The Special Committee plans to evaluate the proposal in a timely manner, but no definitive time frame has been determined. The Special Committee and management have indicated that their review of the proposal will be conducted in a manner that will minimize any disruptions to New Frontier Media's business operations.

The Special Committee is being assisted in its consideration of Longkloof's proposal by its legal advisor, Blank Rome LLP, and is currently in the process of selecting a financial advisor. New Frontier Media is being advised by Holland & Hart LLP.

New Frontier Media advises shareholders that they need not take any action at this time in response to Longkloof's proposal pending review by New Frontier Media's Special Committee.

42.     The March 9, 2012, letter by Longkloof to NFM shareholders indicated that Longkloof had, for sometime, attempted to engage the NFM Board in "meaningful discussions" with respect to acquiring the Company to which it had not been able to engage the Board in any substantive dialogue.  The Longkloof letter questioned the Board's capabilities given NFM's stock price decline over the past five years from above $9.00 (to its then current trading price of) $1.13.  The Longkloof letter also questioned the Board's commitment and direction to the Company given the lack of equity ownership by the directors, as evidenced by the Board's abandoning their former policy of requiring non-employee directors to purchase Company's shares equaling in value at least 20% of the amount of the annual board fee.  The Longkloof letter in its entirety is as follows:

New Frontier Media, Inc.

Board of Directors

6000 Spine Road, Suite 100

Boulder, CO 80301

Ladies and Gentlemen

We own approximately 15% of the outstanding shares of New Frontier Media, Inc. ("NOOF" or the "Company") and have attempted numerous times over the past few weeks to engage in meaningful discussions with you regarding our interest in acquiring NOOF. Given your continued unwillingness to engage in any constructive dialogue with us, we believe expeditious action is necessary to protect the stockholders' interest in NOOF. As a result, subject to a satisfactory due diligence review and execution of definitive documents, we hereby offer to acquire all of the outstanding shares of common stock of NOOF not beneficially owned by us at a price of $1.35 per share in cash. Our offer is not subject to financing, and we anticipate that there would be limited conditions to closing, including that NOOF obtains all necessary corporate and regulatory approvals and refrains from incurring any new or additional "change of control" or similar obligations.

Our offer of $1.35 per share represents a premium of 26% over NOOF's average closing stock price from the start of this year until February 15, 2012, the date on which we first contacted you expressing our interest in an acquisition. We believe that this offer is fair and in the best interest of the Company and its stockholders, and that the stockholders will find such a proposal attractive.

We are extremely concerned about the capabilities and behavior of NOOF's current Board. We do not believe the current Board is capable or willing to undertake the actions necessary to enable NOOF to compete in the future, as the track record established by the current Board over the past several years has been dismal.. Under the Board's stewardship, we have watched the Company's stock price decline over the past five years from above $9.00 per share to its current price of $1.13. Unfortunately, we believe the current Board is more focused on maintaining its excessive director fees and engaging in related party transactions, rather than running the Company in the best interest of the stockholders. We are particularly distressed about the lack of equity ownership by the directors, as evidenced by the Board's abandoning their former policy (which we understand was not even honoured by all the directors when in effect) of requiring the non-employee directors to purchase the Company's shares equalling in value at least 20% of the amount of the annual board fee (after an unexplained cut from the original 50% that had been in effect for fiscal years 2007 and 2008). In fiscal year 2009 the average non-employee director for NOOF received over $90,000 in cash compensation. However, hopefully, even this Board will finally take its fiduciary duty to stockholders seriously enough to allow stockholders to decide whether or not to sell the Company at a substantial premium.

We are prepared to proceed immediately to negotiate and execute definitive documents providing for a merger of the Company with a new acquisition vehicle that we would form. We firmly believe that the Board's fiduciary duties require the Board to allow the stockholders to decide for themselves if they wish to accept this offer. Accordingly, we are also prepared to structure the transaction with an immediate front end tender offer, with protections for minority stockholders pending completion of the back end merger.

This transaction will allow stockholders the opportunity to monetize their relatively illiquid investment in the Company. In addition, following any such transaction, we expect that the Company's senior management team and employees will remain in place and continue to run the business in accordance with current practices.

This transaction is of the highest priority for us and has the full attention of our investment team and our legal advisors at Stroock & Stroock & Lavan LLP. As we have communicated previously, we stand ready to meet with the Board and its representatives as soon as possible. Given our ability to consummate a transaction without a financing contingency, we expect that the Board would meet with us promptly and seriously consider our offer. We sincerely hope that you will engage in meaningful dialogue without delay so that we can work together to arrive at a

negotiated transaction that will benefit NOOF and its stockholders.

While we remain optimistic that we can reach an agreement that benefits all of NOOF's stockholders in a timely manner, we are committed to protecting the value of our investment. Consequently, we are prepared to pursue any and all actions available to us in order to ensure that we maximize stockholder value. We can no longer tolerate this fatal combination of exorbitant Board fees and unfettered self-interest. Although you dismissed our initial overture as a non-offer, we would not be surprised if this Board found a way to further enrich itself at stockholder expense, given that our offer represents a clear threat to those exorbitant fees. We hereby publicly ask the Board to disclose to stockholders the cumulative amounts of all the fees and compensation (including reimbursed expenses) that they have each collected or expect to collect, as well as fees for work their respective firms have charged the Company, this fiscal year. Given that in the past five years the cash compensation to a single Board member for one year has reached as high as $97,500 and the fees to one single Board member's partnership in one single year have been described as approximately $400,000 in the Company's proxy, we feel that our request for the aforementioned disclosure is both fair and necessary given this history of excess.

While we hope that the NOOF Board actively and thoughtfully evaluates our proposal and then allows stockholders, and not themselves, to decide whether to sell the Company at a substantial premium in an all cash transaction, we note the upcoming deadline for delivering notice to the NOOF Board regarding the intention to make proposals, including to nominate individuals for election as directors, at the 2012 annual meeting of stockholders. At this time, we are considering all of our other options in light of such deadline, including whether the recently renewed poison pill should be put to a stockholder vote and whether to propose an alternative slate of four Directors to replace Alan Isaacman, Melissa Hubbard, Hiram Woo and Walter Timoshenko for stockholders to consider.

Of course, no binding obligation on the part of NOOF or the undersigned shall arise with respect to the proposal or any transaction unless and until such time as definitive documentation satisfactory to us and approved by NOOF's Board of Directors is executed and delivered.

We look forward to discussing our proposal with you further in the near future.

43.     Following the Longkloof offer, on March 23, 2012, NFM issued a press release

indicating that it had received a second unsolicited offer, this from Manwin Holding SARL

("Manwin") for $1.50 per share cash.  The NFM press release states:

> BOULDER, Colo., March 23, 2012 /PRNewswire/ -- New Frontier Media, Inc.
> (NasdaqGS: NOOF), a leading provider of transactional television services and

distributor of general motion picture entertainment, confirmed that it has received an unsolicited, non-binding, conditional acquisition proposal from Manwin Holding SARL, a provider of adult entertainment, through online, television and mobile distribution platforms, indicating its interest in pursuing the acquisition of all of the outstanding shares of New Frontier Media for $1.50 per share in cash, subject to due diligence and other conditions.

As previously announced, earlier this month, New Frontier Media also received an unsolicited, non-binding, conditional acquisition proposal from Longkloof Limited, an investment holding company, indicating its interest in pursuing the acquisition of all of the outstanding shares of New Frontier Media not owned by Longkloof for $1.35 per share in cash, subject to due diligence and other conditions.

The Board of Directors of New Frontier Media has formed a Special Committee of independent directors which will carefully review, with its financial and legal advisors, the acquisition proposals received from Manwin and Longkloof, as well as any other acquisition proposal that may be received by the Company, and then determine the appropriate response to these proposals.

The Special Committee is being assisted in its consideration of these acquisition proposals by its legal advisor, Blank Rome LLP, and is currently in the process of selecting a financial advisor.  New Frontier Media is being advised by Holland & Hart LLP.

New Frontier Media advises shareholders that they need not take any action at this time in response to either acquisition proposal pending review by New Frontier's Special Committee.

44.     Following receipt of the unsolicited offers by Longkloof and Manwin, on April 3, 2012, NFM executed indemnity agreements with each member of the Company's Board of Directors and executive officers: namely, each of Ms. Melissa Hubbard and Messrs. Michael Weiner, Alan Isaacman, David Nicholas, Hiram J. Woo, Walter Timoshenko, Grant Williams, Scott Piper and Marc Callipari.  Isaacmen, Chairman of the Special Committee stated at the time, "Our Board of Directors remains very enthusiastic about New Frontier Media's future prospects and has made no decision to sell the Company. However, in keeping with our commitment to act in the best interests of all shareholders, we have decided to undergo a thorough review of strategic alternatives to determine the best opportunities for maximizing shareholder value at this

time. Accordingly, while our financial advisor will assist us with reviewing and responding to the unsolicited acquisition proposals that we have received, as well as any other acquisition proposals that we may receive, the scope of our financial advisor's assignment will be comprehensive and not limited to any specific vision for New Frontier Media's future."

45.     On May 2, 2012, NFM received a notice from an entity affiliated with the publicly-traded South African conglomerate, Hosken Consolidated Investments (Johannesburg Stock Exchange: HCL), that it intended to nominate four individuals, including two employees of a Hosken affiliate, for election to the NFM Board of Directors at the Company's 2012 Annual Meeting of Shareholders.  Isaacman, Chairman of NFM's Special Committee commented, "Hosken's threatened proxy contest is a transparent attempt to take control of New Frontier Media by placing four of Hosken's hand-picked candidates on New Frontier Media's six-member Board who would then be in a position to give favorable consideration to Hosken's unsolicited $1.35 per share offer.  It is unfortunate that rather than choosing to engage constructively with the Special Committee's financial advisor, Hosken has chosen to launch a potentially costly and distracting proxy contest."

46.     On May 23, 2012, Longkloof sent a letter to the Board of Directors of the Company, pursuant to which Longkloof increased its offer to acquire all of the outstanding shares of common stock of the Company not beneficially owned by Longkloof to $1.75 per share in cash.  The May 23, 2012, letter states:

New Frontier Media, Inc.
6000 Spine Road, Suite 100
Boulder, CO 80301

Attn: Michael Weiner, Corporate Secretary

23 May 2012

Dear Sirs

As the single largest shareholder of New Frontier Media, Inc., we remain extremely concerned with the actions (or shall we say "inactions") of the Special Committee since we first made public on March 9, 2012 our proposal to acquire the Company in an all cash transaction. We remain extremely committed to an acquisition and are hereby increasing our offer to a price of $1.75 per share in cash. Our offer represents a premium of over 60% to the Company's average closing stock price from the start of this year until February 15, 2012, the date on which we first contacted you expressing our interest in an acquisition. In an effort to be completely transparent we thought it is in the best of interests of all shareholders for us to make our offer public. We urge the Board of Directors to similarly embrace the spirit of transparency.

We believe we have provided the Special Committee with all relevant material information relating to our proposal. We further note that we have not requested, and do not believe that we need, any material non-public information to complete this acquisition on the terms described herein. However, if the Special Committee is willing to provide us access to such information under reasonable and customary terms and conditions that would not preclude us from taking actions which would be in the best interests of all shareholders, we would consider such new information in putting forth our best possible offer. It is time for the Special Committee to allow the shareholders, the true owners of the Company, to decide for themselves whether our proposal—providing immediate liquidity at a substantial premium—is a better alternative to the Board of Director's current misguided, time-consuming and value-wasting strategy of remaining a public company and paying the associated exorbitant costs, including the excessive and unnecessary board fees to its non-management directors.

We believe that the Chairman of the Special Committee mischaracterized our intentions when he stated our "threatened proxy contest is a transparent attempt to take control of New Frontier Media." For the record, let us be explicitly clear— our intentions are to acquire New Frontier Media in an all cash transaction representing a substantial premium for all shareholders. To this end, we fully support the Special Committee's stated objective of "acting in the best interests of, and maximizing value for, all shareholders", and are prepared at this time to allow for a "go shop" period in a definitive agreement. We are also prepared to participate in an auction process to ensure that shareholders receive fully-negotiated, full and fair value for their shares, and look forward to receiving the promised bid letter from the Special Committee's financial advisor. All we ask is that the members of the Special Committee act quickly, exercise their fiduciary duties and live up to their mandate before further shareholder value is destroyed.

We want to remind shareholders that the Board of Directors has not responded to the request in our March 9th letter that it publicly disclose the cumulative amounts of all the fees and compensation (including reimbursed expenses) that

the directors have each collected or expect to collect, as well as fees for work their respective firms have charged the Company, this fiscal year, including any fees payable to the members of the Special Committee. Nor has the Special Committee responded to our advance notice of our intention to nominate a slate of nominees for directors at the next annual meeting. Are they looking to further delay the process (such as by delaying the annual meeting) or force a time consuming and value-destroying litigation when we clearly have the best interests of all shareholders in mind? Shareholders should not stand by while the Board of Directors takes steps to further entrench themselves. We hope that the Special Committee will finally take its fiduciary duties seriously and not continue to use our offer as a justification for paying itself additional fees.

Our offer continues not to be subject to a financing contingency, and we anticipate that there would be limited conditions to closing, including retention of management, the state of the balance sheet, no material adverse change, and that New Frontier Media obtains all necessary corporate and regulatory approvals. In addition, we urge the Company to refrain from establishing any new or additional "change of control" or similar obligations or otherwise taking actions which further erode shareholder value.

Although we remain optimistic that we can reach an agreement that benefits all of New Frontier Media's shareholders in a timely manner, we are committed to protecting the value of our investment and continue to be prepared to pursue any and all actions available to us in order to maximize all shareholders' interests. We believe it is imperative upon the Special Committee to allow the shareholders to decide for themselves the future of this company, including whether to accept our offer, or, if one is received, a higher and better offer, or to reject all offers. Under any of these circumstances, we will be content in knowing that it was OUR actions that resulted in greater shareholder value and choice. If the shareholders reject all offers, we will roll up our sleeves as a significant shareholder and hopefully under the guidance of a better qualified and more appropriately compensated Board of Directors seek to further enhance value for all shareholders.

Of course, no binding obligation on the part of New Frontier Media or the undersigned shall arise with respect to the proposal or any transaction unless and until such time as definitive documentation satisfactory to us and approved by New Frontier Media's Board of Directors is executed and delivered.

We would like to move forward immediately and are ready to meet and start immediate negotiations to maximize value for all shareholders. It is our belief that this offer is fair and in the best interest of the Company and its shareholders, and that the shareholders will find such a proposal attractive if presented to them.

Yours faithfully

Longkloof Limited

47.     On May 31, 2012, NFM announced that it had filed a complaint in the United States District Court for the District of Colorado against a publicly-traded South African conglomerate, Hosken Consolidated Investments Limited (Johannesburg Stock Exchange: HCI), its Executive Chairman, Marcel Golding, Longkloof Limited, Mile End Limited, Sabido Investments (Pty) Ltd., Adam Rothstein, Eric Doctorow, Mahomed Khalik Ismail Sheriff, Willem Deon Nel and Barbara Wall.  The complaint alleges, among other things, that the Defendants violated Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), when they failed to disclose that the Defendants were operating as a "group" for the purposes of seeking control of the Company, and the true nature, extent and intent of their "group," as required by Section 13(d) of the Exchange Act. The complaint also alleges that, because of the Defendants' failure to disclose material information related to the "group" as required by the advance notice provisions contained in the Company's Amended and Restated Bylaws, the Defendants' notice of nominations of candidates for election to the Company's board of directors at the 2012 annual meeting of shareholders does not comply with the Company's advance notice provisions, and therefore, such nominations are invalid.

48.     On June 11, 2012, Longkloof counterclaimed against NFM and its Board claiming that the Board has breached its fiduciary duties in denying Longkloof's nomination of a slate of four directors and in stonewalling Longkloof's previously announced all-cash, fully financed offer to acquire the Company. The counterclaims allege, among other things, that the Board is seeking to entrench itself and to continue to pay themselves extravagant directors' fees. Significantly, non-employee director compensation for fiscal year 2012 was as follows:

| Name | Fees Earned or Paid in Cash ($)(1)(2) | | Total ($) | |
|---|---|---|---|---|
| Alan Isaacman | $ | 110,000 | $ | 110,000 |
| Melissa Hubbard | $ | 100,000 | $ | 100,000 |
| Walter Timoshenko | $ | 107,500 | $ | 107,500 |
| David Nicholas | $ | 87,500 | $ | 87,500 |
| Hiram Woo | $ | 105,000 | $ | 105,000 |

49.     On July 12, 2012, NFM entered into a settlement agreement with Longkloof Limited, Hosken Consolidated Investments Limited and various associated parties (the "Longkloof Parties") to end the Longkloof Parties' proxy contest related to the Company's 2012 annual meeting of shareholders.  The settlement also ended the related litigation between the Company and the Longkloof Parties pending in the United States District Court for the District of Colorado.  Under the terms of the Settlement Agreement, the Longkloof Parties, which beneficially own in the aggregate approximately 15.9% of the Company's outstanding shares, agreed to immediately terminate their proxy contest, withdraw their notice of intent to nominate four candidates for election to the Company's Board of Directors (the "Board"), and not support, for the balance of 2012, any other person not recommended by the Board in seeking representation on the Board.  In addition, the Longkloof Parties agreed to certain standstill restrictions through December 31, 2012 and the Company agreed that if it does not engage in a sale, merger or similar change of control transaction by December 31, 2012, Longkloof will have the right to designate one person for appointment to the Board for a term expiring at the 2013 annual meeting of shareholders and, under certain circumstances, the Company will be obligated to include such designee on the slate of nominees presented by the Company to shareholders at the 2013 annual meeting of shareholders.

## BOARD IN-FIGHTING

50.     On September 18, 2012, in a press release titled "SPECIAL COMMITTEE OF COMPANY BOARD CONTINUING TO EVALUATE STRATEGIC ALTERNATIVES," NFM announced that the employment of the Company's Chief Executive Officer, Michael Weiner, was terminated as of September 15, 2012.

51.     Following defendant Weiner's termination, on September 29, 2012, defendant Nicholas tendered his resignation as a director of NFM.  In a mailing to the Board, Nicholas cited many reasons for his resignation, including (a) the Special Committee's self-serving interests and desire to pay themselves "excessive" fees for a job that should require no additional compensation, (b) the fractured review process that "continuously exclude[d]" him, (c) the lack of communication within the Committee that "curtailed [his] ability to carry out [his] fiduciary duties, and (d) the termination of Defendant Weiner, a decision that was made without input or approval from all Board members.  Nicholas' letter to the Board in its entirety is as follows:

September 28, 2012

Alan Isaacman
Melissa Hubbard
Walter Timoshenko
Hiram J. Woo
New Frontier Media, Inc.
6000 Spine Road, Suite 100
Boulder, Colorado 80301

Dear Alan, Melissa, Walter and Hiram:

I hereby submit my resignation as a director of New Frontier Media, Inc., effective immediately, as a result of my fundamental disagreement with recent actions taken by each of you, in your capacities as members of the Special Committee and otherwise, that I believe are not in the best interests of the shareholders, employees and other constituents of the Company.

Since Longkloof Limited made its offer to acquire the Company back in March 2012, I believe the members of the Special Committee have put their own

interests ahead of those of the shareholders and may have breached their fiduciary duties. Consistent with my fiduciary duties, I delivered to each of you a letter dated August 15, 2012 detailing my serious concerns that the Special Committee was imperiling the Company and pursuing its own personal self-interests at the expense of shareholders. In the letter, I suggested that we immediately hold a special meeting of the Board to cordially and productively discuss these concerns. Instead of coordinating to convene a meeting, I received a written response one month later from the members of the Special Committee containing self-serving and misleading statements that failed to adequately address my concerns.

The following is a brief summary of some of my concerns that have compelled me to resign:

**Formation of Special Committee -** The purpose of the Special Committee established by the Board in response to the Longkloof offer was purportedly to evaluate the Company's current long-term business plan against a range of alternatives that have the potential to maximize shareholder value. I was appointed to serve on the Special Committee when it was first established by the Board.

However, the amount of additional fees other members of the Special Committee proposed to pay themselves became a sore point of contention among us. After I expressed my view that these fees were excessive and that I would be willing to continue to serve on the Special Committee without additional compensation, I was told by other members of the Special Committee that it would "look bad" if I was the only member who did not accept additional fees. Shortly thereafter, the size of the Special Committee was reduced from 5 to 3 and Mr. Woo and I were voted off the Special Committee. It was at this point that I began to have serious concerns with the policies, practices and motives of the Special Committee. At a subsequent Board meeting, Mr. Woo was added back to the Special Committee despite my emphatic objection as this would result in a majority of the Board serving on the Special Committee, thereby ceding control of the Company to the Special Committee.

**Longkloof Litigation -** In response to Longkloof's acquisition proposal and nomination of a dissident slate, the Special Committee filed an expensive lawsuit against Longkloof and its affiliates. I do not believe the lawsuit made strategic sense from a shareholder interest standpoint and believe it was a waste of corporate assets. In addition, the lawsuit was filed without first holding a Board meeting to obtain formal approval or even consulting Michael Weiner, the then current CEO, or me and in my view contained false and misleading statements. Instead of just accepting my criticism of the Special Committee's decision to file the lawsuit, the Special Committee brazenly suggested that because I did not openly support the lawsuit, I must have been sympathetic to Longkloof and complicit in its efforts to acquire the Company. This accusation is absurd and is completely lacking in merit. My intent has always been to obtain the highest and

best offer for the Company, irrespective of who made the proposal, in order to maximize shareholder value.

**Exclusion From Strategic Review Process -** The Special Committee has continuously excluded me and other Company executives from the strategic review process. I am fully aware of the reasons why an independent committee is necessary to run the process. However, the full Board still needs to be assured that the significant time and money being spent by the Special Committee is actually benefiting shareholders. Despite numerous requests in my capacity as a director, I was not given any meaningful updates on the process by the Special Committee. This lack of communication on the part of the Special Committee curtailed my ability to carry out my fiduciary duties as a director.

**Termination of Michael Weiner -** Based upon my conversations with senior management, in my view the Special Committee has effectively shut senior management out of the strategic review process, thereby making it extremely difficult for management to effectively run the business, and has attempted to usurp the duties of key members of management. This has culminated with the recent termination of Michael Weiner as CEO of the Company, a decision that was made by the Board members constituting the Special Committee without my approval and without seeking my input. Alan Isaacman, the Chairman of the Special Committee, has also replaced Mr. Weiner as Chairman of the Board. Prior to his termination, Mr. Weiner also raised what in my view are serious concerns with the lack of communication with management regarding the strategic review process, the Longkloof lawsuit and the activities of the members of the Special Committee in general.

It is my strong belief that the directors of any public company should be receptive to and welcome other points of view on the Board. This ensures a system of checks and balances that prevents any individual or group of directors from taking action that is contrary to the best interests of the shareholders, the true owners of the company. Unfortunately, the termination of Mr. Weiner as CEO, the replacement of Mr. Weiner as Chairman of the Board and the other activities of the Special Committee that have made it impossible for me to continue to serve as a director was in my view a coup d'etat carefully orchestrated by the members of the Special Committee to silence opposition. For example, I am told that despite the fact that I remain a director of the Company, certain members of management have been informed that speaking to me could create issues for them.

With my resignation, it is my hope that I have impressed upon shareholders an urgent need to question your true independence and closely monitor your future actions, including your decision to be the only director nominees up for election at the upcoming annual meeting of shareholders. This Board cries out for the addition of truly independent directors to serve as representatives of the shareholders. I remain seriously concerned with the

strategic review process as a result of the failure of the Special Committee to properly update me prior to my resignation. I hope that any business relationships, personal interests or agendas advanced by any of you with respect to the strategic review process will not interfere with the process.

Throughout my tenure as a director of New Frontier during the past 10 years, I have always made the interests of shareholders my top priority. Due to the actions taken by the members of the Special Committee, I am now powerless to continue to serve as a steward of shareholders in accordance with my fiduciary duties. It is therefore with great regret and a heavy heart that I must now step down from the Board.

52.     Further illustrating the clear disconnect between the members of the NFM Board, the Special Committee and the strategic review process that was carried out, on October 4, 2012, the NFM Board authored the following letter to defendant Nicholas:

October 4, 2012

Mr. David M. Nicholas
P.O. Box 681647
Park City, Utah  84068

Dear David:

We received your September 28, 2012 letter accepting our September 15, 2012 request that you resign from the New Frontier Media, Inc. Board of Directors. Your resignation is effective immediately.  Your conduct as a member of the Board has been unacceptable, and we believe that your resignation is in the best interests of the company and its shareholders.

While we understand your disappointment with not being re-nominated for election to the Board at our upcoming annual meeting and in being asked to resign from the Board, we don't believe that excuses the baseless and misleading statements you made in your letter.

As you know, earlier this year, the Board unanimously decided to form a Special Committee consisting of the independent members of the Board to review alternatives to maximize shareholder value, including, without limitation, the unsolicited acquisition proposal received from an investor group that included Longkloof Limited and Adam Rothstein. As you also know, Mr. Rothstein is a friend and personal business associate of Michael Weiner who was the CEO of New Frontier until the middle of last month. As is common practice, the Special Committee retained its own financial and legal advisors to assist it in conducting the process, which has included contacting numerous parties potentially interested

in making a bid for the Company. The Special Committee has also provided periodic updates to the other Board members and, to help ensure an independent and unbiased process, required that other Board members contact the Special Committee with any requests for information on the process, as opposed to directly contacting the advisors. The Special Committee also required that other Board members refrain from engaging in any communications with potential bidders with respect to the process.

As an independent director, you were originally appointed to the Special Committee. However, we removed you from the Special Committee in April because we believed you were not prepared to act in the best interests of shareholders, and we did not believe you could be trusted to provide the Special Committee with your independent and unbiased judgment. Specifically we believe you had a clear conflict of interest in acting as a "proxy" on the Special Committee for New Frontier's former CEO, Michael Weiner, and seeking to advance Michael's agenda. It became clear very early on in the Special Committee's deliberations that you were committed to advancing Michael's frequently stated and unambiguous preference for selling the Company to the Longkloof / Rothstein investor group even if such a transaction would not maximize value for our shareholders. Our concerns that your and Michael's interests may be aligned with Longkloof and Mr. Rothstein were confirmed when Longkloof, in connection with its publicly-announced unsolicited offer to acquire the Company, announced its intention to initiate a proxy contest against the Company and we learned that Longkloof had invited you and Michael to participate in their proxy contest and serve as nominees on their slate. Such proxy contest, if successful, would have enabled Longkloof to take control of the Company without being required to acquire all shares of the Company (other than the shares held by Longkloof) at a price that maximized value for all shareholders.

Following your removal from the Special Committee, you continued to demonstrate that you and Michael favored Longkloof and did not share the Special Committee's steadfast commitment to ensuring a level playing field and fair process for all potential bidders. You alone, among the independent members of the Board, opposed the Special Committee's decision to file litigation against Longkloof and various associated parties. As you know, that litigation eventually resulted in Longkloof withdrawing its proxy contest for control of the Company — a successful outcome for the Company as the proxy contest had the potential to chill the interest of potential bidders given the cost and uncertainty it was generating. Your alignment with Longkloof was further confirmed to us when, in the course of the negotiations to settle the proxy contest, Longkloof initially requested that if you and Michael were no longer serving on the Board prior to our 2013 annual meeting, Longkloof would have the right to consent to the appointment of the directors replacing the both of you - indicating to us again that they considered you and Michael their allies.

The evidence cited above as well as your numerous other actions to demonstrate your unwavering loyalty to Michael and his agenda culminated in our complete lack of faith and confidence in your ability to act in the best interests of shareholders and fulfill your fiduciary duties and, accordingly, we determined not to re-nominate you at the upcoming annual meeting and asked for your resignation.

We believe that your departure from the Board will now enable the Special Committee to continue its process without any further unnecessary distraction. Since the resolution of the proxy contest and the related litigation, the Special Committee has made solid progress in advancing its process to review strategic alternatives.  We strongly advise you not to take any actions to interfere with the Special Committee's review of strategic alternatives and efforts to maximize shareholder value.

It is regrettable that after ten years of service on the New Frontier Media Board that your service as a public company board member needed to end in the way that it did.

Sincerely,

The Board of Directors of New
Frontier Media, Inc

53.     The "He said, She said," continued on October 8, 2012, when Nicholas responded

to the Board's  October 4, 2012 letter as follows:

October 8, 2012

Alan Isaacman
Melissa Hubbard
Walter Timoshenko
Hiram J. Woo
New Frontier Media, Inc.
6000 Spine Road, Suite 100
Boulder, Colorado 80301

Dear Alan, Melissa, Walter and Hiram:

I refer to your letter dated October 4, 2012 (and attached as an exhibit to New Frontier's Form 8-K filed on same date) responding to my resignation letter in which I set forth the reasons for my resignation, including my serious concerns with actions taken by the current directors. It is shocking that the Special Committee, comprised of two attorneys and two accounting professionals, would use a publicly-filed SEC document as a platform to defend its actions with

30

material misstatements and mischaracterizations of the events leading up to my resignation.

Let me be clear for the record that my disappointment with your transgressions and my concerns about potential breaches of your fiduciary duties should not be confused, as suggested in your letter, as malcontent or "sour grapes" caused by your decision not to re-nominate me for election at the upcoming annual meeting. I assure you that my reputation in the industry during the past thirty-two years has not, and will not, be impacted by your self-serving and transparent attempt to demonize me. I am nevertheless compelled, in the interest of full disclosure to shareholders, to address various inaccuracies in your letter and to reiterate some of the concerns you failed to address.

Your assertions that I was seeking to advance Michael Weiner's "agenda" and that our interests were aligned with Longkloof are entirely inaccurate. My support for Mr. Weiner is based on my belief that he was the best person to serve as CEO of the Company and that he was wrongfully terminated. It is a complete fabrication to insinuate that I had a conversation with Longkloof and was invited to participate in their proxy contest. In fact, I have only spoken to Adam Rothstein once in my entire life - he called me earlier in the spring and we spoke about video distribution trends. Furthermore, I disagree with your continuous attempts to portray yourselves as saviors of the Company for filing the Longkloof lawsuit and to cast my opposition to the lawsuit as an expression of favoritism towards Longkloof. A Board that was interested in maximizing shareholder value would not have wasted hundreds of thousands of dollars to sue a bona-fide acquiror and instead would have attempted to negotiate with them to raise their offer price. My intent has always been to obtain the best and highest price for the Company - whether from Longkloof or otherwise. Any statements to the contrary have no merit.

Your allegation that I was removed from the Special Committee because I could not be trusted to act in the best interests of shareholders is a red herring designed to cloud the true circumstances of my removal. As I stated in my resignation letter, I believe I was removed from the Special Committee because I questioned the amount of additional fees its members agreed to pay themselves. Despite threats from other directors that my refusal to accept these committee fees would make them "look bad," I stand by my decision not to accept additional committee fees that I believe are excessive and unwarranted.

You have done a disservice to shareholders by failing to adequately address many of the concerns raised in my resignation letter. Your assertion that the Special Committee provided "periodic updates" to the other Board members in order to "help ensure an independent and unbiased process" is disingenuous on multiple levels. The limited updates I received regarding the strategic review process lacked substance and were designed to keep me in the dark about the interests of any potential bidders in the Company. Neither I nor the shareholders

can be assured that the activities of the Special Committee, which have been going on for approximately eight months, are actually benefiting shareholders. In addition, my concerns regarding your potential business relationships, personal interests and/or agendas with respect to the strategic review process have been ignored. The issues I have raised regarding your independence also remain unaddressed.

The Special Committee has wasted corporate assets and in my view damaged the Company's business. Ultimately, each of you will be held accountable for any destruction of shareholder value that has resulted from your actions.

Very truly yours

54.     The NFM Board, determined to have the last word, responded on October 10, 2012, to Nicholas most recent mailing with the following letter:

October 10, 2012

Mr. David M. Nicholas
P.O. Box 681647
Park City, Utah 84068

Dear David:

Your most recent letter dated October 8, 2012, only affirms our position that it was in the best interests of all the Company's shareholders that we requested your resignation.  In its diligent ongoing process to review all strategic alternatives to maximize shareholder value, including a potential sale of the Company, our Board's Special Committee has worked tirelessly to create and maintain a level playing field and a fair and open process for all parties interested in acquiring the Company. We have also maintained a steadfast commitment to ensuring that no bidder receives an unfair advantage.

Your correspondence indicates that you don't understand that a commitment to acting in the best interests of ALL shareholders and to maximizing shareholder value does not necessarily mean agreeing to sell the Company to a bidder preferred by you and then – Chief Executive Officer Michael Weiner, particularly at a time before the Board is able to create a process, with the assistance of its advisors, that facilitates an independent and unbiased review of the proposal and the various terms and conditions relating thereto against other alternatives that may be more likely to maximize value for ALL shareholders.  That was particularly so with respect to Longkloof's publicly-announced interest in the Company given the personal relationships that Mr. Weiner has with the

32

Longkloof group which had the potential to cause conflicts of interest given his role, prior to September 15, 2012, as then – Chief Executive Officer of the Company. Mr. Weiner's repeated expressions of preference for the Longkloof group to be the ultimate buyer of the Company, his frequent communications with representatives of the Longkloof group and his unwillingness to respect the independent nature of the Special Committee presented numerous challenges for the Special Committee in its attempts to safeguard the integrity of its process and ensure a level playing field for all potential bidders. It also compelled the Special Committee to be especially vigilant in designing and implementing, with the assistance of our financial and legal advisors, a competitive strategic review process that invited and sought out participation from multiple bidders in an effort to ensure the greatest likelihood of identifying a transaction that would maximize shareholder value.  In that same spirit of seeking to have broad participation in our process, even when Longkloof's proxy contest against the Company was still pending, the Special Committee went out of its way to invite Longkloof to participate in its process.

It would have been preferable and in the best interests of our shareholders if the Special Committee had been allowed to conduct its process for reviewing strategic alternatives without the numerous undue distractions that it has had to endure. Within a month of the Special Committee being formed, the Company received two publicly-announced unsolicited offers and was threatened with a proxy contest by the Longkloof group that would have allowed them to acquire control of the Company without being required to pay our shareholders a control premium for their shares.  The threatened proxy contest, in addition to being highly disruptive to the Special Committee's process, caused the Company to incur significant expenses to ensure that the interests of our shareholders were protected and the integrity of the Special Committee's process was safeguarded.

Rather than abandoning our strategic review process in the face of these numerous and difficult challenges, the Special Committee persevered in ensuring that a fair process was maintained that provided a level playing field for all potential bidders. Ultimately, the Special Committee was successful in negotiating a settlement agreement with the Longkloof group that resulted in the termination of their proxy contest and the related litigation and their commitment that, through the end of the year and subject to the terms of the settlement agreement, they would only pursue an acquisition of the Company through a consensual transaction.  The settlement agreement negotiated by the Special Committee facilitated our strategic review process by ensuring that the interest of potential bidders in the Company would no longer be "chilled" by a threatened proxy contest and the related litigation.

Given how strongly you opposed our efforts to seek a resolution of the proxy contest and your failure to take any action to protect our shareholders from the possible consequences of a proxy contest that sought control of our Company (and would have replaced all the independent members of the Board other than

you), it is not surprising that you have been unwilling to acknowledge the extent to which the Special Committee's efforts to preserve the integrity of its process has benefitted our shareholders.

It is clear that you and the members of the Special Committee will continue to have extremely different and contrasting views as to how best to serve the interests of the shareholders of New Frontier Media and how a member of the board of directors of a public company should comply with his or her fiduciary duties.  It is also clear that you still do not understand why a Special Committee needs to function independently free from potential conflicts of interest and why it is so critically important that a strategic review process overseen by a Special Committee be safeguarded from actions that could adversely affect the fairness and level-playing field required for a successful process. While you criticize the length of time the process has taken, you fail to acknowledge the numerous distractions that the Special Committee has had to contend with in managing its process and the culpability of those, including yourself, that have caused or contributed to these distractions.

While we appreciate a constructive dialogue with our shareholders, we believe your continuing self-serving public letter-writing campaign is yet another attempt to disrupt the Special Committee from focusing on its process to maximize value for ALL shareholders.  We believe that your departure from the Board will now enable the Special Committee to conclude its process without any further unnecessary distraction. If you are still a shareholder in the Company, you should be pleased to know that the Special Committee has made solid progress in advancing its process, despite your numerous efforts to distract us.  We hope you will respect the desire of the Board and its Special Committee to focus on concluding its process and discontinue your public letter writing.

Sincerely,

THE BOARD OF DIRECTORS OF NEW FRONTIER MEDIA, INC.

55.      On October 10, 2012, Weiner tendered his resignation to the Board.  Weiner's

letter to the Board, and the Board's October 16, 2012, response thereto are as follows:

Board of Directors
New Frontier Media, Inc.
6000 Spine Road, Suite 100
Boulder, Colorado 80301

            Re:       Director Resignation

Ladies and Gentlemen:

As a result of the extremely troubling actions taken by a majority of the members of the Board of Directors - consisting of Alan Isaacman, Melissa Hubbard, Walter Timoshenko and Hiram J. Woo - in connection with my termination as CEO, the strategic review process and related matters, I hereby resign as a director effective immediately.

I intend to commence legal proceedings against the Company to enforce my rights, including those rights that arise under my employment agreement. While I am compelled to arbitrate my claims under my employment agreement in order to protect my personal interests and reputation, I believe shareholders should be aware of the circumstances surrounding my termination including actions taken by the current directors that I believe were not in the best interests of shareholders. Specifically, I believe the current directors' decision to terminate me as CEO and not to re-nominate me or David Nicholas for election as a director at the upcoming annual meeting of shareholders was, in my opinion, intended to stifle opposition and criticism from other directors and to entrench the members of the Special Committee on the Board.

During the past few months, I have raised significant concerns with the independence and conduct of the Special Committee, which is now comprised only of the current directors. The Special Committee was formed to review strategic alternatives after receipt of an acquisition proposal from Longkloof, the Company's largest stockholder, holding approximately 16% of the Company's outstanding shares. Instead of negotiating with Longkloof to receive a higher offer price than Longkloof's revised bid of $1.75 per share, the Special Committee filed an expensive lawsuit against Longkloof without a full vote of the Board and without first consulting with me. I have consistently expressed to the current directors my belief that the lawsuit was ill-advised from both a strategic and economic standpoint and the allegations in the lawsuit about me were baseless.

·        Was the Special Committee properly authorized by the full Board to commence the litigation?

·        How much money has the Company spent on the lawsuit? Did the expense of the lawsuit make the Company a less attractive acquisition candidate?

·        Did the Special Committee first consider whether the litigation would be a waste of corporate assets, especially if a higher and better offer from Longkloof was obtainable?

·        Was the decision to sue Longkloof an attempt at self-preservation on the part of the Special Committee?

·        Did the Special Committee consult counsel on any legal ramifications of depriving the right of shareholders to nominate directors?

The Special Committee erroneously asserted that I expressed a favorable view towards Longkloof's initial acquisition proposal and acted in an "unusually friendly" manner towards representatives of Longkloof, the Company's largest shareholder. This was not the case and I was always open, and remain open, to fully considering any proposal that maximizes the value of the Company and that would provide immediate liquidity to shareholders. Nevertheless, the Special Committee shut me out of the strategic review process based on self-serving claims that I was not trustworthy. I find this remarkable since I have worked with members of the Special Committee for over a decade both as a director and executive officer and no one had ever raised any concerns about my trustworthiness until after the Company received Longkloof's proposal.

Despite numerous requests, the Special Committee refused to provide me with meaningful information regarding its timetable and goals for the process and other aspects of the process, making it extremely difficult for me to run the business. I was also kept in the dark on the Longkloof litigation, making it impossible for me to properly address pressing inquiries from employees, shareholders, distributors and customers regarding this matter.

· Did the Special Committee consider whether my insights into the Company and its industry would have benefited the strategic review process and potentially lead to the receipt of higher bids?

· Did the Special Committee consider whether my insights would have assisted Avondale Partners with its valuation analysis of the Company?

· How can shareholders be assured that the activities of the Special Committee are actually benefiting shareholders?

· What is the status of the strategic review process? Shareholders have the right to know!

On September 29, 2012, David Nicholas resigned as a director of the Company as a result of disagreements with the current directors and concerns similar to mine regarding the Special Committee, the strategic review process and my termination as CEO. With my termination, the Special Committee has in my view effectively eliminated any and all opposition to its policies and practices by other directors and any semblance of a truly independent body to oversee the strategic review process. In my view, the lack of independence of the Special Committee and the current directors' failure to nominate any new, unaffiliated director nominees for election at the upcoming annual meeting should raise glaring red flags with respect to the strategic review process and any acquisition proposal that may be recommended by the Board in the coming weeks.

· Did the Special Committee treat all bidders equally and conduct a fair and exhaustive review process?

·        Does any member of the Special Committee have a personal or business relationship with any representatives of the bidders?

·        Why has the Special Committee not concluded the strategic review process?

·        Does the current composition of the Special Committee and the circumstances surrounding the resignation of me and David Nicholas create any legal exposure for the Company in connection with any proposed acquisition?

I co-founded New Frontier in 1997 and since then have always conducted myself and my affairs, both as a director and executive officer, appropriately, responsibly and in accordance with my fiduciary duties to shareholders. It is extremely disappointing that despite my longstanding devotion and contribution to the Company, the current directors have chosen to wrongfully terminate my employment in order to, in my opinion, pursue interests that I believe are contrary to those of the shareholders. I am hopeful that my resignation and the concerns I have raised herein will help ensure that the current directors redirect their focus on preserving what value is left in the Company under the watchful eyes of shareholders. I also intend to vigorously pursue my legal claims against the Company (following my wrongful termination) to prove my actions have always been in the best interests of shareholders. I cannot say the same for the current members of the Board.

Sincerely,

/s/ Michael Weiner
Michael Weiner

*        *        *

October 16, 2012

Mr. Michael Weiner
C/o Meghan Martinez
Barkley Martinez, P.C.
720 S. Colorado Blvd, Suite 530-S
Denver, Co 80246

Dear Michael:

We received your letter dated October 10, 2012 regarding your resignation from the Board of Directors of New Frontier Media, Inc.

37

As we announced yesterday, we successfully concluded our strategic review process and have signed a definitive agreement to be acquired by LFP Broadcasting, LLC, an affiliate of L.F.P., Inc., the company founded and headed up by Larry Flynt, for $2.02 per common share in cash up front, or approximately $33 million, plus a contingent cash payment right for each common share. The acquisition price represents approximately a 79% premium to New Frontier's closing stock price on March 8, 2012, the day before the Company received a publicly-announced $1.35 per share unsolicited acquisition proposal from the investor group led by Longkloof Limited.

With today's announcement of a transaction that will provide our shareholders with a substantial premium for their shares, there can be no doubt as to how committed the members of the Special Committee have been to acting in the best interests of *all* shareholders. Clearly, it would have been preferable and in the best interests of our shareholders if the Special Committee had been allowed to conduct its diligent process without the numerous undue distractions that it has had to endure. Within a month of the Special Committee being formed, the Company received two publicly-announced unsolicited offers and was threatened with a proxy contest by the Longkloof group that would have allowed them to acquire control of the Company without being required to pay our shareholders a control premium for their shares.  The threatened proxy contest, in addition to being highly disruptive to the Special Committee's process, caused the Company to incur significant expenses to ensure that the interests of our shareholders were protected and the integrity of the Special Committee's process was safeguarded.

Rather than abandoning our strategic review process in the face of these numerous and difficult challenges, the Special Committee persevered in ensuring that a fair process was maintained that provided a level playing field for all potential bidders.  Ultimately, the Special Committee was successful in negotiating a settlement agreement with the Longkloof group that resulted in the termination of their proxy contest and the related litigation and their commitment that, through the end of the year and subject to the terms of the settlement agreement, they would only pursue an acquisition of the Company through a consensual transaction.  The settlement agreement negotiated by the Special Committee facilitated our strategic review process by ensuring that the interest of potential bidders in the Company would no longer be "chilled" by a threatened proxy contest and the related litigation.

Given how strongly you opposed our efforts to seek a resolution of the proxy contest and your failure to take any action to protect our shareholders from the possible consequences of a proxy contest that sought control of the Company (and would have kept you and David Nicholas on the Board while it replaced all the other members of the Board), it is not surprising that you have been unwilling to acknowledge the extent to which the Special Committee's efforts to preserve the integrity of its process has benefitted our shareholders.  Nevertheless, we think

today's announcement speaks for itself in making clear how our shareholders have benefitted from our diligent efforts to preserve and maintain a level playing field and fair process for all bidders.

It is unfortunate that during your time as Chairman of the Board and CEO of New Frontier you chose to attack and interfere with the efforts of the Special Committee to maximize value for all our shareholders. While you have criticized the length of time our process has taken, you fail to acknowledge the numerous distractions that the Special Committee has had to contend with in managing its process and the culpability of those, including yourself, that have caused or contributed to these distractions. It is probably not a coincidence that, almost exactly a month after your employment as CEO was terminated and you were no longer in a position to cause as many unnecessary distractions for the Special Committee, we were able to successfully complete our process and enter into the definitive acquisition agreement that we announced yesterday.

Based on your letter, you seem committed to continuing to distract our Board and deprive our shareholders of the opportunity to receive maximum value for their shares. As yesterday's announcement indicates, our transaction with LFP Broadcasting provides our shareholders with liquidity for their shares at a substantial premium plus potential additional consideration tied to the Company's cash balances at the closing of the tender offer. The frivolous and baseless litigation that you indicate in your resignation letter you are planning against the Company can only be seen as attempting to disrupt this value-maximizing transaction and will only serve to deprive our shareholders of some of the potential upside that they stand to receive for their shares.

Given how your past disruptive and distracting actions have already resulted in a process that was longer than it needed to be, we hope you would not take any further actions to prevent our shareholders from being able to receive maximum value for their shares as expeditiously as possible.

Sincerely,

The Board of Directors of New Frontier Media, Inc.

## THE PROPOSED TRANSACTION

56.     On October 15, 2012, NFM and LFP jointly issued the following press release

announcing the Proposed Transaction:

BOULDER, Colo. and LOS ANGELES, Oct. 15, 2012 /PRNewswire/ -- New Frontier Media, Inc. (NasdaqGS: NOOF), a leading provider of transactional

television services and distributor of general motion picture entertainment, today announced that the Company has signed a definitive agreement to be acquired by LFP Broadcasting, LLC, an affiliate of L.F.P., Inc., the company founded and headed up by Larry Flynt, for $2.02 per common share in cash up front, or approximately $33 million, plus a contingent cash payment right for each common share. The acquisition price represents approximately a 79% premium to New Frontier Media's closing stock price on March 8, 2012, the day before New Frontier Media received a publicly-announced unsolicited acquisition proposal. The acquisition is expected to close during the fourth quarter of 2012.

The announcement follows a comprehensive review of strategic alternatives to maximize shareholder value undertaken by the special committee of independent members of New Frontier Media's Board of Directors. Earlier this year, after receiving unsolicited expressions of interest, New Frontier Media formed a special committee and retained financial and legal advisors to evaluate strategic and financial alternatives. After a thorough assessment, the special committee unanimously recommended and the Board of Directors unanimously approved the agreement. The Board of Directors unanimously recommends that New Frontier Media's shareholders tender their shares in the tender offer.

The New Frontier Media Board of Directors issued the following statement commenting on the announcement: "This announcement represents a very positive outcome for our shareholders, who will receive complete liquidity for their shares at a very significant premium. We also believe that this transaction with LFP Broadcasting creates a great opportunity for our organization, cable television partners and customers as two of the premier adult media broadcasting companies join forces."

"The acquisition of New Frontier Media fits perfectly with our strategic plan for the growth of our company," said LFP President Michael H. Klein. "The addition of these assets to our portfolio strengthens us significantly moving forward."

Under the terms of the agreement, an affiliate of LFP Broadcasting will commence a cash tender offer for all issued and outstanding shares of New Frontier Media common stock at $2.02 per share, without interest. New Frontier Media shareholders may also be entitled to receive additional contingent cash payments, not to exceed $0.06 per common share, tied to the extent to which New Frontier Media's available cash balance at the closing of the tender offer, less unpaid transaction expenses, exceeds $11,514,000.

The merger agreement requires that the tender offer commence within 10 business days of October 15, 2012. The tender offer will expire at midnight Eastern Time on the 20th business day following and including the commencement date, unless extended in accordance with the terms of the merger agreement and the applicable rules and regulations of the U.S. Securities and Exchange Commission (SEC). The consummation of the tender offer is subject to the satisfaction or waiver of

certain conditions, including: (i) a majority of outstanding New Frontier Media shares on a fully diluted basis having been tendered into the offer and not validly withdrawn, (ii) there not having been a material adverse change with respect to New Frontier Media, (iii) New Frontier Media having not less than $11,514,000 in cash, and (iv) other customary conditions. The tender offer is not subject to a financing condition.

The tender offer, if successful, will be followed by a second-step merger in which any shares of New Frontier Media not tendered into the offer will be converted into the right to receive the same per share consideration paid to New Frontier Media shareholders in the tender offer, subject to shareholders' dissenters' rights under Colorado law. As a result of the transaction, New Frontier Media's common stock would no longer be publicly-owned or traded on the NASDAQ market. Further details will be provided in filings with the SEC.

Avondale Partners LLC is acting as exclusive financial advisor to the Special Committee of the Board of Directors of New Frontier Media in connection with its review of strategic alternatives and the transaction and has rendered a fairness opinion to the Special Committee in connection with the transaction. Alston + Bird LLP is acting as legal advisor to the Special Committee.  Holland & Hart LLP is acting as legal advisor to the Company.

Lipsitz Green Scime Cambria LLP and Dinsmore & Shohl LLP are acting as legal advisors to LFP Broadcasting in connection with the transaction.

57.     The Proposed Transaction appears rife with conflict.  As the above back-and-forth between members of the Board and ex-Board members detail, there was a clear difference in opinion as to the adequacy of the review process undertaken by the Special Committee, the level of communication among board members, the incentivising of Board members to be apart of the review process and which if any proposed deal was in the best interests of NFM.  So large was the discrepancy in NFM director opinion that, ultimately, NFM co-founder, President, CEO and Board Chairman Weiner resigned/was fired as was long-time director Nicholas.

58.     Moreover, it is clear that the significant issues raised by Defendants Weiner and Nicholas are not academic.  Committing to a process that fails to allow a full and fair bidding process will be detrimental to achieving the most value for shareholders.  Indeed, at least one Yahoo! Finance Analyst has set a $4.00 per share price target for NFM stock and the stated book

value of the Company for the last quarter was $2.79, more than 25% higher than the deal struck with LFP.

59.     Additionally, per the above letters by the NFM Board, and in light of the cross litigation between NFM and the Longkloof parties, it is clear that the Company was not fond of a strategic alliance with Longkloof.  Thus, the Board was motivated to enter into an alternative transaction as soon as possible to negate the expiration of certain standstill restrictions set to expire on December 31, 2012, that were contained in the parties July 12, 2012, settlement agreement.  This *urgency* has effectively curtailed the Company's competitive bidding process. Further, it is clear that in addition to curtailing the bidding process, the litigation that ensued did, in fact, waste significant corporate assets for which there must be an accounting.

60.     If the Proposed Transaction is consummated, the NFM public stockholders will be denied their right to share proportionately in the true value of the Company's valuable assets and future growth in profits and earnings.  The press release, per LFP President Michael H. Klein, recognizes this fact and even states as much:

> The acquisition of New Frontier Media fits perfectly with our strategic plan for the growth of our company.  The addition of these assets to our portfolio strengthens us significantly moving forward.

61.     By the acts, transactions, and courses of conduct alleged herein, defendants, individually, as part of a common plan and scheme, and/or aiding and abetting one another in total disregard of their fiduciary duties, are attempting to deprive Plaintiff and the Class of the true value of their investment in the Company.  Under the circumstances, however, the Director Defendants are obligated to explore all alternatives to maximize shareholder value.

## PRECLUSIVE DEAL MECHANISMS

62.     The Merger Agreement contains certain provisions that unduly benefit LFP by making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Merger Agreement contains a termination fee provision that requires NFM to pay $1,000,000.00 to LFP if the Merger Agreement is terminated under certain circumstances.

63.     In contrast, the Merger Agreement does not require LFP to pay a reciprocal termination fee to NFM under *any* circumstances.

64.     The Merger Agreement also contains a "No Solicitation" provision that restricts NFM from considering alternative acquisition proposals by, *inter alia*, constraining NFM's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits NFM from soliciting any alternative proposal, but permits the Board to consider an *unsolicited* proposal only if it constitutes or is reasonably calculated to lead to a "Superior Proposal" as defined in the Merger Agreement.  However, even the Board's consideration of unsolicited proposal is restricted:  prior to considering any such proposal, the Board must determine, in consultation with its financial advisors, that its fiduciary duties *require* it to consider the proposal.  Thus, the Board cannot consider alternative proposals even if it reasonably believes that any such proposal would be beneficial to shareholders.

65.     Significantly, in its May 23, 2012 letter to the Board, Longkloof specifically offered to allow a go shop period with respect to is offer.  Failing to similarly negotiate such an agreement with LFP raises questions as to not only the effort to maximize shareholder value but also with respect to the continued question of the bias on the part of the Special Committee.

66.     Further, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide LFP information in order to match

any other offer, thus providing LFP access to the unsolicited bidder's financial information and giving LFP the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of LFP.

67.     Additionally, the Merger Agreement contains provisions that permit LFP to purchase NFM regardless of whether a majority of the Company's shareholders support the deal or not.  Specifically, Section 1.04 of the Merger Agreement ("Section 1.04") provides for a "Top-Up Option" as follows:

> (a)     The Company hereby grants to Merger Sub an irrevocable option (the "Top-Up Option"), exercisable only on the terms and conditions set forth in this Section 1.04, to purchase at a price per share equal to (i) the Offer Price paid in the Offer plus (ii) a CPR, that number of shares of Company Common Stock (the "Top-Up Shares") equal to the lowest number of shares of Company Common Stock that, when added to the number of shares of Company Common Stock owned by Parent and Merger Sub at the time of exercise of the Top-Up Option, shall constitute one share more than 90% of the Fully Diluted Shares immediately after the issuance of the Top-Up Shares (the "Short Form Threshold"); provided, that the Top-Up Option will not be exercisable unless, immediately after such exercise and the issuance of Top-Up Shares pursuant thereto, the Short Form Threshold would be reached (after giving effect to the issuance of the Top-Up Shares); provided, further, that (i) the Top-Up Option shall not be exercisable for a number of shares of Company Common Stock in excess of the shares of Company Common Stock authorized and unissued at the time of exercise of the Top-Up Option (giving effect to the shares of Company Common Stock issuable pursuant to all then-outstanding stock options, restricted stock units and any other rights to acquire Company Common Stock as if such shares were outstanding) and (ii) the exercise of the Top-Up Option and the issuance and delivery of the Top-Up Shares shall not be prohibited by any Law or Order.

68.     The Top-Up Option ensures that LFP will acquire control of at least 90% of the Company's outstanding common stock without regard to whether a single shareholder tenders their shares in the Tender Offer, and squeeze out the Company's minority common stockholders for the entirely unfair price of $2.02 per share.

69.     In reality, LFP do not even have to pay NFM for the shares issued pursuant to the Top-Up Option.  Pursuant to Section 1.04(c), the "Top-Up Consideration" may be paid by

issuance of a full-recourse promissory note by Merger Sub guaranteed by Parent in principal

amount equal to the remainder, bearing simple interest at a rate of 4%.

70.     Moreover, although Colorado law provides that a plan of merger shall be

approved by a majority of all the votes entitled to be cast on the merger, the Merger Agreement

itself demonstrates the Defendants' intent to facilitate LFP's acquisition of NFM without such a

vote.  Section 6.05(d) addresses a merger without a meeting of shareholders:

> Notwithstanding the foregoing and anything to the contrary contained in this Agreement, if, following the Offer Closing and the exercise, if any, of the Top-Up Option, the shares of Company Common Stock beneficially owned by Parent, Merger Sub and their Affiliates equal or exceed the Short Form Threshold, the parties hereto shall take all necessary and appropriate action, including with respect to the transfer to Merger Sub of any shares of Company Common Stock held by Parent or its Affiliates, to cause the Merger to become effective as soon as practicable following the Offer Closing without the Company Shareholders Meeting in accordance with Section 7-111-104 of the CBCA.

71.     Moreover, the Company has entered into an amendment (the "Rights Agreement

Amendment") to the Amended and Restated Rights Agreement dated August 1, 2008, as

amended on October 31, 2011, by and between the Company and Corporate Stock Transfer, Inc.

(the "Rights Agreement").  Pursuant to the Rights Agreement Amendment, the Rights

Agreement is inapplicable to the Proposed Transaction.  According to the Company:

> The Amendment was entered into to permit the Offer, Merger and the other transactions contemplated by the Merger Agreement to occur without triggering any distribution or other adverse event to Parent under the Rights Agreement. In particular, neither Parent, Merger Sub nor any of their Affiliates or Associates (as such terms are defined in the Rights Agreement) shall become an Acquiring Person (as such term is defined in the Rights Agreement), and a Stock Acquisition Date, a Distribution Date, a Section 11(a)(ii) Event and a Section 13 Event (as such terms are defined in the Rights Agreement) shall not occur, as a result of the approval, execution, delivery, performance or public announcement of the Merger Agreement or the consummation or public announcement of the Offer, the Merger, Top-Up Option or any of the other transactions contemplated by the Merger Agreement. In addition, the Amendment provides that the Rights Agreement shall expire immediately prior to the effective time of the Merger.

Thus, while the Rights Agreement has been rendered inapplicable to the Proposed Transaction with LFP, it remains as a barrier to any potential competing offers.

72.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction and the Proposed Transaction is the product of the Director Defendant's breaches of fiduciary duty.

### THE SCHEDULE 14D-9 FAILS TO DISCLOSE MATERIAL INFORMATION

73.     On October 29, 2012, the Company filed the 14D-9 with the SEC, which recommends that NFM shareholders accept the offer and tender all of their shares in the Tender Offer.  The 14D-9 misrepresents and omits material information necessary for NFM shareholders to make an informed decision on whether to tender their shares in the Offer.  Specifically, defendants fail to provide the Company's shareholders with material information concerning (i) the process leading to the sale of the Company; (ii) the financial analyses performed by Avondale Partners LLC ("Avondale"), the Company's financial advisor, in rendering its fairness opinion; and (iii) the Company's financial projections.

*Inadequate Disclosures Concerning the Sales Process*

74.     With respect to the process that led to the Proposed Transaction, the 14D-9 is deficient because it fails to disclose fully the following information:

a.     Whether Weiner had the permission of the board as of July 8, 2010 to begin soliciting interest in a potential transaction.

b.     Whether the board was aware of the confidentiality agreement with LFP in July 2010 and the information being provided to LFP.

c.     What form or type of "potential transaction" Weiner was contemplating when he reached out to LFP on July 8, 2010, as well as the motivating factor(s) for Weiner to explore a transaction at this time.

c.     The criteria NFM and Weiner used to identify LFP as a potential partner in a transaction.

d.      The information was supplied to LFP by NFM prior to July 27, 2010, in order to evaluate a potential transaction as well as the reasons expressed by LFP for not making an offer to acquire the Company at that time.

e.      Whether NFM had consulted with a financial advisor prior to the July 27, 2010 meeting with LFP and prior to supplying information to LFP to review.

f.      Whether NFM had discussions with any other companies regarding a potential transaction between July 27, 2010, and July 2011 and whether such discussions were solicited or unsolicited.

g.      Who initiated the contact between LFP and the Company during July 2011.

h.      The extent and scope of the personal relationship and personal business dealings between Weiner and Adam Rothstein.

i.      The specific reasons that the Special Committee retained Avondale as its advisor.

j.      The specific revisions to the Special Committee's arrangement with Avondale that would, in the case that the Company were to pursue a sale transaction, incentivize Avondale to pursue a transaction to maximize shareholder value.

k.      The primary reason that the Special Committee reduced its size form 5 to 3 in and around April 23, 2012; namely, the plan to remove Weiner and Nicholas from the Special Committee.

l.      Whether Avondale or the Special Committee requested information from Manwin and/or LFP similar to the information requested from Longkloof on or about April 6, 2012.

m.      The criteria utilized by Avondale with respect to the 20+ potential buyers contacted to solicit interest, the exact number of potential buyers contacted and the number of strategic versus financial potential buyers.

n.      The content of the call between Avondale and Mr. Rothstein on May 15, 2012.

o.      All reasons for the Board's decision to file suit against Longkloof.

p.      The basis for the Special Committee's decision that it would "preempt" its process if Manwin submitted an acquisition proposal of a minimum of $2.50 a share.

q.      The distinctions, if any, between the confidentiality agreement that the Company wanted Longkloof to sign in July 2012 and those requested of Manwin and LFP.

r.      Whether the Special Committee or Avon dale requested that Bidder C propose a cash only offer in light of the complexity of the offer received on or about July 17, 2012.

s.      The specific issues raised by Longkloof that caused it in September 2012 to value NFM "substantially below $2.00."

t.      Avondale and or the Special Committee's efforts to determine the details of Bidder C's planned financing of it $1.90 indication of interest and the specific concerns Avondale and/or the Special Committee has with Bidder C's ability to finance the transaction.

u.      Whether Longkloof, Manwin or Bidder C ties their indications of interest to the Company's Net Available Cash similar to LFP.

v.      The specific reasons that Mr. Weiner was terminated as CEO on September 15, 2012 and removed as Chairman of the Board.

w.      The specific reasons provided by Mr. Nicholas for his resignation from the Board on or about September 29, 2012.

x.      The specific reasons provided by Mr. Weiner for his resignation from the Board on or about October 10, 2012.

y.      The correspondence between Mr. Nicholas and the Special Committee/Board of Directors and Mr. Weiner and the Special Committee/Board of Directors not provided in the Proxy.

75.      The Proxy also omits material information with respect to the financial matters disclosed in the Proxy, including the analyses conducted by NFM's financial advisors, Avondale. The failure to disclose is particularly acute given that the information that should be provided to shareholders is set forth in the presentations made by Avondale to the Board.  Based on the completion of a narrowly prescribed fairness opinion, as set forth herein, the Proxy fails to

provide adequate information to evaluate both the deal and Avondale's analysis thereof as follows:

***Discounted Cash Flow Analysis*** (p.44)

1. The definition of cash flow used.

2. The inputs and assumptions to derive the range of discount rates (20.0% to 30.0%).

3. How stock-based compensation was treated in the analysis (i.e. cash or non-cash expense).

4. How, if at all, the value of the Company's NOLs was accounted for.

***Precedent Transactions Analysis*** (p.44 – 45)

1. The Enterprise Value / LTM EBIT multiples for each of the comparable precedent transactions selected by Avondale in its analysis.

2. Multiples observed by Avondale other than EV / LTM EBIT multiples for the selected precedent transactions (ex. EV / LTM Revenue).

***Comparable Company Analysis*** (p.46)

1. The following multiples for each of the comparable public companies:

   a. Enterprise Value / LTM EBIT
   b. Enterprise Value / CY2012E EBIT
   c. Enterprise Value / CY2013E EBIT
   d. Price / LTM EPS
   e. Price / CY2012E EPS
   f. Price / CY2013E EPS

***Projections***

1. The financial projections provided by New Frontier management and relied upon by Avondale for purposes of its analysis, for fiscal years 2013-2017, for the following items:
   a. Tax rate
   b. Capital expenditures
   c. Unlevered free cash flow

76.     Additionally, in the description of the calculation of multiples, Avondale states that they calculated enterprise value to LTM EPS, CY2012E EPS and CY2013E EPS; however, any multiple based on earnings should be based on *equity* value not *enterprise* value.  The same error is also found in the table used to provide the multiples in the analysis.  Avondale has "Enterprise Value to:" set over the column that contains LTM EPS, CY2012E EPS and CY2013E EPS *which should be a multiple of the comparable companies equity value not enterprise value.*  If, in fact, Avondale calculated an enterprise value-to-earnings multiple, this would represent a substantial violation of valuation practice.

## DEFENDANTS' FIDUCIARY DUTIES

77.     In light of the foregoing, the Director Defendants have breached their fiduciary duties to maximize stockholder value and have agreed to the Proposed Transaction despite a clear difference in opinion as to the merits of the Proposed Transaction as articulated by 33% of the Board.

78.     The Director Defendants' fiduciary obligations under these circumstances require them to:

a.      Undertake an appropriate evaluation of NFM's worth as a merger or acquisition candidate or in liquidation;

b.      Take all appropriate steps to enhance NFM  value and attractiveness as a merger or acquisition candidate;

c.      Act independently so that the interests of NFM's public shareholders will be protected and enhanced;

d.      Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of NFM  public stockholders;

e.      Undertake a valuation of the liquid value of NFM's assets were they to be disposed of piecemeal in a liquidation auction; and

       f.     Disclose fully and completely all material information during consideration of the Proposed Transaction.

79.    The terms of the Proposed Transaction as now proposed are unfair to the class, and the unfairness is compounded by the disparity between the knowledge and information possessed by the Director Defendants by virtue of their positions of control of NFM and that possessed by NFM's public shareholders.

80.    Defendants owe fundamental fiduciary obligations to NFM's stockholders to take all necessary and appropriate steps to maximize the value of their shares.  The Director Defendants have the responsibility to act independently so that the interests of the Company's public stockholders will be protected and to consider properly all *bona fide* offers for the Company and to immediately reject offers that are clearly not in the interest of shareholders, but instead, have been designed to benefit long-time board members.  Further, the directors of the Company must adequately ensure that no conflict of interest exists between the Director Defendants' own interests and their fiduciary obligations to maximize stockholder value or, if such conflicts exist, to ensure that all such conflicts will be resolved in the best interests of the Company's stockholders.

81.    Because the Director Defendants dominate and control the business and corporate affairs of NFM and because they are in possession of private corporate information concerning the Company's assets, businesses and future prospects, there exists an imbalance and disparity of knowledge of economic power between defendants and the public stockholders of NFM.  This discrepancy makes it grossly and inherently unfair for the special committee to continue to consider the Proposed Transaction.

82.     According to the Company's own ethical guidelines, which are posted on its website, persons in the Company with important corporate governance functions are required to adhere to the following principles, among others:

a.      Promote honest and ethical conduct, including the ethical handling of conflicts of interest;

b.      Ensure the protection of the Company's legitimate business interests, including corporate opportunities, assets and confidential information;

c.      Deter wrongdoing; and

d.      Act with integrity, including being honest and candid in all business dealings, while maintaining appropriate confidentiality of information where required or consistent with the Company's policies;

83.     The Director Defendants have breached their fiduciary and other common law duties owed to plaintiff and other members of the class, as well as their internal conduct regulations, in that they have not and are not exercising independent business judgment and have acted and are acting to the detriment of the class.

84.     Plaintiff seeks preliminary and permanent injunctive relief and declaratory relief preventing Defendants from inequitably and unlawfully depriving plaintiffs and the class of their rights to realize a full and fair value for their stock at a premium over the market price and to compel Defendants to carry out their fiduciary duties to maximize shareholder value.

85.     Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

86.     Unless enjoined by the Court, Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class and will not only prevent the sale of NFM

at a substantial premium, but facilitate the sale at an unfair price all to the irreparable harm of Plaintiff and other members of the Class.

87.     Plaintiff and the class have no other adequate remedy at law.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.      Plaintiff brings this action derivatively in the right and for the benefit of NFM to redress the injuries suffered, and to be suffered, by the Company as a direct result of the breach of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, and negligence alleged herein.  The Company is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

89.     Plaintiff will adequately and fairly represent the interest of the Company and its shareholders in enforcing and prosecuting its rights.

90.     Plaintiff is an owner of NFM common stock and has been an owner of NFM common stock at all times relevant to Defendants' wrongful course of conduct alleged herein.

91.     Plaintiff has not made any demand upon the current NFM board of directors to bring an action on behalf of the Company asserting the claims herein to recover damages for the injuries suffered by NFM for a number of reasons, primary among them the fact that Defendants have chosen the very fast moving tender process that will expire on November 27, 2012. Plaintiff could not risk making a demand on these Defendants at the risk of the entire tender process taking place before Defendants ever bothered to respond to such demand.

92.     Next, demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of NFM to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims.  Indeed, as

set forth at length herein, the conflicted nature of the Board and, in particular, the Special Committee, underscores the fact that demand would be futile.  Here, the Special Committee moved to oust the CEO and force the resignation of a board member rather that acknowledge the conflicted nature of their proceedings.

93.     Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by NFM's board of directors and incapable of ratification by the current board of directors.  Director Defendants are subject to liability for breaching their fiduciary duties to NFM by, *inter alia*, the decision to file the Longkloof litigation, terminating Weiner as CEO, and failing to detect, prevent, or halt the transgressions alleged herein.

94.     Demand is excused because all the Director Defendants face a substantial likelihood of liability in this action because of their acts and omissions alleged herein.  Director Defendants either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, proximately causing hundreds of thousands of dollars in additional legal expenses for NFM.

95.     Demand is also excused because the Directors Defendants have ratified the egregious actions outlined herein, and these same Directors Defendants cannot be expected to prosecute claims against themselves, and persons with whom they have extensive inter-related business, professional and personal entanglements, if Plaintiffs demanded that they do so. Director Defendants, because of these relationships, have developed debilitating conflicts of interest that prevent the board of directors from taking the necessary and proper action on behalf of NFM.

96.     Demand is also excused because Director Defendants participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or

negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein.

97.     Demand is also excused because insurance policies covering the liability of a Company's directors and officers purport to exclude legal claims asserted directly by the Company against such persons.  Thus, there was, and is, a substantial disincentive for NFM to bring any action directly against Director Defendants.  Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of NFM, including Director Defendants in this action, for misconduct and mismanagement.  Thus, if the policy or policies which NFM maintains contain the foregoing provision, the insurance carriers would argue that NFM and its board of directors are thereby contractually disabled from complying with any demand that would cause NFM to institute, or prosecute any action against Director Defendants for such misconduct and mismanagement; because to do so could result in the loss to NFM of its insurance coverage.  Similarly, NFM would be disabled from pursuing these Director Defendants, as it would not benefit from any insurance they may have.

98.     Demand is also excused because the Director Defendants participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly, or negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as alleged herein.

99.     Given the size, scope, and blatancy of the wrongdoing alleged above, the Director Defendants either knew of the risks or turned a blind eye to them.  Such conduct is also not

protected by the business judgment rule and exposes these Director Defendants to a substantial threat of liability in this action.

100.     Defendants lack the sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims against Defendants.

101.     The Company has been directly and substantially injured by reason of the Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

**COUNT I**
**CLASS CLAIM FOR BREACH OF FIDUCIARY DUTIES**

102.     Plaintiff repeats and realleges each allegation set forth herein.

103.     The Director Defendants are knowingly or recklessly and in bad faith violating fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of NFM and have acted to put their personal interests ahead of the interests of NFM shareholders.

104.     By the acts, transactions and courses of conduct alleged herein, the Director Defendants, individually and as a part of a common plan, have acted knowingly or recklessly and in bad faith.

105.     The Director Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by approving the Proposed Transaction without regard to the fairness of the transaction to NFM shareholders and by failing to disclose all material information concerning the Proposed Transaction to such shareholders.

106.     As demonstrated by the allegations above, the Director Defendants are knowingly

or recklessly failing to exercise the care required, and breaching their duties of loyalty, good

faith, candor and independence owed to the shareholders of NFM because, among other reasons:

      a.    they are taking steps to avoid competitive bidding, to cap the price of NFM stock and to give LFP an unfair advantage, by, among other things, failing to solicit other potential acquirers or alternative transactions;

      b.    they are ignoring or are not protecting against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction; and

      c.    they are failing to disclose all material information that would permit NFM stockholders to cast a fully informed vote on the Proposed Transaction, including both financial information and regulatory information which may materially affect the Company and the its shareholders.

107.     Because the Director Defendants dominate and control the business and corporate

affairs of NFM, and are in possession of private corporate information concerning NFM's assets,

business and future prospects, there exists an imbalance and disparity of knowledge and

economic power between them and the public shareholders of NFM which makes it inherently

unfair for them to pursue any proposed transaction wherein they will reap disproportionate

benefits to the exclusion of maximizing stockholder value.

108.     By reason of the foregoing acts, practices and course of conduct, the Director

Defendants are knowingly or recklessly and in bad faith failing to exercise ordinary care and

diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of

the Class.

109.     Unless enjoined by this Court, the Director Defendants will continue to

knowingly or recklessly and in bad faith breach their fiduciary duties owed to Plaintiff and the

Class, and may consummate the Proposed Transaction which will exclude the Class from its fair share of NFM's valuable assets and businesses, all to the irreparable harm of the Class.

110.    The Director Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the members of the Class.

111.    As a result of the Director Defendants' unlawful actions, Plaintiff and the other members of the Class are being harmed in that Director Defendants will deprive Plaintiff and the entire Class of a fair sale process.  Unless the Proposed Transaction is enjoined by the Court, the Director Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to plaintiffs and the members of the Class, will not engage in arm's-length negotiations on the Proposed Transaction terms, and will not supply to NFM's stockholders sufficient information to enable them to cast informed votes on the Proposed Transaction and may consummate the Proposed Transaction, all to the irreparable harm of the members of the Class.

112.    Plaintiff and the members of the Class have an inadequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury which the Director Defendants' actions threaten to inflict.

**COUNT II**
**CLASS CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES**

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.     LFP knowingly aided and abetted the Director Defendants in breaching their fiduciary duties owed to the public shareholders of NFM, including Plaintiff and the members of the Class.

115.     The Director Defendants owed to Plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

116.     By committing the acts alleged herein, the Director Defendants breached their fiduciary duties owed to Plaintiff and the members of the Class.

117.     LFP colluded in or aided and abetted the Director Defendants' breaches of fiduciary duties, and were active and knowing participants in the Director Defendants' breaches of fiduciary duties owed to plaintiffs and the members of the Class.

118.     LFP participated in the breach of the fiduciary duties by the Director Defendants for the purpose of advancing their own interests.  LFP is attempting to obtain both direct and indirect benefits from colluding in or aiding and abetting the Director Defendants' breaches.

119.     Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

**COUNT III**
**CLASS CLAIM FOR INDEMNIFICATION**

120.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

121.     The Director Defendants breached, *inter alia*, their fiduciary duties of care, loyalty and disclosure under Colorado law to the shareholders of NFM.

122.     Plaintiff and members of the class, as shareholders of NFM, have been harmed by reason of the Director Defendants' breaches of their fiduciary duty.

123.     As a result, Director Defendants should be required to indemnify plaintiffs and members of the class.

**COUNT IV**
**INJUNCTION**

124.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

125.    Plaintiff requests that the Court issue such injunctive orders as are necessary to restrain and enjoin defendants from consummating the Proposed Transaction.

**COUNT V**
**DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES**

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    The Director Defendants owed and owe NFM fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe NFM the highest obligation of good faith, fair dealing, loyalty and due care.

128.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to the Company.

129.    As a direct and proximate result of result of the Director Defendants' failure to perform their fiduciary obligations, NFM has been and will continue to be harmed.  As a result of the misconduct alleged herein, the defendants are liable to the Company.

**COUNT VI**
**CLAIM FOR WASTE OF CORPORATE ASSETS AGAINST THE DIRECTOR DEFENDANTS BROUGHT DERIVATIVELY ON BEHALF OF NFM**

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.  Plaintiff brings this claim derivatively on behalf of NFM.

131.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by entering into the Merger Agreement and by initiating the litigation against the Longkloof parties.

132.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.  Plaintiff, on behalf of NFM, has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment as follows:

a.     Declaring, as to the first count, this to be a proper class action and certifying plaintiffs as class representatives;

b.     Ordering the Director Defendants to fulfill their fiduciary duties to plaintiffs and the other members of the Class by announcing their intention to:

(i)     Cooperate fully with any entity or person having a bona fide interest in proposing any transactions that would maximize shareholder value, including, but not limited to, a merger or acquisition of NFM;

(ii)     Adequately ensure that no conflicts of interest exist between the Director Defendants' own interests and their fiduciary obligation to maximize shareholder value or, in the event such conflicts exist, to ensure that all conflicts of interest are resolved in the best interests of the public stockholders of NFM; and

(iii)     Act independently so that the interests of the Company's public stockholders will be protected;

c.     Ordering the Director Defendants, jointly and severally, to account to plaintiffs and the Class for all damages suffered and to be suffered by them as a result of the acts and transactions alleged herein;

d.     Awarding plaintiff the costs and disbursements of this action, including a reasonable allowance for plaintiff's attorneys' and experts' fees; and

e.     Granting such other and further relief as may be just and proper.

Plaintiff requests a jury trial.

Dated:  November 6, 2012                                    Respectfully submitted,

*Pursuant to C.R.C.P. 121, 1-26(7),a*
*duly signed copy of this pleading is on file*
*the offices of [Local Counsel]*

s/Charles W. Lilley
s/Karen Cody-Hopkins
Charles W. Lilley, #9443
Karen Cody-Hopkins, of Counsel, #35367
730 17th Street, Suite 670
Denver, CO 80202
Tel.: (303) 293-9800
Fax: (303) 298-8975
clilley@lilleylaw.com
karen@ciodyhopkinslaw.com

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
(610) 667-6200
(610) 667-9029 (fax)

***Counsel for Plaintiff***