## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-02941-JLK

CRAIG TELKE, and
WILLIAM DOUGLAS MORELAND,
Individually and on Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

NEW FRONTIER MEDIA, INC.,
ALAN ISAACMAN,
MELISSA HUBBARD,
HIRAM J. WOO, and
WALTER TIMOSHENKO,

      Defendants.

_____

## AMENDED CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS

_____

Plaintiffs Craig Telke and William Douglas Moreland ("Plaintiffs"), by their attorneys, allege upon information and belief, except for their own acts, which are alleged on knowledge, as follows:

### I.    NATURE OF ACTION

1.    Plaintiffs bring this class action on behalf of New Frontier Media, Inc.'s ("New Frontier" or the "Company") former public stockholders against four (4) of the former members of New Frontier's Board of Directors (the "Individual Defendants") for

their breaches of fiduciary duties arising out of their sale of the Company to LFP Broadcasting, LLC ("LFP Broadcasting") by means of an unfair process for an unfair price and pursuant to materially misleading disclosure documents. Additionally, Plaintiffs individually bring a claim against Defendants for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"). The acts of the Individual Defendants, former members of the Board of New Frontier Media, were not motivated by any legitimate purpose, but rather based on their desire to control the Company in order to preserve their lucrative seats on its Board as long as possible and to shepherd a sale of the Company to their preferred bidder, LFP Broadcasting, headed by defendant Alan Isaacman's ("Isaacman") close personal friend, Larry Flynt ("Flynt").

2.     Prior to the Merger (defined below), New Frontier was a leader in transactional television as well as general motion picture entertainment. The Company delivered transactional adult-themed pay-per-view networks to cable and satellite operators across the United States. Additionally, the Company provided content to video-on-demand (VOD) platforms on cable and satellite. New Frontier was co-founded by Michael Weiner ("Weiner"). In 2003, Weiner was appointed President of the Company. Weiner served as Chief Executive Officer and Chairman of the Board of New Frontier Media until his termination in September, 2012.

3.     On October 15, 2012, New Frontier announced that the Company had entered into a merger agreement (the "Merger Agreement") with LFP Broadcasting, a

Delaware corporation that offers adult entertainment through HUSTLER TV pursuant to which LFP Broadcasting, commenced a tender offer to acquire all of the outstanding shares of New Frontier for $2.02 per share in cash along with one contingent right per share to receive up to an additional $0.06 dependent on the degree to which New Frontier's available cash balance at the closing of the tender offer exceeded $11,514,000 (the "Merger").

4.     At the time of the announcement of the Merger, the board of directors of New Frontier consisted of Michael Weiner ("Weiner"), the Company's Chief Executive Officer, David Nicholas ("Nicholas"), and individual defendants Alan Isaacman, Melissa Hubbard ("Hubbard"), Walter Timoshenko ("Timoshenko") and Hiram J. Woo ("Woo") (collectively, the "Board").

5.     The tender offer expired on November 27, 2012.  On November 28, 2012, LFP Broadcasting exercised its Top-Up Option to acquire the remaining shares necessary to complete a short-form merger, and completed the Merger that day.

6.     The Board has continually increased the fees paid to its members -- the average director fee paid in cash in 2007 was approximately $40,000 as compared to 2012, in which director fees paid in cash have more than doubled and almost tripled in the case of defendant Isaacman who received $110,000 in fees in 2012, in addition to the hundreds of thousands of dollars in attorney fees his firm, Isaacman, Kaufman & Painter, has billed the Company over the years.

7.     This seemingly unlimited self-dealing was highly objectionable to Weiner and Nicholas, as well as the Company's shareholders.  Indeed, Weiner and Nicholas repeatedly objected throughout 2012 to the Individual Defendants putting their own interests ahead of those of New Frontier's shareholders by continuing to find ways to increase Board fees and other self-dealing.  Yet the Individual Defendants ignored these concerns and continued to entrench themselves.

8.     On March 9, 2012, Longkloof Limited ("Longkloof"), New Frontier's largest shareholder owning approximately 15.7% of the Company's outstanding shares, submitted a non-binding offer to acquire the Company for $1.35 per share and chastising the Board for its focus on paying itself "excessive director fees and engaging in related party transactions, rather than running the Company in the best interest of the stockholders:"  Disappointed with the Board's failure to act in shareholders' best interests, on April 26, 2012, Longkloof delivered a letter to the Company seeking to nominate a slate of four individuals for re-election to the Board at the Company's 2012 annual meeting, in which it sought to replace all members except for Messrs. Weiner and Nicholas.

9.     Rather than focusing its time and money on seeking a transaction that was in shareholders' best interests, in effort to further distract and prevent Longkloof from acquiring or otherwise gaining control of New Frontier, on May 31, 2012, the Board

commenced a lawsuit against Longkloof, accusing Longkloof of attempting to bypass the Board's sales process and coerce the Board into giving it preferential treatment.

10. The Board's decision to sue Longkloof, ***the Company's then highest bidder at that time***, was met with substantial criticism from shareholders. Upon information and belief, among the primary reasons for the Board's decision to sue Longkloof was to deter other potential suitors for the Company from submitting a higher offer. This strategy of warding off other bidders by commencing litigation against Longkloof was successful in allowing the Board to sell New Frontier to Larry Flynt ("Flynt"), founder and owner of LFP Broadcasting, for a grossly inadequate price. Indeed, after the Longkloof suit, no other bidders came forward with an offer higher than Flynt's offer, which is well below the true value of the Company.

11. In September, the Individual Defendants retaliated against Weiner and terminated his employment, accusing Weiner of being allies with Longkloof. Shortly after, Nicholas, who had already been targeted as the only independent director kept from serving on the Special Committee, was constructively removed from the Board for the same reason.

12. With Weiner and Nicholas out of the way, the Board, chaired by Isaacman, steered the sales process towards a rushed deal with LFP Broadcasting. Instead of negotiating in the best interest of the Company's shareholders, in breach of their fiduciary duties of loyalty, due care and good faith, the Board brought the tumultuous and flawed

sales process to a close by agreeing to the Merger with Isaacman's long-time friend and colleague Flynt on October 15, 2012 for grossly inadequate consideration. This rushed sale of the Company, and subsequent rapid delisting of the Company ensured that for New Frontier's Board there would be no further inquiries into the allegations of gross mismanagement and other breaches of loyalty and affirmed by the other now-ousted members of the Company's former Board.

13.    Recognizing the Company's true value, at least one Wall Street analyst had set a price target of $4.00 per share before the announcement of the Merger.  Moreover, even New Frontier's financial advisor's flawed analyses demonstrate the inadequacy of the Merger consideration.  *See* Sections V.E and F., *infra*.  As discussed below, the value for New Frontier is more than $3.00 per share and could be at least $3.49 per share or more.

14.    Defendants exacerbated their breaches of fiduciary duty by agreeing to lock up the Merger with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, pursuant to the Merger Agreement, the Individual Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides LFP Broadcasting with 3 days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay LFP Broadcasting a termination fee of

$1 million in order to enter into a transaction with a superior bidder.  LFP Broadcasting was also the beneficiary of a "Top-Up" provision that ensured that LFP Broadcasting gained the shares necessary to effectuate a short-form merger.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of New Frontier

15.    To make matters worse, on October 29, 2012, the Company filed its 14D-9 Recommendation Statement with the SEC ("Recommendation Statement") and disseminated it to the Company's public shareholders in an attempt to convince shareholders to tender their shares in the tender offer.  In contravention of the Board's duty of candor and full disclosure, and in violation of Sections 14(d)(4) and 14(e) of the Exchange Act, the Recommendation Statement failed to provide the Company's shareholders with material information and/or provided them with materially misleading information critical to the total mix of information available to the Company's shareholders concerning the financial and procedural fairness of the Merger. Without such information, New Frontier shareholders were forced to decide whether to tender their shares in the tender offer without all information necessary to make a fully informed decision.

16.    The Individual Defendants have violated the federal securities laws and breached their fiduciary duties of loyalty, due care, independence, good faith, fair

dealing, and disclosure, and New Frontier has aided and abetted such breaches by New Frontier's officers and directors. Plaintiffs seek rescission of the Merger Agreement and/or money damages.

## II.   JURISDICTION AND VENUE

17.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(d) and 14(e) of the Exchange Act. This court also has pendent jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

18.   This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

19.   Venue is proper in this district because: (i) the conduct at issue took place and had an effect in this district; (ii) New Frontier is incorporated in, and maintains its principal place of business in this district; (iii) one or more of the Defendants either resides in or maintains executive offices in this district; (iv) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this district; and (iv) Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

### III.    PARTIES

20.    Plaintiff Craig Telke was, at all relevant times, the owner of shares of New Frontier common stock.  Immediately before he was unfairly cashed out of his New Frontier stock, Mr. Telke held 300 shares of New Frontier stock.

21.    Plaintiff William Douglas Moreland was, at all relevant times, the owner of shares of New Frontier common stock.  Immediately before he was unfairly cashed out of his New Frontier stock, Mr. Moreland directly held and controlled through immediate family members 1,175,862shares of New Frontier stock which, by information and belief, made Moreland the largest non-institutional investor in New Frontier.

22.    New Frontier was a corporation organized and existing under the laws of the State of Colorado.  Prior to the Merger, the Company maintained its principal executive offices at 6000 Spine Road Suite 100 Boulder CO 80301.

23.    Defendant Alan Isaacman was Chairman of the Board of the Company from September 2012and a director of the Company from 1999 continuing until the Merger closed. Isaacman was also the Chairman of the Special Committee during the relevant period.

24.    Defendant Melissa Hubbard was a director of the Company from 2002 until the Merger closed. Hubbard was also a member of the Special Committee during the relevant period.

25.     Defendant Hiram J. Woo was a director of the Company from 2001 until the Merger closed. Woo was also a member of the Special Committee during the relevant period.

26.     Defendant Walter Timoshenko was a director of the Company from 2007 until the Merger closed. Timoshenko was also a member of the Special Committee during the relevant period.

27.     Non-party LFP Broadcasting is a Delaware corporation with its headquarters located at 8484 Wilshire Boulevard, Suite 900, Beverly Hills, CA 90211. LFP Broadcasting offers adult entertainment through HUSTLER TV, which is available through cable, satellite, telcos, and hotel/motel television providers as a video-on-demand or pay-per-view television network. Hustler TV programming includes the adult films in release, from adult studios. The company was incorporated in 2004 and is based in Beverly Hills, California. LFP Broadcasting LLC operates as a subsidiary of LFP.

## IV.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

28.     By reason of the Individual Defendants' positions with the Company as directors, they were in a fiduciary relationship with Plaintiffs and the other public shareholders of New Frontier and owed them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

29.     Under Colorado law, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-

up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

30.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

31.    Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Merger, knowingly or recklessly breached their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to Plaintiffs and the other public shareholders of New Frontier.

32.    Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Merger and, particularly, the fairness of the price offered for the stockholders' equity interest.  Defendants knowingly or recklessly breached their fiduciary duty of candor by failing to disclose all material information concerning the Merger, and/or aiding and abetting other Defendants' breaches.

## V.    FURTHER SUBSTANTIVE ALLEGATIONS

### A.    New Frontier Company Background

33.    Founded in 1997 and headquartered in Boulder, Colorado, New Frontier is a leader in transactional television and adult-themed adult entertainment in North America, Europe and Latin America.

34.    The majority of New Frontier's revenue is derived from three operating segments: Transactional TV, Film Production, and Direct-to-Consumer.

35.     The Transactional TV segment distributes branded adult entertainment PPV networks and VOD content through electronic distribution platforms including cable television and DBS operators.

36.     The Film Production segment produces and distributes mainstream and adult-themed films that are distributed through U.S. and international premium channels, PPV channels and VOD platforms.

37.     Finally, the Direct-to-Consumer segment aggregates and resells adult-themed content via the internet, selling content to subscribers through the Company's consumer websites.

**B.     The Individual Defendants Face Substantial Criticism from Shareholders and Management Concerning Excessive Director Fees and Director Self-Dealing**

38.     Despite New Frontier's subpar financial performance over the last few years, the Board has continually increased the fees paid to its members.  According to the Company's Definitive Proxy Statement on Schedule 14A for fiscal 2007, the average director fee paid in cash was approximately $40,000.  By 2012, the director fees paid in cash had more than doubled and almost tripled in the case of defendant Isaacman:

**NON-EMPLOYEE DIRECTOR COMPENSATION FOR FISCAL YEAR 2012**

| Name | Fees Earned or Paid in Cash ($)(1)(2) | | Total ($) | |
|---|---|---|---|---|
| Alan Isaacman | $ | 110,000 | $ | 110,000 |
| Melissa Hubbard | $ | 100,000 | $ | 100,000 |
| Walter Timoshenko | $ | 107,500 | $ | 107,500 |

- 13 -

| | | | |
|---|---|---|---|
| David Nicholas | $ | 87,500 | $ | 87,500 |
| Hiram Woo | $ | 105,000 | $ | 105,000 |

39.     As a publically traded company, New Frontier Media was only required to have one committee -- an Audit Committee.   However, historically members of the Company's Board have each received an annual fee of $80,000 and an additional annual fee of $7,500 for each board committed on which they serve.   The chairman of each committee receives an additional annual fee of $2,500 for his service.

40.     Despite having only six Board members, upon information and belief, whenever the Board members saw an opportunity to increase the compensation they could receive by establishing committees, the Board voted to do so.   Consequently, numerous committees have been established:   a Compensation Committee, an Audit Committee, a Nominations Committee, a Special Committee, an Executive Committee and a Compliance Committee.   Each committee the Board created resulted in additional fees paid to the members of such committee.   In summary, each of the Board Members earns more than six figures a year for their service.

41.     Upon information and belief, Longkloof and Rothstein have been challenging the Board's practices of compensating Board members with excessive and exorbitant director fees for years.   Defendant Timoshenko met with Rothstein in recent years, during which Rothstein expressed his disapproval of the Board's continuing practice to increase director fees by raising compensation levels and creating unnecessary subcommittees, which Rothstein believed was not in shareholders' best interest.

42.     According to the Recommendation Statement, the Board appointed a Special Committee consisting of Nicholas and defendants Isaacman, Woo, Timoshenko and Hubbard to oversee the process in connection with the Merger.  For serving on the Special Committee, Board members received another $5,000 per month.  The chairman of the Special Committee, Isaacman, was paid $10,000 every month.  Upon information and belief, Nicholas, insisted on serving on the Special Committee without receiving any additional compensation and urged other members to forgo their compensation.  Nicholas was told that if he were the only member who did not accept compensation for serving on the Special Committee it would look unfavorably on the rest its members.

43.     Nicholas repeatedly objected throughout 2012 to the Board putting its own interests ahead of those of New Frontier's shareholders by continuing to find ways to increase Board fees and other self-dealing.  Upon information and belief, in August 2012, Nicholas informed the Board regarding his significant concerns that the Special Committee was putting the Company at risk, while pursuing its members own self-interests, at the expense of shareholders.  The other Special Committee members did nothing to address Nicholas' concerns.

44.     In July 2012, the Board formed a Compliance Committee consisting of defendants Hubbard and Woo to purportedly investigate potential leaks in the merger process.  Nicholas objected to the formation of this unnecessary committee and to the payment of yet more director fees.  The Compliance Committee's role arguably

overlapped with duties of the numerous other committees the Board had formed, thereby allowing directors to double-dip.

45.     In addition to receiving fees for their service on the board of directors and committees, Board members also received fees for their purported outside work for the Company.  For example, Isaacman's law firm, Isaacman, Kaufman & Painter, billed the Company hundreds of thousands of dollars in attorney fees over the years.

46.     As alleged herein, this seemingly unlimited self-dealing was highly objectionable to Weiner and Nicholas, as well as the Company's shareholders.  Yet the Individual Defendants ignored the concerns of Company shareholders and Nicholas.  As discussed below, the Individual Defendants retaliated by forcing Weiner and Nicholas out of the Company.

**C.     Longkloof Makes A Play for the Company and Seeks to Replace Four Entrenched Board Members Who They Claim Were Breaching Their Fiduciary Duties By Paying Themselves Exorbitant Director and Other Fees**

47.     On January 19, 2012, in response to a request from Adam Rothstein ("Rothstein"), Longkloof's financial advisor, for an in person meeting to discuss a potential acquisition of New Frontier, Weiner and defendant Isaacman met with Rothstein to discuss a possible acquisition.   According to the Recommendation Statement, "[d]ue to his role as a representative of the Company's largest [16%] stockholder, Mr. Rothstein had the opportunity to become very familiar with the Company and its management."  The full Board met telephonically with Rothstein and

his associates on January 30, 2012 during which Rothstein, again, indicated Longkloof's interest in pursuing an acquisition of New Frontier.

48.     On February 7, 2012, Damien J. Park of Hedge Fund Solutions, LLC, an advisor to the Company,[1] informed the Board that Longkloof intended to make an offer to acquire New Frontier and was "considering changes to the Board's composition" as a result of Longkloof's view that the current Board was acting in their own self-interests by paying themselves excessive director fees and related party transactions, rather than to properly manage the Company's business affairs.

49.     As a result of Longkloof's anticipated proposal and possible proxy context, the Board formed a special committee of purported independent directors (the "Special Committee") on February 7, comprised of defendants Hubbard, Woo, Timoshenko, Nicholas and Isaacman, with Isaacman serving as Chairman, to consider Longkloof's indication, as well as to consider strategic alternatives for the Company.

50.     Longkloof submitted a letter to the Board on February 15, 2012 seeking to acquire New Frontier for $1.35 per share and requesting that the Board to except Longkloof from the Company's Rights Plan so it could engage in negotiations with the Board regarding a potential acquisition of the Company.  The Board flatly refused.

---

[1] Damien Park is the Managing Partner of Hedge Fund Solutions and a purported industry expert on shareholder activism.  Upon information and belief, the Special Committee hired Mr. Park to review, and consult with Special Committee members on the merger process.  Mr. Park had worked with New Frontier for approximately six years prior to the Merger and had advised the Company on various corporate matters.

51.     On March 9, 2012, Longkloof submitted a non-binding offer to acquire the Company for $1.35 per share and chastising the Board for its inexplicable unwillingness to engage in discussions with Longkloof regarding a potential acquisition of the Company and for the Board's focus on paying itself "excessive director fees and engaging in related party transactions, rather than running the Company in the best interest of the stockholders:"

Ladies and Gentlemen

We own approximately 15% of the outstanding shares of New Frontier Media, Inc. ("NOOF" or the "Company") and have attempted numerous times over the past few weeks to engage in meaningful discussions with you regarding our interest in acquiring NOOF. Given your continued unwillingness to engage in any constructive dialogue with us, we believe expeditious action is necessary to protect the stockholders' interest in NOOF. As a result, subject to a satisfactory due diligence review and execution of definitive documents, we hereby offer to acquire all of the outstanding shares of common stock of NOOF not beneficially owned by us at a price of $1.35 per share in cash. Our offer is not subject to financing, and we anticipate that there would be limited conditions to closing, including that NOOF obtains all necessary corporate and regulatory approvals and refrains from incurring any new or additional "change of control" or similar obligations.

Our offer of $1.35 per share represents a premium of 26% over NOOF's average closing stock price from the start of this year until February 15, 2012, the date on which we first contacted you expressing our interest in an acquisition. We believe that this offer is fair and in the best interest of the Company and its stockholders, and that the stockholders will find such a proposal attractive.

We are extremely concerned about the capabilities and behavior of NOOF's current Board. We do not believe the current Board is capable or willing to undertake the actions necessary to enable NOOF to compete in the future, as the track record established by the current Board over the past several years has been dismal. Under the Board's stewardship, we

- 18 -

have watched the Company's stock price decline over the past five years from above $9.00 per share to its current price of $1.13. Unfortunately, we believe the current Board is more focused on maintaining its excessive director fees and engaging in related party transactions, rather than running the Company in the best interest of the stockholders. We are particularly distressed about the lack of equity ownership by the directors, as evidenced by the Board's abandoning their former policy (which we understand was not even honored by all the directors when in effect) of requiring the non-employee directors to purchase the Company's shares equaling in value at least 20% of the amount of the annual board fee (after an unexplained cut from the original 50% that had been in effect for fiscal years 2007 and 2008). In fiscal year 2009 the average non-employee director for NOOF received over $90,000 in cash compensation. However, hopefully, even this Board will finally take its fiduciary duty to stockholders seriously enough to allow stockholders to decide whether or not to sell the Company at a substantial premium.

We are prepared to proceed immediately to negotiate and execute definitive documents providing for a merger of the Company with a new acquisition vehicle that we would form. We firmly believe that the Board's fiduciary duties require the Board to allow the stockholders to decide for themselves if they wish to accept this offer. Accordingly, we are also prepared to structure the transaction with an immediate front end tender offer, with protections for minority stockholders pending completion of the back end merger.

This transaction will allow stockholders the opportunity to monetize their relatively illiquid investment in the Company. In addition, following any such transaction, we expect that the Company's senior management team and employees will remain in place and continue to run the business in accordance with current practices.

This transaction is of the highest priority for us and has the full attention of our investment team and our legal advisors at Strock & Strock & Lavan LLP. As we have communicated previously, we stand ready to meet with the Board and its representatives as soon as possible. Given our ability to consummate a transaction without a financing contingency, we expect that the Board would meet with us promptly and seriously consider our offer. We sincerely hope that you will engage in meaningful dialogue without

delay so that we can work together to arrive at a negotiated transaction that will benefit NOOF and its stockholders.

While we remain optimistic that we can reach an agreement that benefits all of NOOF's stockholders in a timely manner, we are committed to protecting the value of our investment. Consequently, we are prepared to pursue any and all actions available to us in order to ensure that we maximize stockholder value. We can no longer tolerate this fatal combination of exorbitant Board fees and unfettered self-interest. Although you dismissed our initial overture as a non-offer, we would not be surprised if this Board found a way to further enrich itself at stockholder expense, given that our offer represents a clear threat to those exorbitant fees. We hereby publicly ask the Board to disclose to stockholders the cumulative amounts of all the fees and compensation (including reimbursed expenses) that they have each collected or expect to collect, as well as fees for work their respective firms have charged the Company, this fiscal year. Given that in the past five years the cash compensation to a single Board member for one year has reached as high as $97,500 and the fees to one single Board member's partnership in one single year have been described as approximately $400,000 in the Company's proxy, we feel that our request for the aforementioned disclosure is both fair and necessary given this
history of excess.

While we hope that the NOOF Board actively and thoughtfully evaluates our proposal and then allows stockholders, and not themselves, to decide whether to sell the Company at a substantial premium in an all cash transaction, we note the upcoming deadline for delivering notice to the NOOF Board regarding the intention to make proposals, including to nominate individuals for election as directors, at the 2012 annual meeting of stockholders. At this time, we are considering all of our other options in light of such deadline, including whether the recently renewed poison pill should be put to a stockholder vote and whether to propose an alternative slate of four Directors to replace Alan Isaacman, Melissa Hubbard, Hiram Woo and Walter Timoshenko for stockholders to consider.

Of course, no binding obligation on the part of NOOF or the undersigned shall arise with respect to the proposal or any transaction unless and until such time as definitive documentation satisfactory to us and approved by NOOF's Board of Directors is executed and delivered.

We look forward to discussing our proposal with you further in the near future.

52.     As alleged herein, Longkloof's accusations, of course, are not the first time the New Frontier Board has come under fire over the last few years as a result of shareholder complaints regarding the large director fees being paid to a Board that was seemingly running the Company into the ground.

53.     Longkloof's desire to keep Weiner and Nicholas on the Board of the Company (and to replace the Individual Defendants) made sense because Weiner had historical knowledge of the Company as its co-founder and Nicholas had three decades of industry experience.  In contrast, none of the Individual Defendants had any industry experience outside of the Company.

54.     After Longkloof submitted its offer letter, conflict between Longkloof and the Board developed rapidly in negotiations, and by the end of March, Longkloof announced that unless the Board acted, it may ultimately be forced to use its position as a substantial shareholder of the Company to present its offer directly to the Company's shareholders.

55.     Once Longkloof went public with its offer, the Board received two other unsolicited offers to acquire the Company -- on March 22, 2012, Manwin Holdings S.A.R.L. ("Manwin") submitted an indication of interest to acquire the Company for

$1.50 per share in cash and, on April 16, 2012, LFP Broadcasting verbally expressed an interest in acquiring the Company for $1.60 per share.

56.     On April 23, 2012, the Board removed Mr. Nicholas and defendant Woo from the Special Committee, purportedly in order to make the committee a more appropriate and manageable size.  In reality, the committee's removal of both directors was a transparent maneuver to remove Nicholas from the Special Committee and the merger process as a result of his opposition to the excessive fees being paid to the Special Committee.  Not surprisingly, just  over two months later, Woo was reinstated as a member of the Special Committee -- Mr. Nicholas was not.  As shareholders would later learn, the real reason the Board removed Mr. Nicholas from the Special Committee was because he questioned the amount of additional fees Board members agreed to pay themselves and expressed that, by doing so, the Board may be breaching its fiduciary duties.

57.     Disappointed with the Board's failure to act in shareholders' best interests, on April 26, 2012, Longkloof delivered a letter to the Company seeking to nominate a slate of four individuals for re-election to the Board at the Company's 2012 annual meeting, in which it sought to replace all members except for Messrs. Weiner and Nicholas.

**D.** **As A Result of Longkloof's Proxy Contest and Breach of Fiduciary Duty Claims, the Board Seeks Refuge Through an Acquisition With LFP Broadcasting and Flynt, With Whom Isaacman Has A Long-standing and Close Personal Relationship**

58.    After receiving bids from Longkloof, Manwin and LFP Broadcasting, which were publicly announced, on May 3, 2012, the Special Committee determined to conduct a "mini auction" in which Avondale would contact a select group of strategic and private equity buyers to solicit interest in an acquisition of New Frontier.

59.    As discussed below, the process was a sham instituted to for the purpose of avoiding further shareholder criticism by creating the appearance that the Board was properly discharging its fiduciary duties.  In reality, however, the Board and the Special Committee, with Isaacman at the helm, intended to, and did, steer the process towards a merger with LFP Broadcasting, a known protector that would not investigate into the Board's gross mismanagement of the Company.

60.    Although the Recommendation Statement asserts that Avondale contacted over 20 potential buyers on or about May 8, 2012, it provides no information regarding any discussions that took place between the Company and Avondale and these parties.

61.    Incredibly, the Special Committee instructed Avondale to not speak with Weiner who, as CEO and founder of the Company, was critical to analyzing potential offers because of his knowledge of the Company and the industry for more than a decade. The exclusion of Weiner from communications with Avondale demonstrates that even in early 2012, the Board members were only interested in arranging a sale to Flynt,

believing it was important to remove Weiner and his criticisms from that process. Moreover, while the Special Committee justified its exclusion of Weiner based on his relationship with Longkloof, the largest shareholder in the Company, no issue was raised about the 30 year relationship between Isaacman and Flynt, which was so close that it was portrayed in the 1996 Hollywood move *The People v. Larry Flynt*, with Ed Norton playing the role of Isaacman and Woody Harrelson playing the role of Flynt.

62.    Two parties that Avondale purportedly contacted, Bidder C and Bidder D, both entered into confidentiality agreements with the Company, but neither resulted in a meaningful offer.

63.    On May 23, 2012, Longkloof sent a letter to the Board amended its prior offer to increase the proposed consideration to $1.30 to $1.75 per share and seeking to retain the Company's current management in connection with an acquisition of New Frontier.

64.    On May 24, 2012, Avondale sent first round bid process letters requiring the interested parties -- Longkloof, Manwin, LFP Broadcasting, Bidder C and Bidder D -- to submit their bids by June 7, 2012.

65.    Rather than focusing its time and money on seeking a transaction that was in shareholders' best interests, in effort to further distract and prevent Longkloof from acquiring or otherwise gaining control of New Frontier, on May 31, 2012, the Board commenced a lawsuit against Longkloof, accusing Longkloof of attempting to bypass the

Special Committee's sales process and coerce the Board into giving it preferential treatment. After the Board filed its lawsuit denying Longkloof's nominees the right to stand for election, the Company's shares tumbled nearly 10%.

66.    The Special Committee determined to commence the lawsuit against Longkloof without Weiner and Nicholas' knowledge or consent, resulting in the need to have it ratified by the full Board after the fact.

67.    Upon information and belief, among the primary reasons for the Board's decision to sue Longkloof was to deter other potential suitors for the Company from submitting a higher offer for the Company. This strategy of warding off other bidders by commencing litigation against Longkloof (the highest bidder) was successful in allowing the Board to sell New Frontier to Flynt for a grossly inadequate price. After the Longkloof suit, no other bidders came forward with an offer higher than Flynt's offer, which is well below the true value of the Company. *See* Section V.F., *infra*. Had the Special Committee determined not to sue Longkloof, thereby making New Frontier a less attractive acquisition candidate, and wasted more than $700,000 in legal fees and other litigation costs to sue Longkloof, New Frontier would likely have been able to obtain a higher price for the Company.

68.    The Board's decision to sue Longkloof, ***the Company's then highest bidder at that time***, was met with substantial criticism from shareholders.

69.     June 6 and 7, 2012, the Company received first round bids -- LFP Broadcasting offered $1.85 per share in cash, Longkloof offered $1.75 per share in cash and Bidder C offered $1.81 per share in cash and "rollover" equity.

70.     On June 11, 2012, Longkloof filed counterclaims, alleging among other things, that the Board breached its fiduciary duties with respect to its actions in response to Longkloof's unsolicited offer to acquire the Company, and setting forth its allegations regarding the Board's gross mismanagement of the Company over the past five years that led New Frontier to drop over 87% in share value.

71.     Instead of finally addressing these issues raised by Longkloof and later publicly affirmed by its founder and CEO Weiner and then-Independent Director Nicholas, on July 6, 2012 the Special Committee was again restructured, with Woo reclaiming his place on the committee, yet Nicholas (who the Recommendation Statement reveals had supported Longkloof's position) still barred from his former position.

72.     On July 11, 2012 the Company entered into a settlement agreement with Longkloof in which Longkloof agreed to pursue a sale of the Company only through a consensual acquisition, also known as a "standstill" agreement

73.     The Special Committee concluded on August 22, 2012 that Longkloof and LFP Broadcasting to be the "only viable bidders with which to continue to pursue a transaction." From this point forward, however, it became strikingly clear that the only

party the Isaacman-led Special Committee was interested in transacting with was LFP Broadcasting, which, due to Isaacman's long-standing relationship with Flynt, would allow the Board to avoid any further inquiry into their gross mismanagement of the Company over the last few years.

74.    In September, the Individual Defendants retaliated against Weiner and determined to terminate Weiner's employment as then-CEO and Chairman of the Board, accusing him of being allies with Longkloof.  Shortly after, Nicholas, who had already been targeted as the only independent director kept from serving on the Special Committee, was constructively removed from the Board for the same reason. The Recommendation Statement declines to reveal the cause of either man's departure from the Company, although their roles in speaking out against the Board's gross mismanagement of the Company and breaches of their duties of loyalty were much-publicized in the mainstream media.

75.    In an October 8, 2012 letter to the Board, Nicholas lambasted the Board's actions both with regard to him and Weiner, as well as to Longkloof, summarizing the manipulative tactics of the Board during the sales "process" entirely designed to protect their own interests and hinder further inquiry into their gross mismanagement of New Frontier:

> I refer to your letter dated October 4, 2012 (and attached as an exhibit to New Frontier's Form 8-K filed on same date) responding to my resignation letter in which I set forth the reasons for my resignation, including my serious concerns

- 27 -

with actions taken by the current directors. It is shocking that the Special Committee, comprised of two attorneys and two accounting professionals, would use a publicly-filed SEC document as a platform to defend its actions with material misstatements and mischaracterizations of the events leading up to my resignation.

Let me be clear for the record that my disappointment with your transgressions and my concerns about potential breaches of your fiduciary duties should not be confused, as suggested in your letter, as malcontent or "sour grapes" caused by your decision not to re-nominate me for election at the upcoming annual meeting. I assure you that my reputation in the industry during the past thirty-two years has not, and will not, be impacted by your self-serving and transparent attempt to demonize me. I am nevertheless compelled, in the interest of full disclosure to shareholders, to address various inaccuracies in your letter and to reiterate some of the concerns you failed to address.

Your assertions that I was seeking to advance Michael Weiner's "agenda" and that our interests were aligned with Longkloof are entirely inaccurate. My support for Mr. Weiner is based on my belief that he was the best person to serve as CEO of the Company and that he was wrongfully terminated. It is a complete fabrication to insinuate that I had a conversation with Longkloof and was invited to participate in their proxy contest. In fact, I have only spoken to Adam Rothstein once in my entire life - he called me earlier in the spring and we spoke about video distribution trends. Furthermore, I disagree with your continuous attempts to portray yourselves as saviors of the Company for filing the Longkloof lawsuit and to cast my opposition to the lawsuit as an expression of favoritism towards Longkloof. A Board that was interested in maximizing shareholder value would not have wasted hundreds of thousands of dollars to sue a bona-fide acquiror and instead would have attempted to negotiate with them to raise their offer price. My intent has always been to obtain the best and highest price for the Company -

whether from Longkloof or otherwise. Any statements to the contrary have no merit.

Your allegation that I was removed from the Special Committee because I could not be trusted to act in the best interests of shareholders is a red herring designed to cloud the true circumstances of my removal. As I stated in my resignation letter, I believe I was removed from the Special Committee because I questioned the amount of additional fees its members agreed to pay themselves. Despite threats from other directors that my refusal to accept these committee fees would make them "look bad," I stand by my decision not to accept additional committee fees that I believe are excessive and unwarranted.

You have done a disservice to shareholders by failing to adequately address many of the concerns raised in my resignation letter. Your assertion that the Special Committee provided "periodic updates" to the other Board members in order to "help ensure an independent and unbiased process" is disingenuous on multiple levels. The limited updates I received regarding the strategic review process lacked substance and were designed to keep me in the dark about the interests of any potential bidders in the Company. Neither I nor the shareholders can be assured that the activities of the Special Committee, which have been going on for approximately eight months, are actually benefiting shareholders. In addition, my concerns regarding your potential business relationships, personal interests and/or agendas with respect to the strategic review process have been ignored. The issues I have raised regarding your independence also remain unaddressed.

The Special Committee has wasted corporate assets and in my view damaged the Company's business. Ultimately, each of you will be held accountable for any destruction of shareholder value that has resulted from your actions.

76. Weiner's October 10, 2012 resignation letter to the Board raised substantively the same concerns, with the former-CEO also highlighting the numerous issues he had identified in the Board's sale process:

> The Special Committee erroneously asserted that I expressed a favorable view towards Longkloof's initial acquisition proposal and acted in an "unusually friendly" manner towards representatives of Longkloof, the Company's largest shareholder. This was not the case and I was always open, and remain open, to fully considering any proposal that maximizes the value of the Company and that would provide immediate liquidity to shareholders. Nevertheless, the Special Committee shut me out of the strategic review process based on self-serving claims that I was not trustworthy. I find this remarkable since I have worked with members of the Special Committee for over a decade both as a director and executive officer and no one had ever raised any concerns about my trustworthiness until after the Company received Longkloof's proposal.

> Despite numerous requests, the Special Committee refused to provide me with meaningful information regarding its timetable and goals for the process and other aspects of the process, making it extremely difficult for me to run the business. I was also kept in the dark on the Longkloof litigation, making it impossible for me to properly address pressing inquiries from employees, shareholders, distributors and customers regarding this matter.

> - Did the Special Committee consider whether my insights into the Company and its industry would have benefited the strategic review process and potentially lead to the receipt of higher bids?
> - Did the Special Committee consider whether my insights would have assisted Avondale Partners with its valuation analysis of the Company?

- How can shareholders be assured that the activities of the Special Committee are actually benefiting shareholders?
- What is the status of the strategic review process? Shareholders have the right to know!

On September 29, 2012, David Nicholas resigned as a director of the Company as a result of disagreements with the current directors and concerns similar to mine regarding the Special Committee, the strategic review process and my termination as CEO. With my termination, the Special Committee has in my view effectively eliminated any and all opposition to its policies and practices by other directors and any semblance of a truly independent body to oversee the strategic review process. In my view, the lack of independence of the Special Committee and the current directors' failure to nominate any new, unaffiliated director nominees for election at the upcoming annual meeting should raise glaring red flags with respect to the strategic review process and any acquisition proposal that may be recommended by the Board in the coming weeks.

- Did the Special Committee treat all bidders equally and conduct a fair and exhaustive review process?
- Does any member of the Special Committee have a personal or business relationship with any representatives of the bidders?
- Why has the Special Committee not concluded the strategic review process?
- Does the current composition of the Special Committee and the circumstances surrounding the resignation of me and David Nicholas create any legal exposure for the Company in connection with any proposed acquisition?

I co-founded New Frontier in 1997 and since then have always conducted myself and my affairs, both as a director and executive officer, appropriately, responsibly and in accordance with my fiduciary duties to shareholders. It is extremely disappointing that despite my longstanding

- 31 -

devotion and contribution to the Company, the current directors have chosen to wrongfully terminate my employment in order to, in my opinion, pursue interests that I believe are contrary to those of the shareholders. I am hopeful that my resignation and the concerns I have raised herein will help ensure that the current directors redirect their focus on preserving what value is left in the Company under the watchful eyes of shareholders. I also intend to vigorously pursue my legal claims against the Company (following my wrongful termination) to prove my actions have always been in the best interests of shareholders. I cannot say the same for the current members of the Board.

77.    With Weiner and Nicholas out of the way, the Board and Special Committee, now both chaired by Isaacman, steered the sales process towards a rushed deal with LFP Broadcasting.  Instead of negotiating in the best interest of the Company's shareholders, in breach of their fiduciary duties of loyalty, due care and good faith, the Board brought the tumultuous and flawed sales process to a close by agreeing to the Merger with Isaacman's long-time friend and colleague Flynt on October 15, 2012 for grossly inadequate consideration. This rushed sale of the Company, and subsequent rapid delisting of the Company ensured that for New Frontier's Board there would be no further inquiries into the allegations of gross mismanagement and other breaches of loyalty made by Longkloof and affirmed by the other now-ousted members of the Company's former Board.

**E.      To Hinder Further Inquiry Into Their Gross Mismanagement of New Frontier, the Board Enters Into the Merger With Isaacman's Long-Standing Friend and Colleague, Flynt of LFP Broadcasting**

78.     Following this unfair and materially conflicted sales process and despite the Company's recent strong performance and positioning for robust growth, in a press release dated October 15, 2012, the Company announced that it had entered into a Merger Agreement with LFP Broadcasting, pursuant to which LFP Broadcasting, would acquire the Company through a tender offer for $2.02 per New Frontier share, with shareholders eligible to receive up to $0.06 more per share dependent on New Frontier's cash balance at the closing of the tender offer.

79.     The Merger consideration is grossly unfair and significantly undervalues the Company. LFP Broadcasting is attempting to acquire the Company at the most opportune time, when New Frontier shares are trading at artificially deflated prices.  In particular, the Merger consideration does not account for the Company's recent expansion into international markets for Transactional TV, in 2009 expanding services into international markets in North America, Europe and Latin America, and most recently, Asia, from which New Frontier received $6.2 million of Transactional TV segment VOD and PPV revenue in 2012.

80.     In addition, on April 5, 2012, the Company announced a new content and development agreement with Bluebird Films, an industry leader in global content production with studios in London, Prague and Las Vegas. The content is expected to be

provided worldwide to cable and satellite operators for distribution through New Frontier's PPV and VOD channels. The agreement included a commitment from Bluebird to develop and produce 250 hours of original content beginning in April 2012 that initially would be provided exclusively to New Frontier's worldwide cable and satellite customers. Additionally, over 2,500 high-definition scenes from Bluebird's existing library were to be available for worldwide distribution. The agreement also included an option to acquire up to 900 additional hours of scenes, to be produced over a three year term.

81.     Recognizing the Company's value, at least one Wall Street analyst had set a price target of $4.00 per share before the announcement of the Merger.  Moreover, even New Frontier's own financial advisor's analyses demonstrate the inadequacy of the Merger consideration. Specifically, even after what appears to be a manipulation of the data and inputs to achieve the lowest implied value for the Company upon which it could opine was a "fair" price, Avondale's *Premiums Paid Analysis* implies ranges of equity value per share still reflected prices for New Frontier as high as $3.67, $3.58, $4.37, $3.07, $3.25 and $3.65 -- all significantly higher than the Merger consideration.

82.     Most importantly, however, the Merger fails to adequately compensate New Frontier's shareholders for the significant benefits that LFP Broadcasting will receive from the merger.

83.     The Merger is a strategic merger for LFP Broadcasting. As stated in an October 15, 2012 Denver Post article:

> Such a deal could make waves in the adult entertainment industry, said Don Parret, executive director of publishing for industry trade publication XBIZ. The move to combine these two established adult entertainment brands is certainly a blockbuster move, one that would potentially establish a worldwide market leader for video-on-demand and pay-per-view sales of adult content . . .

84.     As described in a November 1, 2012 analysis by *Seeking Alpha* on the deal, with LFP Broadcasting's acquisition of New Frontier, "[T]his acquisition makes Larry Flynt one of the biggest business owners in the adult entertainment industry."  This major consolidation of the market was noted by an October 16, 2012 *Business Insider* article, "Larry Flynt Beat Playboy In A Huge Adult Entertainment Consolidation," as especially relevant as it leads to Flynt "owning both the content production side and the TV distribution channels" of the adult entertainment industry.

85.     In light of these significant synergies, LFP Broadcasting officers have not been shy about proclaiming their glee with the Merger and the significant benefits LFP Broadcasting will gain from exploiting New Frontier's leading position in the adult-themed entertainment market.   According to *Business Insider*, LFP Broadcasting President Michael H. Klein noted: "The acquisition of New Frontier Media fits perfectly with our strategic plan for the growth of our company. The addition of these assets to our portfolio strengthens us significantly moving forward."

86.     However despite these significant synergies inherent in the transaction for LFP Broadcasting, as noted by analysts across the country, and proclaimed by LFP Broadcasting's President himself, the Board failed to secure a fair deal for the Company, either for the intrinsic value of its assets or the value of the Company's assets to LFP Broadcasting in a combined entity.

**F.     The Inadequate Merger Price And Avondale's Flawed Fairness Opinion**

87.     The Merger consideration is inadequate and does not adequately compensate New Frontier's shareholders for the Company's strong financial and operational performance and significant growth prospects described above.  Significantly, the $2.02 per share price that Avondale concluded was "fair" was predicated upon Avondale's flawed analysis in which Avondale manipulated the key inputs in its analyses to reach the desired conclusion and failed to adequately consider the value of the synergies to be realized by the combined company.  As discussed above (Section V.E., *supra*), even after Avondale's data manipulations, the high end of the prices in certain analyses was well above the Merger consideration.

**1.     Avondale's Inappropriate Use of EBIT Multiples In Its Analyses**

88.     Avondale inappropriately used EBIT (earnings before interest and taxes) multiples, rather than EBITDA (earnings before interest, taxes, depreciation and amortization) multiples in its *Discounted Cash Flow Analysis*, *Precedent Transactions*

*Analysis*, and *Comparable Companies Analysis*. Avondale's use of EBIT multiples is problematic for several reasons.

89.     *First*, depreciation and amortization are *non-cash* expenses resulting from the purchases of fixed and intangible assets, which are excluded from EBITDA but included in EBIT, thereby resulting in a lower figure when using EBIT. New Frontier's LTM capital expenditures totaled $1.51 million for fiscal 2011 while its LTM depreciation and amortization expenses for fiscal 2011 totaled $13.28 million, or nearly 8.8x the actual cash outlay for capital expenditures.[2] Thus, Avondale's use of EBIT rather than EBITDA resulted in a substantially lower value for the Company than it otherwise would have if it appropriately used EBITDA multiples.

90.     In order to provide a truly fair analysis, Avondale should have used Revenue and EBITDA multiples – both of which avoid the distortive effects of New Frontier's temporarily high depreciation and amortization expenses and are also more-widely used in fairness opinion analyses.

91.     In addition, in Avondale's *Discounted Cash Flow Analysis*, the range of terminal EBIT multiples Avondale selected of 5x to 7x lie far below Avondale's own observations of market-derived EBIT multiples. Indeed, Avondale's entire selected range

---

[2] Furthermore, this level of depreciation and amortization is unsustainably high based on current capital spending. Although depreciation and amortization expenses eventually equal the capital expenditures upon which they are based, they only do so with a lag. As a result, New Frontier's future depreciation and amortization charges will fall (and its EBIT and EPS rise, all other things equal) as the accounting treatment of larger historical expenditures gives way to that based on the more-recent, lower expenditures.

lies below the lowest LTM EBIT multiple observed among the 35 acquisitions it examined, and reflect a fraction of the 17.9x median.  Similarly, Avondale's range was far below the 10.7x LTM median from the comparable public companies it examined, the lowest of which reflected a 5.9x LTM multiple. Thus, Avondale not only used a multiple that reflected an inherent pessimistic bias (relative to the more widely used EBITDA multiple), but compounded this negative bias by selecting an inappropriately low range of multiples.

92.     Moreover, in its *Precedent Transactions Analysis*, Avondale examined LTM EBIT multiples in 35 comparable transactions.  However, because New Frontier's LTM EBIT multiple was negative, this analysis yielded no meaningful results.  As admitted in the Recommendation Statement, Avondale "was unable to calculate an implied value for the Company using LM EBIT multiples because the Company's LTM EBIT was negative."  Had Avondale used EBITDA multiplies that excluded the large depreciation and amortization expenses, it could have conducted a more meaningful *Precedent Transactions Analysis*.

93.     Further, in Avondale's *Comparable Companies Analysis*, Avondale purports to have examined LTM 2012 and 2013 EBIT multiples for New Frontier and its peer group. EBIT multiples, however, were not available for all of the selected companies in each period, as detailed below:

- FriendFinder: 2013 EBIT estimates were not available.
- LodgeNet: Neither 2012 nor 2013 EBIT estimates were available.

- Outdoor Channel: 2013 EBIT estimates were not available.
- Private Media: Neither 2012 nor 2013 EBIT estimates were available. In addition, Private Media had not reported financial statements since September 30, 2011. Consequently, Avondale could not have calculated any EBIT multiples (or EPS multiple, for that matter) for Private Media.
- Rick's Cabaret: Information was available to calculate all three EBIT multiples.

94.     Thus, contrary to the representation in the Recommendation Statement, Avondale could not have looked at all of these multiples because the information does not appear to exist.    Moreover, had Avondale looked at revenue and/or EBITDA multiples for which there was more available information, it would have resulted in a more meaningful analysis for shareholders.

95.     Had Avondale used more appropriate EBITDA and revenue multiples in its analyses, it would have yielded indicated values for New Frontier over $3.00 per share and as high as $3.49 per share.

> **2.     Avondale Selected Companies That Are Not Comparable To New Frontier In Its Selected Companies Analysis, Resulting In A Lower Implied Value For The Company**

96.     In Avondale's *Comparable Companies Analysis*, it selected companies with low multiples that were not comparable to New Frontier at all in order to bring down the implied per share valuation for the Company.

97.     For example, FriendFinder was not in compliance with debt covenants, which was waived by the indenture trustee in March and June of 2012, but not in September 2012.   LodgeNet, similarly, was in violation of its debt covenants as of

September 30, 2012, entered into a forbearance agreement on October 15, 2012 and ultimately filed for Chapter 11 on February 28, 2013.Private Media Group had not reported its financial results for more than a year prior to Avondale's presentation to New Frontier's Board.  New Frontier, by contrast, was current with respect to its financial reporting and had *no debt*.

98.    Moreover, four of the six pricing multiples Avondale examined in its *Comparable Companies Analysis* were unusable. LTM and 2012 EBIT multiples did not render meaningful results when applied to New Frontier because the Company's EBIT was negative for the LTM period and 2012 projected EBIT was temporarily depressed, thereby resulting in an unreliable value indication. Similarly, New Frontiers' LTM and 2012 EPS figures were negative.[3]

99.    As demonstrated above, as a result of the Individual Defendant's reliance on the grossly flawed banker analysis, their failure to consider the Company's strong financial performance (Section V.A., *Supra*) and the significant synergies (Section V.E., *Supra*) inherent in a transaction with LFP Broadcasting, the Individual Defendants failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to LFP Broadcasting, that would maximize shareholder value, to the detriment of New Frontier's shareholders.

---

[3] Avondale also used an abnormally high discount rate range of 20% to 30%. Such high rates of return are not consistently realized even from venture capital investments. According to calculations prepared by Bloomberg, LP, the highest weighted-average cost of capital for New Frontier's selected peer group was a much-more reasonable 11.8%.

### G.    The Preclusive Deal Protection Devices

100.    To ensure these lucrative benefits for themselves, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Merger a *fait accompli* and ensure that no competing offers will emerge for the Company.

101.    Section 6.04 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by LFP Broadcasting.  Section 6.04(a) also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

102.    Pursuant to Section 6.04(d) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify LFP Broadcasting of the bidder's identity and the terms of the bidder's offer within 48 hours. Thereafter, the Board must provide LFP Broadcasting three days in which the Company must negotiate in good faith with LFP Broadcasting (if LFP Broadcasting so desires) and allow LFP Broadcasting to amend the terms of the Merger Agreement to make a counteroffer so that the superior proposal is no longer superior. In other words, the Merger Agreement gives LFP Broadcasting access to any rival bidder's information and allows LFP Broadcasting a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly

assures that any "auction" will favor LFP Broadcasting and piggy-back upon the due diligence of the foreclosed second bidder.

103.   Section 8.06 of the Merger Agreement provides that a termination fee of $1 million must be paid to LFP Broadcasting by New Frontier if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

104.   LFP Broadcasting was also the beneficiary of a "Top-Up" provision that ensured it gained the shares necessary to effectuate a short-form merger. Pursuant to the Merger Agreement, if LFP Broadcasting receives 90% of the shares outstanding through its tender offer, it can effect a short-form merger. In the event LFP Broadcasting fails to acquire the 90% required, the Merger Agreement also contains a "Top-Up" provision that grants LFP Broadcasting an option to purchase additional shares from the Company in order to reach the 90% threshold required to effectuate a short-form merger.   On November 27, 2012, LFP Broadcasting received 83.1% of the Company's outstanding share in the tender offer.   On November 28, 2012, it exercised the Top-Up Option to acquire the rest of the shares necessary to effect a short form merger.

105.   Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an

alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

106.   The Merger was wrongful, unfair and harmful to New Frontier's public shareholders, and was not in the Company's or the shareholders' best interests.  As a result of defendants' conduct, New Frontier's public shareholders were denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company.  The deal reflected in the Merger does not represent the true inherent value of the Company, and the deal protection devices are preclusive and prevented the Board from ensuring an acquisition that maximized shareholder value and was in the Company's and the shareholders' best interests.

**H.    New Frontier's Materially Misleading Recommendation Statement**

107.   To make matters worse, on October 29, 2012, the Company filed its Recommendation Statement with the SEC and disseminated it to the Company's public shareholders in an attempt to convince shareholders to tender their shares in the tender offer. The Recommendation Statement failed to provide the Company's shareholders with material information and/or provided them with materially misleading information critical to the total mix of information available to the Company's shareholders concerning the financial and procedural fairness of the Merger. Without such information, New Frontier shareholders were forced to decide whether to tender their

shares in the tender offer without all information necessary to make a fully informed decision.

108.    The Recommendation Statement, which recommended that New Frontier shareholders tender their shares in the Merger, contained numerous material omissions and misstatements, in contravention of the Board's duty of candor and full disclosure and in violation of Sections 14(d)(4) and 14(e) of the Exchange Act.

### 1.    Materially Incomplete and Misleading Disclosure Concerning Management's Financial Projections

109.    The Recommendation Statement failed to disclose the following material information regarding the management-prepared financial projections provided to Avondale and relied upon by Avondale in its analyses:

(a)    The reason for which the Company provided two separate sets of financial projections to Avondale;

(b)    The reason for which prospective bidders were given a third set of financial projections on May 16, 2012;

(c)    Whether Avondale also was given the third set of financial projections;

(d)    The assumptions underlying all three of management's financial forecasts; and

(e)    Free cash flows forecasted by management for fiscal years 2013 through 2017 for Management I Forecast and Management II Forecast.

110.   It is well-settled that management's financial projections are the lifeblood of the Company and are crucial to providing shareholders with management's inside view of the Company's value and future prospects necessary for making an informed decision about whether to tender their shares.

### 2.   Materially Incomplete and Misleading Disclosures Concerning Avondale's Financial Analyses

111.   The financial analyses prepared by New Frontier's financial advisor and included in its Fairness Opinions were materially incomplete and misleading in a number of respects.   Specifically, Defendants failed to disclose in the Recommendation Statement:

(a)   With respect to the *Discounted Cash Flow Analysis*: (i) the projected cash flows utilized in the analysis; (ii) the definition of cash flow utilized in the analysis; (iii) the reason for which Avondale utilized Management I and Management II Forecasts in the analysis, but declined to utilize Management III Forecast; (iv) the method by which the ranges of terminal value multiples and discount rates were determined; (v) how NOLs were accounted for; and (vi) how stock-based compensation was treated.

(b)   With respect to the *Precedent Transactions Analysis*: The criteria used to select the transactions utilized in the analysis, the LTM EBIT multiples observed for each transaction utilized in the analysis, and; the conclusions of the analysis;

(c)     With respect to the *Comparable Company Analysis*: the criteria used to select the companies utilized in the analysis, and; the multiples observed for each company utilized in the analysis;

(d)     With respect to the *Premiums Paid Analysis*:  The transactions utilized in the analysis as well as the criteria used to select these transactions, and the dates on which these transactions occurred; the reason for which Avondale excluded transactions involving financial institutions and real estate investment trusts (REITs), and; the premiums observed for each transaction utilized in the analysis.

112.   These material facts that were used by Avondale in the financial analyses supporting its fairness opinion presented to the Board were critical to New Frontier's shareholders' ability to assess the credibility of Avondale's analyses upon with the Board relied in recommending the Merger and were necessary to provide shareholders with a fair summary of Avondale's analyses and work.

### 3.     Materially Incomplete and Misleading Disclosures Concerning the Flawed Process and Conflicts of New Frontier's Board, Management and Financial Advisor

113.   The Recommendation Statement also failed to disclose the following material information concerning the sales process and conflicts of New Frontier's Board, financial advisor, and management:

(a)     The reason for which Weiner contacted LFP Broadcasting on July 8, 2010, inquiring as to whether LFP Broadcasting would have an interest in a potential

transaction with the Company, whether he was acting under the direction of the Board at this time, and whether the Company reached out to any other parties at this time to gauge interest in a potential transaction;

(b)     The circumstances surrounding the Company's discussions with LFP Broadcasting in July 2011, including but not limited to, who initiated these discussions, and for what purpose;

(c)     Information regarding the Special Committee's sales process described as being in its early stages on February 22, 2012, including whether the Special Committee had identified and contacted any potential bidders at this stage;

(d)     The reason for which on February 29, 2012 and March 1, 2012 Nicholas informed Longkloof's Adam Rothstein that he could not speak with him until "events are settled;"

(e)     The reason for which Longkloof wished to replace all members of the Board other than Weiner and Nicholas;

(f)     Information regarding Weiner's "personal relationship and personal business dealings" with Rothstein;

(g)     The "various qualifications" the Special Committee was seeking for an investment banking firm, as discussed on March 26, 2012, as well as the reason for which the Special Committee decided to retain Avondale as its financial advisor on March 30, 2012;

(h)     The strategic alternatives evaluated by Avondale, from April 3, 2012 until the signing of the Merger Agreement;

(i)     Whether Avondale received the list of "all parties that over the past year had expressed an interest in some type of a strategic transaction or business combination with the Company" it requested from the Company on April 9, 2012, and if so, how many parties the list contained, how many of those parties were ultimately asked to participate in the sales process, and the criteria used to determine which parties to solicit interest from;

(j)     Details concerning the communications Avondale had engaged in with interested parties discussed by Avondale and the Special Committee on April 9, 2012;

(k)     The reason for which Avondale believed on April 9, 2012, that "none of the in-bound calls from private equity firms were from parties with any serious and/or credible interest in pursuing an acquisition of the Company," as well as the criteria Avondale used to determine credible interest;

(l)     The reason(s) the Board determined to commence a lawsuit against Longkloof on May 31, 2012;

(m)     The criteria used in the selection of the potential acquirers contacted during the process, the content of any discussions and negotiations held between the Company and Avondale, and any of these potential buyers;

(n)     Whether Longkloof, Manwin or Bidder C tied their indications of interest to the Company's Net Available Cash as did LFP Broadcasting;

(o)     The reason for which the Special Committee viewed LFP Broadcasting and Longkloof as the only viable bidders on August 22, 2012;

(p)     The reason for which Weiner's employment was terminated on September 15, 2012, and Isaacman was selected to succeed Weiner as Chairman of the Board;

(q)     The reasons for which Nicholas tendered his resignation as a director of the Company on September 29, 2012, and Weiner tendered his resignation as a director of the Company on October 10, 2102; and

(r)     Information regarding the conflicts of Avondale, including whether or not Avondale has worked as a "market maker (or otherwise)" in New Frontier and what "long or short position" in the Company Avondale may have held during the course of negotiations of the Merger.

114.    Accordingly, Plaintiffs seek rescission of the Merger Agreement and/or money damages.

## VI.    CLASS ACTION ALLEGATIONS

115.    Plaintiffs bring their breach of fiduciary duty claims asserted in this action as a class action pursuant to Section 23 of the Colorado Rules of Civil Procedure on behalf of all persons and/or entities that own New Frontier common stock (the "Class").

Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

116.   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in the Class. According to the Merger Agreement, as of October 12, 2012, the Company had 16,264,213 shares of common stock outstanding.  All members of the Class may be identified from records maintained by New Frontier or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

117.   Questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)   Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, and due care with respect to Plaintiffs and the other members of the Class in connection with the Merger;

(ii)   Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonably under the

circumstances for the benefit of Plaintiffs and the other members of the Class in connection with the Merger;

(iii)   Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

(iv)   Whether the Individual Defendants breached any of their other fiduciary duties to Plaintiffs and the other members of the Class in connection with the Merger, including the duties of good faith, diligence, honesty and fair dealing;

(v)   Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(vi)   Whether Plaintiffs and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(vii)   Whether New Frontier aided and abetted the Individual Defendants' breaches of fiduciary duty;  and

(viii)   Whether the Class entitled to injunctive relief or damages as a

result of defendants' wrongful conduct.

118.   Plaintiffs' claims are typical of the claims of the other members of the

Class. Plaintiffs and the other members of the Class have sustained damages as a result of

Defendants' wrongful conduct as alleged herein.

119.   Plaintiffs will fairly and adequately protect the interests of the Class, and

have no interests contrary to or in conflict with those of the Class that Plaintiffs seek to

represent.

120.   A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy. Plaintiffs know of no difficulty to be

encountered in the management of this action that would preclude its maintenance as a

class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Section 14(d)(4) and 14(e) of the Exchange Act**
**(Brought Individually Against Individual Defendants)**

121.   Plaintiffs repeat all previous allegations as if set forth in full herein.

122.   Plaintiffs bring this claim individually and not on behalf of a class.

123.   Defendants issued the Recommendation Statement with the intention of

soliciting shareholder support of the Merger.

124.   Sections 14(d)(4) and 14(e) of the Exchange Act require full and complete

disclosure in connection with tender offers.  Specifically, Section 14(e) provides that:

- 52 -

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative

125.   The Recommendation Statement violates the Sections 14(d)(4) and 14(e) because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

126.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiffs, and Plaintiffs and the Class were deprived of their entitlement to make a fully informed decision on whether to tender their shares in the tender offer and have been damaged thereby.

## COUNT II
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

127.   Plaintiffs repeat all previous allegations as if set forth in full herein.

128.   The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the public

- 53 -

shareholders of New Frontier and have acted to put their personal interests ahead of the interests of New Frontier shareholders.

129.    The Individual Defendants' recommendation of the Merger will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize New Frontier's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

130.    The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of New Frontier because, among other reasons:

(a)    they failed to take steps to maximize the value of New Frontier to its public shareholders and took steps to avoid competitive bidding;

(b)    they failed to properly value New Frontier; and

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Merger.

131.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiffs and the Class have suffered irreparable injury in that they have not and will not receive their fair portion of the value of New Frontier's assets and will be prevented from benefiting from a value-maximizing transaction.

132.    Plaintiffs and the Class have no adequate remedy at law.

**COUNT III**
**Breach of Fiduciary Duty -- Disclosure**
**(Against Individual Defendants)**

133.    Plaintiffs repeat all previous allegations as if set forth in full herein.

134.    The fiduciary duties of the Individual Defendants in the circumstances of the Merger require them to disclose to Plaintiffs and the Class all information material to the decisions confronting New Frontier shareholders.

135.     As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

136.    As a result, Plaintiffs and the Class members are being harmed irreparably.

137.    Plaintiffs and the Class have no adequate remedy at law.

**COUNT IV**
**Aiding and Abetting**
**(Against New Frontier)**

138.    Plaintiffs repeat all previous allegations as if set forth in full herein.

139.    As alleged in more detail above, Defendant New Frontier aided and abetted the Individual Defendants' breaches of fiduciary duties.

140.    As a result, Plaintiffs and the Class members were harmed.

141.    Plaintiffs and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiffs demand judgment against defendants jointly and severally, as follows:

(A)    declaring this action to be a class action and certifying Plaintiffs as the Class representatives and their counsel as Class counsel;

(B)    declaring that the Recommendation Statement is materially misleading and contains omissions of material fact in violation of Sections 14(d)(4) and 14(e) of the Exchange Act;

(C)    rescinding the Merger or awarding Plaintiffs and the Class recessionary damages;

(D)    directing that Defendants account to Plaintiffs and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)    awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts; and

(F)    granting Plaintiffs and the other members of the Class such further relief as the Court deems just and proper.

DATED:  May 15, 2013                    Respectfully submitted,

                                        DYER & BERENS LLP
                                        ROBERT J. DYER III
                                        JEFFREY A. BERENS


                                              /s/ JEFFREY A. BERENS
                                        _____
                                              JEFFREY A. BERENS

                                        303 East 17th Avenue, Suite 810
                                        Denver, CO  80203
                                        Tel:  303-861-1764
                                        Fax: 303-395-0393
                                        bob@dyerberens.com
                                        jeff@dyerberens.com

                                        LEVI & KORSINSKY, LLP
                                        SHANNON L. HOPKINS
                                        JOY KARUGU
                                        30 Broad Street, 24th Floor
                                        New York, NY  10004
                                        Tel: 212-363-7500
                                        Fax: 212-363-7171
                                        shopkins@zlk.com
                                        jkarugu@zlk.com

                                        CRANE DUNHAM PLLC
                                        STEPHEN J. CRANE
                                        JASON T. LEEHAN
                                        2121 Fifth Avenue
                                        Seattle, WA 98121
                                        Tel: 206-292-9090
                                        Fax: 206-292-9736
                                        scrane@cranedunham.com
                                        jleehan@cranedunham.com

                                        *Counsel for Plaintiffs*